UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CASE NO. 5:15-CV-105-TBR

DEERE & COMPANY,                                    PLAINTIFF/COUNTER-DEFENDANT

v.

FIMCO INC., d/b/a/ SCHABEN
INDUSTRIES,                                         DEFENDANT/COUNTER-CLAIMANT

## MEMORANDUM OPINION AND ORDER

Plaintiff Deere & Company ("Deere") brings this action alleging that Defendant FIMCO Inc. ("FIMCO") is using Deere's green and yellow color scheme on agricultural equipment in violation of federal trademark and common law. There are currently several pending motions ripe for adjudication by the Court, most notably the parties' cross-motions for summary judgment. Deere has filed a motion for partial summary judgment on its claim of trademark dilution, FIMCO's affirmative defense and counterclaim of functionality, and FIMCO's affirmative equitable defenses. [DN 99.] FIMCO responded. [DN 115.] Deere replied. [DN 141.] For the reasons stated herein, the Court will **DENY** Deere's motion with respect to its dilution claim and FIMCO's affirmative defenses of acquiescence and estoppel and **GRANT** its motion with respect to FIMCO's defense and counterclaim of functionality and FIMCO's affirmative defenses of laches and implied license.

FIMCO has moved for summary judgment finding that Deere has no trademark rights in yellow tanks, that Deere's registered trademarks have not become incontestable, and that farmers want their agricultural equipment to match their tractors. [DN 100.] Deere responded. [DN 113.] FIMCO replied. [DN 124.] For the reasons stated herein, FIMCO's motion is **DENIED**.

BACKGROUND

Although the parties dispute various factual matters, which will be addressed in detail below, the basic facts of the action are not in dispute. Deere sells tractors and towed and trailed agricultural equipment in "[i]ts distinctive green and yellow 'Deere Colors.'" [DN 98 at 8 (Deere's Memorandum in Support).] Deere has three trademarks registered with the United States Patent and Trademark Office (PTO) pertaining to the use of its green and yellow color scheme on its equipment. [DN 1-2 at 2; DN 1-3 at 2; DN 1-4 at 2.] The first of these registered trademarks, Reg. No. 1,502,103 (the '103 Registration), was obtained in 1988 and covers green and yellow "agricultural tractors, lawn and garden tractors, trailers, wagons, and carts," specifically those with green bodies/frames and yellow wheels. [DN 1-3 at 2.] The second, Reg. No. 1,503,576 (the '576 Registration), was obtained in 1988 and covers green and yellow "wheeled agricultural, lawn and garden, and material handling machines." [DN 1-2 at 2.] The third and most recent registration, Reg. No. 3,857,095 (the '095 Registration), was obtained in 2010 and covers "tractor-towed agricultural implements," including, among others, "fertilizer spreaders" and "nutrient applicators" with green bodies and yellow wheels. [DN 1-4 at 2.] In addition to its registered trademarks, Deere asserts common law trademark protection of its green and yellow color combination. [DN 1 at 8–9.]

FIMCO manufactures both lawn and garden sprayers, its main source of business, and agricultural equipment, "which is a much smaller line of products for FIMCO." [DN 100-1 at 2.] The agricultural equipment FIMCO manufactures includes towed agricultural sprayers and nutrient applicators, which FIMCO offers in multiple colors, including green and yellow. [*Id.*]

Deere claims that it first learned of FIMCO's allegedly infringing use in 2011 and tried, unsuccessfully, to persuade FIMCO to cease the use of the green and yellow color combination.

[DN 98 at 12.] Deere then brought suit against FIMCO on April 27, 2015, alleging that FIMCO is engaging in infringing activity by selling its sprayers and other agricultural equipment "bearing the Deere Colors or green bodies with yellow wheels or tanks." [DN 1 at 5.] Deere asserts four causes of action: 1) trademark infringement in violation of 15 U.S.C. § 1114, 2) federal false designation of origin and unfair competition in violation of 15 U.S.C. § 1125(a), 3) trademark dilution in violation of 15 U.S.C. § 1125(c), and 4) common law trademark infringement. [*Id.* at 6–9.] Deere seeks a permanent injunction prohibiting FIMCO from "using the Deere Colors trademark in connection with its sprayers and wheeled agricultural equipment, as well as an injunction ordering [FIMCO] to cease using yellow tanks or wheels in connection with wheeled agricultural equipment having green vehicle bodies." [*Id.* at 1–2.]

FIMCO denies having engaged in any infringing activity, claims that it and its alleged predecessor in interest, J-D-D Lubricants Co. ("JDD"), have long used yellow and green on its equipment, and asserts, in defense, that Deere's claims are barred by the doctrines of laches, estoppel, implied license, acquiescence, and functionality. [DN 5 at 7.] In addition to these defenses, FIMCO brought four counterclaims against Deere. [*Id.* at 13–16.] The first, second, and fourth claims seek a declaratory judgment finding that FIMCO has not infringed on or diluted Deere's trademarks, has not unfairly competed, and has not falsely designated the origin of FIMCO's products. [*Id.*] FIMCO's third claim seeks to have Deere's trademarks held invalid and cancelled pursuant to 15 U.S.C. § 1119 on the grounds that Deere's yellow and green colors are functional and therefore cannot comprise valid trademarks. [*Id.* at 15.]

DISCUSSION

I.    **Preliminary Motions**

Before the Court can proceed to the parties' summary judgment motions, it must first address several other non-dispositive motions that are currently pending.

   A. **FIMCO's Motion *in Limine* to Exclude Testimony of Deere's Expert William Shanks [DN 95]**

FIMCO requests that the Court, pursuant to the standards set out in *Daubert* and Federal Rule of Evidence 702, exclude all testimony from Deere's expert, William Shanks. [DN 95.] Deere responded. [DN 110.] FIMCO replied. [DN 123.] For the following reasons, FIMCO's motion is denied.

Shanks has, since 1998, been an investigator at a firm called Marksmen, Inc., "a private investigation firm that focuses on intellectual property investigations." [DN 110-1 at 1.] Marksmen "primarily assists trademark and other intellectual property attorneys in investigating the use of trademarks or other intellectual property, so the intellectual property owners can prosecute or defend infringement claims." [*Id.*] As the Lead Investigator at Marksmen, Shanks' duties include "investigating possible infringement, locating witnesses, and supervising other intellectual property investigators." [*Id.*] At the request of Deere, Shanks conducted an investigation and wrote a report based upon his findings. In his Declaration, Shanks summarized his investigation as follows:

> Over several weeks in June 2016, I spoke with a total of 20 salespeople at different dealership locations, and with 18 of those 20 salespeople, I said something very close to the following: "I always thought [or assumed] that yellow/green farm equipment was made by . . . ." or "I always thought [or assumed] that the yellow/green coloring looked like . . . ." I would not finish the sentence, but would pause, to see if the sales personnel would finish the sentence. Each time I raised this unfinished sentence (18 of 18 times) the salesperson responded to my partial sentence and pause by stating promptly either "John Deere" or "Deere." (In two of the 20 interviews, I did not put this statement to the

4

salesperson.) I took notes of these conversations, which eventually became part of my Report in this case.

[*Id.* at 2 (internal citations omitted).] Based upon this investigation, Shanks opined "that salespeople at dealerships that sell FIMCO's agricultural equipment perceive the green and yellow colors on agricultural equipment as associated with Deere, or at a minimum, recognize or believe that people generally associate such colors with Deere." [DN 89-4 at 54 (Shanks Report).]

As part of Shanks' investigation, he presented himself in the role of "an employee of a film production company that wanted to rent or purchase agricultural equipment for a movie." [*Id.*] Shanks took this approach so that dealers would "perceive[] [him] as someone not well-versed in that equipment, so the salespeople would be more inclined to educate [him] about the equipment than to assume [he] knew about it already." [*Id.*] Shanks also explained that his investigation consisted of "candid conversations" more so than "an interrogation or formal survey" in an effort to "ensure that the respondents felt comfortable enough with me to use their own words and give me their truthful, candid opinions." [*Id.* at 3.] Shanks "offered an open-ended statement so people would feel free to fill in the gap however they wanted, instead of acting on a prompt or specific question from me." [*Id.*]

In the instant motion, FIMCO asserts that Shanks is unqualified to testify as to his opinions in this case and that any expert testimony regarding Shanks' report and investigation is irrelevant, unreliable, and based on inadmissible hearsay. [DN 95-1 at 4–7.] In response, Deere argues that Shanks is properly qualified to testify under Federal Rule of Evidence 702, that his opinion is not based on hearsay, and that FIMCO's criticisms of Shanks' survey and testimony go to weight, not admissibility. [DN 110.] The Court agrees.

Pursuant to Rule 702, experts must be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Here, the Court agrees with Deere that Shanks' twenty years of experience as a private investigator for an intellectual property investigation firm, which has often involved developing personas, conducting investigations, eliciting candid responses, and evaluating the results of such investigations, qualifies him to testify as to his opinions in this case. [*See* 110-1 at 1–3.]

Rule 702 further requires that an expert's "specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue" and that the testimony be "based on sufficient facts or data" and is "the product of reliable principals and methods." Fed. R. Evid. 702(a)–(c). FIMCO argues that Shanks' testimony does not satisfy these requirements because

> 1) the pretext in which he contacted the dealers skewed the results of the poll; (2) the manner of questioning suggests the respondents answered based on perceptions of market dominance rather than confusion; and (3) the lack of specificity regarding methodology *and* results makes it impossible for the trier of fact to determine whether Shanks' conclusions are supported.

[DN 123 at 6–7.] For instance, FIMCO alleges that, because Shanks posed as a film producer, interviewees likely "tailored their responses accordingly." [*Id.* at 7.] Specifically, FIMCO argues that dealers would give different, less specific answers to a "random layman" than they would to a "true purchaser or shopper." [*Id.*] Moreover, FIMCO claims that, because Shanks used the phrase "*I* always thought [or assumed] . . .", that it is likely that respondents were making "*guesses* . . . as to what they thought Shanks' film producer character, as a completely uninformed, uneducated consumer, would think *Shanks* meant to finish the statement with." [*Id.* at 7–8.]

Additionally, FIMCO asserts that "Shanks' manner of asking an open-ended question likely resulted in demand effects . . . Shanks' [u]nfinished [s]tatements clearly lobbed for the

respondents an answer going to what company *most prominently* features green and yellow on its agricultural equipment." [*Id.* at 9.] *See 6 McCarthy on Trademarks and Unfair Competition* § 32:172 (4th ed. 2017) ("Caution must be exercised in evaluating the results of some open-ended survey questions about brands because respondents who merely guess will likely just play back the names of the best-known and dominant brands.")

Finally, FIMCO states that "Shanks' testimony cannot be helpful to the trier of fact, nor can Shanks be certified as an expert witness in the absence of sufficiently clear methodologies and results that the Court can analyze and determine whether, indeed, such methodologies are of the kind that experts in the field would follow and the results are probative more than they are prejudicial." [DN 123 at 10.] Specifically, FIMCO argues that Shanks' notes only "approximate" the conversations he had with each interviewee, that his prompt varied from one call to the next, and that Shanks gave no context for the conversations he had with dealers before he asked them the open-ended question. [*Id.* at 10–11.]

Although FIMCO's arguments may indeed demonstrate why Shanks' investigation and resulting opinions should be given less weight, they do not require exclusion. Indeed, "the relevant case law counsels that—subject to the Court's overriding gatekeeping function under *Daubert*—errors in survey methodology are more properly directed against the weight a jury should give the survey, rather than overall admissibility." *Innovation Ventures, LLC v. NVE, Inc.*, 90 F. Supp. 3d 703, 720–21 (E.D. Mich. 2015) (citations omitted). *See also Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 518 (6th Cir. 2007) ("Where a survey presented on the issue of actual confusion reflects methodological errors, a court may choose to limit the importance it accords the study in its likelihood of confusion analysis."); *Citizens Banking Corp. v. Citizens Fin. Grp., Inc.*, 320 F. App'x 341, 348 (6th Cir. 2009) ("In explaining its reasoning,

7

the district court noted several flaws in the surveys . . . The district court's findings are supported by the record, and so we find that the district court did not commit clear error in minimizing the weight given to CBC's surveys."); *Rocky Brands, Inc. v. Red Wing Shoe Co.*, No. 2:06-CV-00275, 2009 WL 5125475, at *3 (S.D. Ohio Dec. 28, 2009) ("Because almost all surveys are subject to some sort of criticism, courts generally hold that flaws in survey methodology go to the evidentiary weight of the survey rather than its admissibility." (citations omitted)); *McCarthy*, *supra*, at § 32:158 ("The usual rule is that a professionally conducted survey that relates to the facts in issue will be admitted into evidence, with any deficiencies or shortcomings serving to reduce the weight the survey is given.")

Certainly, "a trial court, in the exercise of its 'gatekeeping function' may, in an appropriate case, exclude a flawed survey report from being received into evidence" at all. *McCarthy*, *supra*, at § 32:158. However, examples of situations in which outright exclusion is warranted include "if the person who designed the survey does not qualify as an expert" or "[i]f the survey was so informally designed and conducted that it fails key tests of professionalism and reliability." *Id.* (citations omitted). This is not the case here. Rather, FIMCO's challenges to Shanks' survey amount to claims of "technical inadequacies" such as problems with "the format of the questions or the manner in which it was taken." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1036 (9th Cir. 2010) (quoting *Keith v. Volpe*, 858 F.2d 467, 480 (9th Cir. 1988)). As each of these challenges "bear on the weight of the evidence, not its admissibility," *id.*, the Court will not exclude Shanks' report or testimony.

Lastly, FIMCO claims that Shanks' report and expected opinion testimony are based solely off of hearsay; that is, off of statements made by the dealers he interviewed, and are therefore inadmissible. [DN 95-1 at 5–6 (citing Fed. R. Evid. 801).] However, as Deere points

out and as numerous courts and commentators have made clear, "since at least 1951 the cases are now unanimous that evidence of the state of mind of persons surveyed is not inadmissible as hearsay." *See* 6 *McCarthy*, *supra*, at § 23:2.75. *See also Piper Aircraft Corp. v. Wag-Aero, Inc.*, 741 F.2d 925, 931 (7th Cir. 1984) ("[C]ommentators unanimously agree that survey results are not inadmissible hearsay; rather, the results are reports of the state of mind of the interviewees, Fed.R.Evid. 803(3), and form the basis for the opinion of an expert witness from which the expert testifies as to the likelihood of confusion."); *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 227 (2d Cir. 1999), *as amended on reh'g* (Sept. 29, 1999) ("The great majority of surveys admitted in this Circuit, including those used in Lanham Act cases to establish actual confusion or secondary meaning, fall into this category: they poll individuals about their presently-existing states of mind to establish facts about the group's mental impressions.") Here, Shanks phrased his questions to dealers as inquiring into what they always "thought [or assumed]" about the colors green and yellow on agricultural equipment. [DN 110-1 at 2.] Therefore, the Court agrees that the answers Shanks obtained consisted of the states of mind of those polled, and accordingly do not constitute inadmissible hearsay.

Furthermore, even outside of the survey context, Rule 703 permits expert witnesses to offer opinions based on inadmissible facts or data so long as "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Fed. R. Evid. 703. Here, Shanks disclosed the individuals he interviewed, the dates on which he conducted the conversations, the questions asked, the interviewees' responses, and the opinions he formed as a result. *Contra Potts v. Martin & Bayley, Inc.*, No. 4:08-CV-00015-JHM, 2011 WL 4703058, at *3 (W.D. Ky. Oct. 4, 2011) ("[T]he Court finds that the inadmissible hearsay statements of an unnamed consulting expert, where neither the date nor content of the

conversation is disclosed, is not the type of information that is reasonably relied upon by experts in MacInnes's field.") Here, the Court is satisfied that experts in Shanks' field would reasonably rely on this kind of data in forming opinions. Accordingly, FIMCO's motion *in limine* to exclude Shanks' testimony [DN 95] is denied.

### B. Deere's Motion to Exclude Witnesses Mark Schwarz, David Staack, Albert Kessler, Todd Yeazel, and Cindy Perkins [DN 96]

Deere has moved to exclude the expert reports and testimony of FIMCO's five expert witnesses. [DN 96.] FIMCO responded. [DN 106.] Deere replied. [DN 125.] For the following reasons, Deere's motion is granted in part and denied in part.

FIMCO's five expert witnesses are: 1) Mark Schwarz, the manager of FIMCO's company store in Columbus, Nebraska, 2) David Staack, a FIMCO store manager in Hopkinsville, Kentucky, 3) Albert Kessler, a manager of the sprayer systems and precision equipment departments at Stutsmans, Inc., in Hills, Iowa, 4) Todd Yeazel, the National Sales Manager at Fertilizer Dealer Supply, and 5) Cindy Perkins, an owner at Perkins Sales, Inc., in Bernie, Missouri. Each report is titled "Disclosure of Opinion Testimony (Whether Lay or Expert)." In the "Qualifications" section of each report, each witness states that they are "very familiar with the U.S. agricultural equipment industry, including manufacturing, marketing, sales, pricing, financing, service and warranty work" and that they have "spoken with people within the U.S. agricultural equipment industry, including representatives of various competitors and actual and prospective customers." [DN 96-9; DN 96-11; DN 96-12; DN 96-13; DN 96-14.]

### 1. Rule 26 Requirements for Expert Reports

Deere argues, first, that none of FIMCO's experts prepared their own reports, and therefore they must be excluded due to a failure to comply with the requirements of Rule 26 of the Federal Rules of Civil Procedure. [*Id.* at 1; 21.] In support of this argument, Deere points out

that each report contains the same five identically-worded opinions. [DN 96-1 at 12–13.] Additionally, language in each of these opinions "either tracks verbatim, or is drawn in substantial part from, FIMCO's pleadings and other submissions in this case." [*Id.* at 13.] What's more, "[e]ach witness candidly admitted in deposition that FIMCO's counsel drafted the reports in their entirety," and none of the experts made any substantive changes to their reports.  [*Id.* at 15 (citing DN 96-10 at 40 (Yeazel Deposition)).]

The witnesses testified that they each had a brief phone call with FIMCO's counsel prior to being given a draft of the report, in addition to a brief conference call with all five witnesses after the drafts were circulated. [*Id.* at 16–18.] However, although each report lists four exhibits "to be used in support" including photographs and catalogs depicting JDD, Ag Spray, and John Deere products in green and yellow, [DN 96-9; DN 96-11; DN 96-12; DN 96-13; DN 96-14], the witnesses all testified "that they had neither asked for these documents (some of which they had never seen) nor relied on them in forming their opinions." [DN 96-1 at 20 (citing DN 96-17 at 21 (Kessler Deposition)).]

Rule 26(a)(2)(B) provides, in relevant part:

> **(B)** *Witnesses Who Must Provide a Written Report*. Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report-- prepared and signed by the witness--if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony.

Fed. R. Civ. P. 26(a)(2)(B). Based upon this provision, Deere alleges that, as the reports were clearly not "prepared and signed by the witness[es]," they must be excluded pursuant to Rule 37. Rule 37(c)(1) provides, in turn, that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) . . . , the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

In response, however, FIMCO argues that Rule 26(a)(2)(B) is inapplicable because none of the five expert witnesses was "retained or specifically employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony." Fed. R. Civ. P. 26(a)(2)(B).[1] Rather, FIMCO alleges that Rule 26(a)(2)(C) applies, which provides:

> **(C)** *Witnesses Who Do Not Provide a Written Report*. Unless otherwise stipulated or ordered by the court, if the witness is not required to provide a written report, this disclosure must state:
>
> **(i)** the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and
>
> **(ii)** a summary of the facts and opinions to which the witness is expected to testify.

Fed. R. Civ. P. 26(a)(2)(C). The Court agrees. Rule 26(a)(2)(C) was added in 2010 to "resolve[] a tension that has sometimes prompted courts to require reports under Rule 26(a)(2)(B) even from witnesses exempted from the report requirement." Fed. R. Civ. P. 26, advisory committee's note. As stated above, a report is *not* required of witnesses who are not retained or employed for the purpose of providing expert testimony in a particular case or to employees whose regular job duties do not regularly require such testimony. Fed. R. Civ. P. 26(a)(2)(B).

Since the 2010 amendment, courts have attempted to parse the distinction between experts who are subject to the report requirements of Rule 26(a)(2)(B) and those subject to the less burdensome disclosure requirements of Rule 26(a)(2)(C). In *Call v. City of Riverside*, the Magistrate Judge provided a thorough analysis of the considerations relevant to making this

---

[1] Though Deere has argued that FIMCO originally represented that its witnesses *were* of the type required to file reports pursuant to Rule 26(a)(2)(B), the Court does not find this to clearly be the case. Although FIMCO stated that "there will be a report" when it disclosed each of its witnesses, [DN 96-4 at 3–4], the Court finds it conceivable that FIMCO was using the word "report" interchangeably with "disclosure." Moreover, when FIMCO ultimately did produce its five reports, each was titled "Disclosure." Accordingly, the Court will not consider FIMCO bound to that language here.

determination which this Court finds persuasive. No. 3:13-CV-133, 2014 WL 2048194, at *7 (S.D. Ohio May 19, 2014). In *Call*, the court explained that "[t]he Advisory Committee's Note provides a persuasive indication that Rule 26(a)(2)(C) is meant to apply only to so-called hybrid witnesses, *i.e.,* fact witnesses who can also provide expert testimony under Federal Rules of Evidence 702, 703, or 705." *Id.* at 3. A common example of a hybrid witness is treating physicians, who "are both fact witnesses and, by virtue of their education, training and experience, experts." *Id.* (quoting *Crabbs v. Wal–Mart Stores, Inc.,* No. 4:09–CV–519, 2011 WL 499141, at *2 (S.D. Iowa Feb. 4, 2011)).

The *Call* court further addressed a leading Sixth Circuit case which addressed whether an expert was retained or specially employed. *Id.* In *Fielden v. CSX Transp., Inc.*, the Sixth Circuit held that a treating physician was not subject to the report requirement when there was "evidence that Dr. Fischer formed his opinions as to causation at the time that he treated Fielden and there is no evidence that Dr. Fischer formed his opinion at the request of Fielden's counsel." 482 F.3d 866, 869 (6th Cir. 2007), *as amended on denial of reh'g and reh'g en banc* (July 2, 2007). The *Call* court further identified and analyzed "[t]he leading case attributed to the new Rule," a 2011 First Circuit case called *Downey v. Bob's Discount Furniture Holdings, Inc.,* 633 F.3d 1 (1st Cir. 2011). *Call*, 2014 WL 2048194, at *4. In *Downey*, the court determined that an exterminator hired by the plaintiffs as the result of a bed bug outbreak was not an expert retained or specially employed to give testimony when "his opinion testimony ar[o]se[] not from his enlistment as an expert but, rather, from his ground-level involvement in the events giving rise to the litigation." *Downey*, 633 F.3d at 6. The *Downey* court further explained that

> [i]n order to give the phrase "retained or specially employed" any real meaning, a court must acknowledge the difference between a percipient witness who happens to be an expert and an expert who without prior knowledge of the facts giving rise

to litigation is recruited to provide expert opinion testimony. It is this difference, we think, that best informs the language of the rule.

*Id.* The *Downey* court analogized the facts of its case to that of a treating physician, explaining that "where . . . the expert is part of the ongoing sequence of events and arrives at his causation opinion during treatment, his opinion testimony is not that of a retained or specially employed expert." *Id.* at 7. Rather, when an expert's, such as a treating physician's, "opinion about causation is premised on personal knowledge and observations made in the course of treatment, no report is required under the terms of Rule 26(a)(2)(B)." *Id.* To the contrary, when "the expert comes to the case as a stranger and draws the opinion from facts supplied by others, in preparation for trial, he reasonably can be viewed as retained or specially employed for that purpose, within the purview of Rule 26(a)(2)(B)." *Id.*

The *Call* court further cited to *Ulbrick v. UPR Products, Inc.*, in which the court determined that a racing mechanic was retained or specifically employed when "his opinions were formed not, for example, in an attempt to repair the vehicle, but rather in an effort to determine the cause of the accident. Thus, he was functioning analogously to a physician performing an "after-the-fact" diagnosis rather than providing 'in-the-moment' or 'on-the-scene' treatment." No. CIV. 08-13764, 2011 WL 500034, at *4 (E.D. Mich. Feb. 8, 2011). The mechanic's "opinions were not formed as a result of witnessing or experiencing the accident which is the subject matter of this lawsuit. Rather, they were presumably formed as a result of a process that any expert witness would undertake; namely, an 'after-the-fact' examination of the vehicle in question." *Id.* at *4.

Similarly, the court in *Beane v. Utility Trailer Manufacturing. Co.* found that a group of nine experts in the trailer manufacturing industry were retained or specifically employed because

[t]here [wa]s no evidence that these experts have any firsthand knowledge on UTM's trailer design or Beane's specific side underride accident, and thus any

14

comparisons the experts might make between their companies' trailer and UTM's trailer must arise by examining the relevant information from this case, indicating that they were specifically recruited after-the-fact just to provide expert testimony.

No. 2:10 CV 781, 2013 WL 1344763, at *3 (W.D. La. Feb. 25, 2013). The *Beane* court distinguished its case from cases that, following *Downey*, have "held that 26(a)(2)(C) experts' conclusions and opinions arise from firsthand knowledge of activities they were personally involved in before the commencement of the lawsuit, and not conclusions they formed because they were recruited to testify as an expert after-the-fact." *Id.*

Here, the Court agrees that FIMCO's five expert witnesses are analogous to treating physicians not subject to the report requirements of Rule 26(a)(2)(B). Rather than being "strangers" to the facts of the case and forming opinions based upon "facts supplied by others, in preparation for trial," *Downey*, 633 F.3d at 7, or based upon an "examin[ation] [of] the relevant information from this case," *Beane*, 2013 WL 1344763, at *3, all of FIMCO's experts had prior "firsthand knowledge" regarding sales of agricultural equipment, including Deere and FIMCO products. Each witness's disclosure states that they are "very familiar with the U.S. agricultural equipment industry, including manufacturing, marketing, sales, pricing, financing, service and warranty work" and that they have, throughout their careers, "spoken with people within the U.S. agricultural equipment industry, including representatives of various competitors and actual and prospective customers." [DN 96-9; DN 96-11; DN 96-12; DN 96-13; DN 96-14.] Moreover, each bases their opinions on their "background and experience," including their extensive experience in the industry and/or in consumer interactions. [*See* DN 96-9; DN 96-11; DN 96-12; DN 96-13; DN 96-14.] This is in clear contrast to the situations in *Ulbirck* and *Beane* because, here, FIMCO's witnesses base all of their testimony on "firsthand knowledge of activities they were personally involved in before the commencement of the lawsuit," *Beane*, 2013 WL

1344763, at *3; that is, the sale of agricultural equipment and interactions with customers engaged in such sales. FIMCO's experts did not perform "after-the-fact" evaluations; rather, they were asked to give opinions based upon their *existing* knowledge and experience in the agricultural industry.

Accordingly, the Court agrees that FIMCO's witnesses were not subject to the expert report requirements of Rule 26(a)(2)(B), but rather are subject to the disclosure requirements of Rule 26(a)(2)(C). Rule 26(a)(2)(C) requires expert witnesses to file disclosures outlining "the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705" and "a summary of the facts and opinions to which the witness is expected to testify." Fed. R. Civ. P. 26(a)(2)(C)(i)–(ii). There is no requirement that the experts themselves prepare such disclosures. *See id.* The Court agrees that the disclosures FIMCO submitted for each witness satisfy these requirements, and therefore the Court need not exclude the expert disclosures pursuant to Rule 37(c)(1).

### 2. Admissibility of the Opinions Contained in the Expert Disclosures

Next, Deere asserts that, notwithstanding the report and disclosure requirements of Rule 26(a), each of the five witnesses' testimony is still "inadmissible because it is based solely on unsupported subjective experiences, anecdotes, and speculations, which cannot support an expert opinion and are grounds for exclusion." [DN 96-1 at 22 (citing Fed. R. Evid. 702; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999)).] Moreover, Deere states that this testimony would also be improper as lay opinion testimony "because the proffered opinions are not rationally based on the witnesses' own perceptions or observations." [*Id.* at 6–7.]

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> **(b)** the testimony is based on sufficient facts or data;
>
> **(c)** the testimony is the product of reliable principles and methods; and
>
> **(d)** the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

A trial court plays a "gatekeeper" role, excluding evidence that is "unreliable and irrelevant." *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 792 (6th Cir. 2002). The inquiry is "a flexible one" and the focus "must be solely on [the proposed expert's] principles and methodology, not on the conclusions they generate." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 594–95 (1993). While there is no "definitive checklist or test," some factors to consider include: (i) whether the theory or technique "can be (and has been) tested," (ii) whether it "has been subjected to peer review and publication," (iii) whether it has a "known or potential rate of error," and (iv) whether the theory or technique enjoys general acceptance in the relevant scientific community. *Id.* at 594. However, the Sixth Circuit has acknowledged that the list of four *Daubert* factors "neither necessarily nor exclusively applies to all experts or in every case." *First Tennessee Bank Nat. Ass'n v. Barreto*, 268 F.3d 319, 335 (6th Cir. 2001) (quoting *Kumho*, 526 U.S. at 141). Specifically, in some cases, "the factors may be pertinent, while in other cases 'the relevant reliability concerns may focus upon personal knowledge or experience.'" *Id.* (quoting *Kumho*, 526 U.S. at 150). For instance, in *Barreto*, the court explained that it found "the *Daubert* reliability factors unhelpful in the present case, which involves expert testimony derived

largely from [the expert's] own practical experiences throughout forty years in the banking industry." *Id.*

A trial judge has "considerable leeway" in deciding whether expert testimony is reliable and his decision is reviewed for abuse of discretion. *Kumho*, 526 U.S. at 152; *Tamraz v. Lincoln Electric Co.*, 620 F.3d 665, 672 (6th Cir. 2010) ("[W]here one person sees speculation, we acknowledge, another may see knowledge, which is why the district court enjoys broad discretion over where to draw the line"). The Sixth Circuit has explained that we interpret Rule 702 "as imposing a threshold requirement of qualification by 'knowledge, skill, experience, training or education,' coupled with a two-part test for relevance (i.e., will the testimony 'help the trier of fact to understand the evidence or to determine a fact in issue') and reliability." *Bradley v. Ameristep, Inc.*, 800 F.3d 205, 208 (6th Cir. 2015) (citing *United States v. Cunningham*, 679 F.3d 355, 379–80 (6th Cir. 2012)).

Here, Deere first alleges that the expert witnesses' opinions that "[t]here is no actual or likely confusion by U.S. consumers as to the identity of the manufacturer of FIMCO's agricultural equipment products" are inadmissible because they lack any proper basis. [DN 96-1 at 22–23 (quoting expert reports).] The Court agrees.

The experts state in their disclosures that this opinion is based upon their "training, background, and experience," "consumer interactions," and, for some, their "own farming experience." [*See* DN 96-9 at 2; DN 96-11 at 3; DN 96-12 at 4; DN 96-13 at 3; DN 96-14 at 3.] However, as many courts have noted, "[g]enerally, a party alleging trademark infringement relies upon a consumer survey to prove the likelihood of consumer confusion in a particular case." *Tovey v. Nike, Inc.*, No. 1:12CV448, 2014 WL 3510636, at *4 (N.D. Ohio July 10, 2014) (citing 4 *McCarthy on Trademarks and Unfair Competition* § 32:158 (4th ed. 2013)). *See also Patsy's*

*Italian Rest., Inc. v. Banas*, 531 F. Supp. 2d 483, 486 (E.D.N.Y. 2008) (Finding expert's "testimony . . . unreliable as to the issue of likelihood of confusion" where the expert "appears not to have relied on such a consumer survey but, rather, he drew his conclusions based upon his own personal knowledge and expertise."); *Int'l Mkt. Brands v. Martin In''l Corp.*, 882 F. Supp. 2d 809, 814 (W.D. Pa. 2012) ("[E]xpert opinion on the ultimate factual issue of whether or not there exists a likelihood of confusion is inadmissible.").

A leading treatise, *McCarthy on Trademarks and Unfair Competition*, provides helpful guidance as to this point. Professor McCarthy explains:

> At the trial level, the issue of likelihood of confusion is an issue of fact. Most courts will not allow the expert testimony of a witness who opines on the ultimate question of whether there is or is not a likelihood of confusion. For example, most courts will not allow a jury to hear a witness testify that: "I've been an executive in the Gizmo industry for over twenty years, and in my opinion, defendant's use of the accused trademark Abba will probably confuse customers into thinking they are the goods of plaintiff Alfa."
>
> The reason that such testimony is usually not proper is *not* that the witness is testifying as to a conclusion of law, but that the witness has no expertise and no factual basis to opine as to the probable state of mind of customers when presented with the conflicting marks. A survey expert has conducted a scientific test and asked questions of potential buyers: other experts have not.

4 *McCarthy*, *supra*, at § 23:2.75. Although the "decision to forego a consumer survey . . . is not necessarily fatal to the admissibility of [an expert's] opinion," *Tovey*, 2014 WL 3510636, at *5, an "expert who has not conducted such a survey must articulate and describe some other reliable methodology that forms the basis for the conclusion that confusion is or is not likely in this case." 4 *McCarthy*, *supra*, at § 23:2.75.

Here, the Court is unpersuaded that FIMCO's witnesses have articulated such reliable methodologies sufficient to offer the blanket opinions that "[t]here is no actual or likely confusion by U.S. consumers." In his deposition, for example, Yeazel testified that he based this

opinion on "many years talking to people about FIMCO equipment, its color being green and yellow, and them never coming in and saying, 'Is that a John Deere?'" [DN 96-10 at 54.] Similarly, Schwarz testified that his "opinion is there is none and I have no experience of any confusion." [DN 96-18 at 38.] Staack testified that "there is no confusion in my mind, my opinion, . . . I've never been asked by -- nobody has ever come into one of my booths and asked is this a John Deere sprayer." [DN 96-19 at 44.] To be clear, the witnesses can certainly testify regarding their *own* experiences with their customers throughout their careers. However, without more, the Court cannot say that the witnesses used "some other reliable methodology" sufficient to testify that no likelihood of confusion exists in this case among all U.S. customers. Although FIMCO emphasizes in its response the experience and qualifications of its witnesses, [*see* DN 106 at 15–18], it has not persuaded the Court why its witnesses' conclusions as to this point are sufficiently reliable. Although the experts can testify as to their own experiences with customers, their opinions as to the existence of actual or likely confusion as to all U.S. consumers are improper. Accordingly, the Court agrees with Deere that such testimony is inadmissible.

The Court finds this reasoning equally applicable to the witnesses' opinions that "U.S. consumers of agricultural equipment are not deceived into believing that FIMCO's products are sponsored by, approved by, or otherwise affiliated with Deere & Co." [*See* DN 96-9; DN 96-11; DN 96-12; DN 96-13; DN 96-14.] Because the confusion inquiry is intertwined with the concept of "deception," the Court further finds that the witnesses' opinions as to deception are improper and inadmissible. *See McCarthy*, *supra*, at § 23:2.75 (Addressing "the admission of expert testimony on matters that assist in the determination of the key question in most trademark disputes: is there a likelihood of confusion, mistake or *deception*?" (emphasis added)).

Accordingly, Deere's motion to exclude is granted with respect to these portions of the experts' report and testimony.

Although the Court agrees with Deere that FIMCO's experts cannot testify as to the key questions of likelihood of confusion or deception among U.S. customers,

> [i]t is entirely proper and relevant for a qualified expert witness to opine as to . . . subsidiary factual questions, such as the ways in which the goods or services are sold and advertised, the sophistication of buyers and the degree of care buyers typically exercise when making a purchasing decision of these kinds of goods or services.

*Id.* Moreover, "an expert in the field can testify as to the similarity of the markets served by the litigating parties." *Id.* Accordingly, the Court finds that the witnesses' opinions that "[p]urchasers of large agricultural equipment are knowledgeable about the equipment they intend to purchase and are sophisticated consumers who take great care to do research before purchasing in order to understand the features and price of the competing equipment they plan to purchase" are permissible. [*See* DN 96-9; DN 96-11; DN 96-12; DN 96-13; DN 96-14.] While Deere asserts that none of the experts conducted outside research to support these statements and therefore that they, too, lack any proper basis, the Court finds that Deere's concerns do not require exclusion but are instead properly directed to cross-examination of the witnesses at trial.

The Court is also satisfied that the witnesses opinions that "[m]any manufacturers use the colors green and yellow on agricultural equipment sold in the United States, and those colors are not solely identified with Deere & Co." are permissible. [*See* DN 96-9; DN 96-11; DN 96-12; DN 96-13; DN 96-14.] Despite Deere's assertions that no witness researched this topic, the witnesses were able, during depositions, to support their statements by identifying other manufacturers who use green and yellow. [*See, e.g.*, DN 96-10 at 51–52 (Yeazel Deposition) (Identifying Bestway and Top Air as using green and yellow); DN 96-17 at 34–46 (Kessler

Deposition) (Identifying Bestway, Top Air, Summers Manufacturing, and Demco); DN 96-18 at 29–30 (Schwarz Deposition) (Identifying Unverferth, Top Air, Demco, Force Manufacturing, Summers, Big John, Sprayer Specialties, JD Skiles, and Minden Machine.").] That the witnesses were able to support these statements by identifying specific companies convinces the Court of the reliability of their testimony. *See Barreto*, 268 F.3d at 335 ("[R]elevant reliability concerns may focus upon personal knowledge or experience.") Although Deere has indicated that some of the manufacturers identified by the witnesses no longer use green and yellow, and therefore that the word "many" is inaccurate, the Court again finds that this does not justify exclusion, but that Deere can instead address this issue on cross-examination.

The opinions that "[i]n the U.S. market, a new self-propelled agricultural sprayer does not compete with a new trailed sprayer," [DN 96-9; DN 96-11; DN 96-12; DN 96-13; DN 96-14], are likewise sufficiently reliable. Indeed, "the similarity of the markets served by the litigating parties" is within the scope of permissible expert testimony in a trademark case. *McCarthy*, *supra*, at § 23:2.75. The Court is not persuaded by Deere's argument that the witnesses have no proper basis for this opinion. For example, Kessler testified, reliably in the Court's view, that he based this opinion on "[t]he price difference. The farmer is either looking for self-propelled that doesn't compete because it's a 300, $400,000 sprayer self-propelled sprayer versus a $50,000 or less sprayer." [DN 96-17 at 43.] The fact that the witnesses did no research before forming this opinion again goes to weight, not admissibility. Accordingly, Deere's concerns do not require exclusion.

Next, Deere challenges the opinion that "if a purchaser owns a John Deere tractor or agricultural vehicle, the colors green and yellow become extremely important to the purchase decision because such consumers desire to match or complement their trailed agricultural

22

equipment to their John Deere tractor or agricultural vehicle." [DN 96-1 at 25.] Deere claims that the fact that "the witnesses all testified that they undertook zero investigation, research, or work in reaching" that opinion. [*Id.*] Again, however, the Court is satisfied that each witness, based upon their experience in the industry, have demonstrated a proper basis for this opinion so as to make them reliable. [*See, e.g.*, DN 96-10 at 67 (Yeazel Deposition) ("In my experience, many people at the end of . . . their buying process would like to matchup their equipment.); DN 96-17 at 50–51 (Kessler deposition) (describing a customer he encountered who had a red tractor and wanted a red sprayer to match).] The fact that the witnesses did not conduct research before forming their opinions may make them less credible, but it does not make their testimony inadmissible.

Finally, the witnesses all opine that "[b]ecause John Deere has a large share of the U.S. tractor and agricultural vehicle market, under these circumstances, it would be a substantial competitive disadvantage for FIMCO to not be able to offer its products in green and yellow." [DN 96-9; DN 96-11; DN 96-12; DN 96-13; DN 96-14.] Deere argues that, absent investigation or research, this opinion is improper. [DN 96-1 at 25.] During their depositions, the witnesses each supported this opinion with some variation of the statement that, because farmers want to match their agricultural equipment to their tractors, if they were not able to offer green and yellow equipment, they fear they would lose sales. The Court finds that, based upon these articulated reasons, the witnesses' testimony as to this opinion is sufficiently reliable. [*See, e.g.*, DN 96-10 (Yeazel Deposition) ("I'm afraid if we didn't have that option, we would run into . . . a few more of . . . those instances where we would . . . lose equipment because we didn't have the color to match it up."); DN 96-17 at 56 (Kessler Deposition) ("In the past, people have come to me and -- for instance, for the red sprayer there. That guy wants a red sprayer. He's not going

23

to buy a green sprayer, probably."); DN 96-18 at 46 (Schwarz Deposition) (Customers "care greatly about what the appeal looks like when it's out in the field. They don't want a green tractor and a -- with yellow wheels attached to, you know, a red frame, necessarily, or a black frame. They would prefer it to match their tractor.") Though Deere argues that the assertions that companies would lose sales and therefore be at a competitive disadvantage is speculative and based on conjecture, the Court again finds that Deere is free to demonstrate as much on cross-examination at trial, and the Court will, in turn, give the testimony the weight it deserves.

Accordingly, Deere's motion to exclude [DN 96] is granted in part with regard to the witnesses' testimony regarding the existence of actual or likelihood of confusion or deception among U.S. customers, but in all other respects is denied.

### C. Deere's Motion to Strike FIMCO's Assertions About its Sales in Opposition to Deere's Summary Judgment Motion [DN 122]

Deere has additionally moved to strike certain statements FIMCO made in its response to Deere's motion for summary judgment [DN 115] on the basis that FIMCO withheld the information during discovery. [DN 122.] FIMCO responded. [DN 133.] For the following reasons, Deere's motion is denied as moot.

Deere claims that FIMCO refused to provide any information, either through document production or through its 30(b)(6) deposition testimony, about "either its current or projected sales of or net profits from the relevant products," or about its sales of products that are not green and yellow. [DN 122-1 at 2–3.] Deere states that it sought this information because it is relevant both to its requested injunctive relief, specifically, to any harm FIMCO may suffer if injunctive relief were granted, and to its claim of progressive encroachment. [*Id.* at 3.]

In FIMCO's response in opposition to Deere's motion for summary judgment, FIMCO made two statements relating to its sales. First, as part of its argument that its use of green and

yellow is not likely to cause dilution, FIMCO states that "FIMCO's total revenue for it [sic] towed green framed and yellow wheeled agricultural sprayers and applicators is [a small percentage] of its annual revenues, which is nominal compared to Deere's $29 billion in annual revenue." [DN 115 at 16–17.]  Second, in responding to Deere's argument regarding progressive encroachment, FIMCO states that its "sales of its ag sprays [sic] and applicators has remained consistent, expanding and contracting only with general economic trends." [*Id.* at 38.] Deere asserts that these two "references to sales in FIMCO's summary judgment opposition should be stricken" because "[a] party who refuses to produce information on a topic in discovery cannot subsequently use that information to its advantage." [DN 122 at 4–5.]

Deere further argues in its motion, however, that these assertions are both unsupported by the evidence FIMCO cites in support. [*Id.*] Because it appears that Deere is correct, the Court cannot rely on either of those assertions in its ruling on Deere's summary judgment motion. Specifically, in support of its claim that green and yellow sprayers and applicators make up a small percentage of its annual revenue compared to Deere's $29 billion in annual revenue, FIMCO cites to an interrogatory response from Deere which states that "[i]n 2015, Deere's global sales and revenue were approximately $29 billion, a significant portion of which included sales of products under the Deere Colors or wheeled agricultural equipment with green vehicle bodies and yellow tanks or wheels." [DN 115 at 16–17 (citing DN 109-24 at 6).]  However, FIMCO cites *no* evidence in support of its assertion that FIMCO's sales of relevant agricultural equipment make up a small percentage of its total annual revenue.

And in support of its statement that FIMCO's sales of sprayers and applicators have remained constant but have grown and fallen consistent with economic trends, FIMCO cites to deposition testimony of Kevin Vaughan, FIMCO's owner. [*Id.* at 16 (citing DN 115-11 at 3; 24–

25

25; 27–33).] However, during his deposition, the only testimony Vaughan gave related to FIMCO's sales or growth was that 1) as of 1994, FIMCO "hadn't grown much," and 2) FIMCO started with about two or three employees and worked up to about fifty. [DN 115-11 at 3; 24–25.] Nowhere in the portions of Vaughan's deposition to which FIMCO cites does Vaughan discuss FIMCO's sales of sprayers and applicators, whether those sales remained constant, or economic trends. [*See* DN 115-11.] Accordingly, this assertion, too, is unsupported by any evidence.

Federal Rule of Civil Procedure 56(e) provides, in pertinent part, that if, "[i]f a party fails to properly support an assertion of fact . . . as required by Rule 56(c), the court may" chose from a variety of options, or "issue any other appropriate order." Fed. R. Civ. P. 56(e)(4). Here, FIMCO has failed to properly support both of the above assertions regarding its sales. As a result, the Court will not consider either of these assertions in ruling on Deere's summary judgment motion. *See also Loggins v. Franklin Cty.*, No. 2:02-CV-964, 2005 WL 1705187, at *11 (S.D. Ohio July 20, 2005), *aff'd sub nom. Loggins v. Franklin Cty., Ohio*, 218 F. App'x 466 (6th Cir. 2007) ("[T]he Court in addressing this summary judgment cannot accept unsupported factual allegations as true."); *Ryan v. Kentucky Dep't of Corr.*, No. 5:14-CV-89-TBR, 2016 WL 4370046, at *8 (W.D. Ky. Aug. 12, 2016) ("[T]his Court will not consider . . . unsupported allegations because 'at the summary judgment stage, [this Court] must look to the evidence and the facts, not to labels and allegations.'" (citation omitted)).

Accordingly, the Court need not "strike" these assertions at this time. However, the Court notes that, should FIMCO attempt to introduce evidence in support of these assertions at trial, the Court will entertain further challenges to such evidence at that time. At this stage, however, Deere's motion to strike [DN 122] is denied as moot.

26

**D.  Deere's Motion to Strike New Evidence Submitted by FIMCO on Reply in Support of its Motion for Partial Summary Judgment [DN 132]**

Deere additionally moved to strike "new evidence" it alleges FIMCO included in its reply in support of its summary judgment motion. [DN 132.] FIMCO responded. [DN 142.] Deere replied. [DN 148.] For the following reasons, Deere's motion is denied.

Deere claims that, in FIMCO's motion for partial summary judgment, it failed to authenticate, or otherwise present in an admissible form, several pieces of evidence. [DN 113-13.] Accordingly, Deere included along with its response several objections to the evidence it claims is inadmissible or that was altogether missing from FIMCO's motion. [*Id.*] Some of Deere's objections include, for example, claims that FIMCO failed to properly authenticate various photographs and catalogs, that FIMCO's witnesses made improper legal conclusions, and that FIMCO's expert reports were unsworn and thus are inadmissible hearsay. [*Id.* at 1–5.]

As a result, FIMCO included, along with its reply, a response to each of Deere's objections, [DN 124-5], and attached thereto several declarations authenticating various pieces of evidence. [DN 124-6; DN 124-7; DN 124-8; DN 124-9; DN 124-10; DN 124-11.] Deere asserts that, "[i]nstead of doing what responses to evidentiary objections properly do—try to explain why the objected-to evidence is, in fact, admissible—FIMCO used its Response to Deere's Objections to offer reams of *new* evidence and to attempt to explain how this new evidence supports FIMCO's motion." [DN 132-1 at 4.] For instance, Deere states that a declaration from FIMCO's counsel included "newly-submitted deposition testimony [that] supports the factual assertions in its motion" which Deere objected to as wholly unsupported. [*Id.*] Deere further states that FIMCO's attempt to cure an unsworn expert report and to authenticate various photographs and catalogs was improper because "[a] party should not submit insufficient or incompetent evidence in support of a summary judgment motion and then try to offer admissible

evidence on reply." [*Id.* at 8.] In response, FIMCO asserts that "[e]ach of FIMCO's additional citations was in direct response to arguments raised by Deere in its opposition brief, and thus are not 'new' evidence such as to justify Deere's inapposite remedy of striking." [DN 142 at 13.]

As an initial matter, the Court is satisfied with FIMCO's efforts to authenticate various photographs, catalogs, and other pieces of evidence and disagrees that its declarations constitute "new evidence" to which Deere required an opportunity to respond. However, with regard to allegedly new deposition testimony, it is certainly true, as the Sixth Circuit has noted, that "[w]hen new submissions and/or arguments are included in a reply brief, and a nonmovant's ability to respond to the new evidence has been vitiated, a problem arises with respect to Federal Rule of Civil Procedure 56(c)," the purpose of which "is to afford the nonmoving party notice and a reasonable opportunity to respond to the moving party's summary judgment motion and supporting evidence." *Seay v. Tennessee Valley Auth.*, 339 F.3d 454, 481 (6th Cir. 2003) (citing Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986)). Here, Deere asserts that, had FIMCO submitted its allegedly new evidence in its original motion, "Deere could have responded at the time of its opposition, instead of being sandbagged on FIMCO's reply." [DN 132-1.] However, it has been nearly three months since FIMCO submitted its reply in support of its motion for summary judgment with the accompanying additional attachments. [*See* DN 124.] At no time since has Deere requested leave from the Court to file a surreply or otherwise respond to this allegedly improper new evidence. *See Key v. Shelby Cty.*, 551 F. App'x 262, 265 (6th Cir. 2014) (Surreplies "may be allowed in the appropriate circumstances, especially '[w]hen new submissions and/or arguments are included in a reply brief.'" (citation omitted)).

Although Deere argues that it would have responded had FIMCO filed these materials in its motion, Deere has made no attempt to do so since. *See Seay*, 339 F.3d at 482 ("TVA argues

on appeal that Plaintiff could have filed a surreply . . . However, this is beside the point, as the district court granted summary judgment only three days after TVA filed the reply brief, arguably too swiftly for Plaintiff to have requested a surreply."). *See also Key*, 551 F. App'x at 265 ("*Seay* only mandates that the district court provide an adequate opportunity to respond, not an indefinite opportunity to respond. The district court waited six months to deliver its decision on the motion, leaving Key plenty of time to file her motion for leave.") Here, Deere has had nearly three months to move for leave to file a surreply, and, as Deere has proven itself more than capable of filing motions before this Court, the Court is confident that Deere would have seized upon the opportunity to file such a motion if it had desired to do so. Accordingly, the Court is unpersuaded by Deere's assertion that it has been unable to respond, as it has never attempted to do so. Rather, the Court finds that Deere has indeed had "an adequate opportunity to respond," *id.*, and its motion to strike [DN 132] is therefore denied.

### E. Deere's Objections to FIMCO's Evidence in Support of FIMCO's Motion for Summary Judgment [DN 113-13]

As the Court stated above, along with its response to FIMCO's motion for partial summary judgment, Deere attached objections to various evidence FIMCO submitted in support thereof. [DN 113-13.] Deere additionally references these objections in its reply in support of Deere's motion for summary judgment. [*See* DN 141 at 13; 18; 22.] FIMCO responded to these objections in its reply in support of its motion for partial summary judgment. [DN 124-5.]

Deere objects pursuant to Federal Rules of Civil Procedure 56(c)(2), which allows a party to object on the grounds that "the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence," Fed. R. Civ. P. 56(c)(2), and pursuant to Rule 56(c)(4), which provides that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and

show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Evid. 56(c)(4).

First, Deere objects to several photographs: 1) a 1960 catalog which depicts JDD, FIMCO's claimed predecessor-in-interest, marketing agricultural sprayers in green and yellow [DN 5-1], 2) pictures dated 1957 which appear to show a JDD agricultural sprayer in green and yellow, [DN 100-6], and 3) a 2016 picture of an agricultural sprayer with FIMCO's Ag Spray Brand, [DN 100-9.] Deere objects to each of these items on the basis that they were "not accompanied with any evidence sufficient to support a finding that the item is what FIMCO claims it is, as Federal Rule of Evidence 901 requires." [DN 113-3 at 1–3.] In response, however, FIMCO submitted the Declaration of Kevin Vaughan, FIMCO's CEO, who states that these depictions are true and correct copies, that he found them in the "archived business records of JDD and[/or] FIMCO at FIMCO offices in a condition consistent with [their] age." [DN 124-6 at 2–3.] The Court is persuaded, therefore, that these photographs have been properly authenticated or, at the very least, could be presented in an admissible form at trial. Accordingly, Deere's objections as to these items are overruled.

Deere further objects to a portion of the deposition of Kevin Vaughan, FIMCO's owner, in which Vaughan testifies regarding its and its alleged predecessor's use of green and yellow dating back to the 1930s. [DN 113-13 at 2 (citing DN 100-4).] Deere objects to this testimony on the ground that it lacks personal knowledge and is inadmissible hearsay. [*Id.*] However, as the Court will address the admissibility of this testimony below in addressing the merits of the parties' summary judgment motions, Deere's objection on this ground is overruled as moot.

Next, Deere objects to portions of deposition testimony from Dave Wipson, FIMCO's Chief Operating Officer and corporate representative during FIMCO's 30(b)(6) deposition.

Wipson testified, first, that "[t]here has never been any confusion that we are John Deere or selling a John Deere piece of equipment." [*Id.* (citing DN 100-11 at 5).] Deere claims that, because the standard for trademark infringement is "likelihood of confusion," this statement is an improper legal conclusion. [*Id.*] *See Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410, 419 (6th Cir. 2012) ("In any case, a court considering a claim for trademark infringement must determine the likelihood of consumer confusion.") However, Wipson testified that *he* is "not aware of any confusion ever with our product and John Deere's." [DN 100-11 at 5.] He further clarified that, although he does not "have a form on a piece of paper that we've sent out an official survey," based upon "all the interactions that we have with customers on a regular basis . . . [t]here has never been any confusion that we are John Deere or selling a John Deere piece of equipment." [*Id.*]

Rule 602 provides that "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony." Fed. R. Evid. 602. Moreover, Rule 701 requires that testimony "in the form of an opinion" must be "rationally based on the witness's perception." Fed. R. Evid. 701(a). Here, Wipson testified that he was basing his statement on "interactions that we have with customers." [DN 100-11 at 5.] Although Wipson's testimony does mention "confusion," the Court is persuaded that his testimony was sufficiently grounded in FIMCO's personal knowledge and perceptions rather than a legal conclusion as to likelihood of consumer confusion, which, as the Court held above, would be impermissible.

Second, Wipson testified that "[g]reen and yellow is the color of agriculture and corn and soybeans, not your client." [DN 113-13 at 3 (citing DN 100-11 at 5).] Deere objects to this

statement, asserting that it both lacks foundation under Rule 602 and is improper lay opinion testimony under Rule 702. [*Id.*] In response, FIMCO argues that this statement "is clearly based on Wipson's long experience in the agricultural equipment industry." [DN 124-5 at 3.] The Court agrees. This statement appears to be Wipson's opinion and, regardless of whether it is actually correct, the Court does not find that it is inadmissible. Deere's objections to Wipson's testimony are overruled.

Deere also objects to a report of FIMCO's expert witness, Al Kessler, on the grounds that the report is unsworn and therefore is inadmissible hearsay under Rule 803. [DN 113-13 at 4.] However, in response, Deere attached a Declaration from Kessler acknowledging and adopting this report. [DN 124-7.] Accordingly, Deere's objection on this ground is overruled as moot.

Finally, Deere objects to excerpts of deposition testimony given by Kessler on the grounds that "Kessler's statements are based only on Mr. Kessler's unsupported subjective experiences, anecdotes, and speculations, not on any actual work of any kind related to forming his opinions." [DN 113-13 at 4.] However, Deere has already challenged this testimony, in addition to the testimony and reports of four other expert witnesses, in a separate motion to exclude. [DN 96.] Because the Court addressed these challenges above when it addressed that motion, the Court will not do so again here. Deere's objections on this ground are overruled as moot.

**F. FIMCO's Motion for Leave to Submit Additional Evidence [DN 151] and Deere's Motion for Leave to File a Sur-Reply in Opposition to FIMCO's Motion for Leave to Submit Additional Evidence [DN 158]**

Finally, FIMCO has moved the Court to allow it to place additional evidence into the summary judgment record. [DN 151; 152.] Deere responded. [DN 156.] FIMCO replied. [DN 157.] Deere then filed a motion for leave to file a surreply. [DN 158.] FIMCO responded. [DN

159.] Deere replied. [DN 160.] For the following reasons, both parties' motions are denied as moot.

FIMCO specifically seeks to add to the record portions of notes taken by Deere's expert, Shanks, during his investigation. [DN 152 at 4.] FIMCO only recently obtained these notes because they were the subject of a motion to compel [DN 88] which the Magistrate Judge granted on December 5, 2016 [DN 136] and upon which he denied reconsideration on December 22, 2016. [DN 146.] Once FIMCO obtained Shanks' additional notes, it found that many of the agricultural dealers with whom Shanks spoke stated, in addition to their initial statements that green and yellow is associated with John Deere, that farmers and other individuals familiar with the agricultural products at issue do not confuse John Deere products with FIMCO products. [DN 152 at 6–8.]

In response, Deere contends that, as it did not move for summary judgment on its trademark infringement claim, which turns on the existence of likelihood of confusion, that the portions of Shanks' notes that FIMCO seeks to add to the record are irrelevant at this stage, as they relate only to the confusion inquiry. [DN 156 at 17.] Rather, as Deere only moved for summary judgment on its dilution claim, which turns on the existence of an *association* with John Deere products, Deere contends that any evidence regarding consumer confusion is irrelevant at this stage. [*Id.* at 17–18.] *See* 15 U.S.C. § 1125(c)(1) (An element of a trademark dilution claim is that the defendant's use of plaintiff's mark is "likely to cause dilution by blurring . . . regardless of the presence or absence of actual or likely confusion."); 15 U.S.C. § 1125(c)(2)(B) ("'[D]ilution by blurring' is association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark.")

In opposition, FIMCO argues that Shanks' notes are relevant to the instant motion because "confusion presumes an association" and therefore that Shanks' additional notes "undermine[] both Deere's infringement and dilution claims." [DN 152 at 14.] However, the Court need not resolve this issue at this time. Even if FIMCO is correct that the additional evidence is relevant to Deere's dilution claim, the Court did not reach the "likelihood of dilution by blurring" inquiry in its resolution of that motion below. [See Part II(A)(1) below]. Accordingly, the Court need not consider Shanks' notes at this time. FIMCO's motion to submit this evidence is therefore denied as moot, as is Deere's motion for leave to file a surreply. The parties will be free to raise their concerns to the admissibility of this evidence again before or at trial.

## II.   Dispositive Motions

### STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court "may not make credibility determinations nor weigh the evidence when determining whether an issue of fact remains for trial." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001); *Ahlers v. Schebil*, 188 F.3d 365, 369 (6th Cir. 1999)). "The ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one

party must prevail as a matter of law.' " *Back v. Nestlé USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 251–52).

When the parties have filed competing motions for summary judgment, as is the case here, the Court "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Hensley v. Grassman*, 693 F.3d 681, 686 (6th Cir. 2012) (quoting *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994)). The moving party must shoulder the burden of showing the absence of a genuine dispute of material fact as to at least one essential element of the nonmovant's claim or defense. Fed. R. Civ. P. 56(c); *see also Laster*, 746 F.3d at 726 (citing *Celotex*, 477 U.S. at 324). Assuming the moving party satisfies its burden of production, the nonmovant "must—by deposition, answers to interrogatories, affidavits, and admissions on file—show specific facts that reveal a genuine issue for trial." *Laster*, 746 F.3d at 726 (citing *Celotex*, 477 U.S. at 324). "[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is "whether the party bearing the burden of proof has presented a jury question as to each element in the case." *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). Nor will mere speculation suffice to defeat a motion for summary judgment: "[t]he mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

### A. Deere's Motion for Summary Judgment [DN 99]

Deere seeks summary judgment on three claims: 1) its dilution claim, 2) FIMCO's affirmative defense of functionality and FIMCO's counterclaim seeking the cancellation of

Deere's registered trademarks on the theory of functionality, and 3) FIMCO's affirmative defenses of laches, acquiescence, estoppel, and implied license. [DN 98 at 8–9.] For the following reasons, Deere's motion is denied with respect to its dilution claim and FIMCO's affirmative defenses of acquiescence and estoppel but granted with respect to FIMCO's affirmative defense and counterclaim of functionality and FIMCO's affirmative defenses of laches and implied license.

### 1. Trademark Dilution

Under the Lanham Act, a trademark owner may be entitled to an injunction against another to prohibit dilution of the owner's famous mark. 15 U.S.C. § 1125(c)(1). "Dilution law, unlike traditional trademark infringement law ... is not based on a likelihood of confusion standard, but only exists to protect the quasi-property rights a holder has in maintaining the integrity and distinctiveness of his mark." *Audi AG v. D'Amato*, 469 F.3d 534, 547 (6th Cir. 2006) (quoting *AutoZone, Inc. v. Tandy Corp.,* 373 F.3d 786, 801 (6th Cir. 2004); *Kellogg Co. v. Toucan Golf, Inc.,* 337 F.3d 616, 628 (6th Cir. 2003)).

In order to prevail on a claim of dilution by blurring, as Deere alleges here, and therefore obtain injunctive relief, the owner of a mark must demonstrate that its mark is 1) famous and 2) distinctive, that the junior mark was 3) used in commerce, 4) such use began after the senior mark became famous, and 5) that use "is likely to cause dilution by blurring . . . of the famous mark." § 1125(c)(1). Dilution by blurring is defined as "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark." § 1125(c)(2)(B). To prevail on a claim of trademark dilution, "the presence or absence of actual or likely confusion, of competition, or of actual economic injury" is irrelevant. § 1125(c)(1). Rather, the focus is on "whether a senior user's distinctive and famous mark is being

diluted by another's use of a similar mark that weakens the strength or damages the reputation of the senior mark." *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 703 F. Supp. 2d 671, 697 (W.D. Ky. 2010), *aff'd*, 679 F.3d 410 (6th Cir. 2012) (citing *Jet, Inc. v. Sewage Aeration Sys.*, 165 F.3d 419, 425 (6th Cir. 1999)).

In its response, FIMCO disputes that Deere's mark is famous and distinctive, that FIMCO began using the colors of green and yellow *after* Deere's mark allegedly became famous, and that FIMCO's use of those colors is likely to cause dilution by blurring. [DN 115 at 9–18.]

A "famous mark" is a mark "widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." § 1125(c)(2)(A). "Since the [2006] revision to the trademark dilution act, courts have deemed famous brands such as Nissan, Nike and Pepsi." *Maker's Mark*, 703 F. Supp. 2d at 698 (citing *Nissan Motor Co., Ltd. v. Nissan Computer Corp.,* 2007 WL 4938219 (C.D. Cal. 2007); *Nike, Inc. v. Nikepal Int'l, Inc.,* 2007 U.S. Dist. LEXIS 66686 (E.D. Cal. 2007); *Pepsico, Inc. v. # 1 Wholesale, LLC,* 2007 WL 2142294, (N.D. Ga. 2007)).

In determining whether a mark is sufficiently "widely recognized" so as to become famous for dilution purposes, courts may consider, in addition to any other relevant factors, four factors specifically listed in the statute: 1) "[t]he duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties," 2) [t]he amount, volume, and geographic extent of sales of goods or services offered under the mark, 3) [t]he extent of actual recognition of the mark, and 4) "whether the mark was registered . . . on the principal register." § 1125(c)(2)(A)(i)–(iv).

Deere addresses each of the four factors in detail. With regard to the first factor, Deere states that, since the early nineteen hundreds, it has expended significant amounts of money on advertising on a nationwide basis. [DN 98 at 15.] Deere argues that its advertising expenditures were $34,000 in 1903 (roughly 1.1 percent of its total company expenditures), $1.59 million in 1948, and $5.4 million in 1957 (roughly $46.3 million today), and $75.3 million in 2015. [*Id.* at 15–16.] Deere emphasizes that, since the 1920s, it has advertised in color, clearly depicting its yellow and green color scheme, and has often referred to this color scheme as the "John Deere Colors." [*Id.* at 16–17.] With regard to the second factor, Deere argues that its sales of agricultural equipment in the United states have been extensive throughout its history, beginning in 1905 and reaching $299.7 million in 1950 (roughly $3 billion today) and $29 billion today, and that "a significant portion of those sales included products bearing the Deere colors." [*Id.* at 17.]

As to the third factor, actual recognition of the mark, Deere points to several instances of public recognition of its use of green and yellow, which it argues demonstrate that its mark has been famous since 1923 or, at the latest, by 1950. [DN 98 at 10; 13; 18–19.] In support of this claim, Deere cites the Declaration of Neil Dahlstrom, Deere's archivist. [*Id.* (citing DN 99-3 at 15–16 (Dahlstrom Declaration)).] In his Declaration, Dahlstrom notes "several examples of public recognition of Deere's use of green and yellow colors on tractors and other agricultural equipment in both industry publications and popular culture." [*Id.* at 15.] First, Dahlstrom references a January 13, 1923 article published in *Implement & Tractor Trade Journal*. [*Id.*] The article, which discusses an upcoming convention at which a "Model Store" would be featured for agricultural dealers to view, states that "[t]he glassed-in front is painted in the Deere colors, green and yellow." [DN 99-40 at 3.]   Second, Dahlstrom points to excerpts from a novel,

38

originally published in 1950 as *Reluctant Farmer* and later reprinted in 1976 as *The Strength of the Hills*, which mentions the Deere colors. [DN 99-3 at 15 (citing DN 99-41 at 6; 8).] The novel twice references John Deere; first in discussing a new wagon "painted the bright John Deere green and yellow" and second a "side-delivery rake" painted "the usual bright John Deere green and yellow." [DN 99-41 at 6; 8.]

Third, Dahlstorm points to an article published on *Smithsonian.com* on February 7, 2011 called "Happy Birthday, John Deere!". [DN 99-3 at 15–16.] The article commemorates the 1804 birth of John Deere and begins with the following statement from the author:

> Unless, like my husband, you hail from a place like Nebraska, where it is common knowledge that Farmall tractors are candy apple red, New Hollands' are royal blue and Allis Chalmers are orange, I suspect that John Deere tractors, with their kelly green bodies and bright yellow hubcaps, are the only ones that are instantly recognizable.

[DN 99-42 at 2.] Finally, Deere references survey evidence it claims demonstrates that its use of yellow and green on agricultural equipment is a widely recognized trademark today. [DN 98 at 18–19.] The survey, conducted by Deere's expert Hal Poret, surveyed members of the general public, 153 out of 156 of which identified a tractor bearing the yellow and green colors as being a Deere brand. [*Id.* (citing DN 77 (Poret Declaration)).] The fourth factor, whether the trademarks have been registered, appears to weigh in Deere's favor, as it currently has three trademarks registered on the principal register. However, those registrations were not obtained until 1988 and 2010, long after the years in which Deere alleges its mark became famous.

As FIMCO points out, Deere must demonstrate that its mark became famous *before* FIMCO began using a green and yellow color scheme on its agricultural equipment. [DN 115 at 13.] In this case, therefore, the more difficult question is perhaps not whether Deere's mark is famous at all, but, if its mark *is* famous, *when* it became so. It is as to the issues of if and when

Deere's mark became famous, and whether FIMCO's first use of green and yellow began *after* Deere's mark allegedly became famous, the Court believes, that genuine disputes of material fact exist.

FIMCO alleges that, through its alleged predecessor in interest, JDD, it has been using green and yellow on its agricultural equipment from "either [19]32 or [19]38 forward." [DN 115 at 12–13 (citing DN 100-4 at 4 (deposition of Kevin Vaughan)).] To demonstrate JDD's long use of green and yellow on agricultural equipment, FIMCO points to four color photographs dated December 9, 1957 which depict a JDD sprayer called "Big Butch" featuring yellow tanks and wheels with green accents. [*Id.* at 13 (citing DN 100-6 at 1–8).] FIMCO also relies on a JDD catalog dated 1960 which advertises "Big Butch" sprayers in green and yellow. [*Id.* (citing DN 5-1).]

Deere vigorously argues, however, that FIMCO has offered no admissible evidence to prove that FIMCO is JDD's successor in interest such that JDD's use of green and yellow can be attributed to FIMCO. [DN 98 at 9; 42–42.] In support of this claim, FIMCO relies exclusively on deposition testimony from Kevin Vaughan, the current CEO and sole owner of FIMCO. [DN 115 at 29; 31–32.] During his deposition, Vaughan testified that his father was a manager at JDD who then "took over [JDD] and bought it . . . in 1966. I was 6 years old." [DN 99-44 at 3; 6–7.] Vaughan testified that after his father took over the company, he "changed the name to FIMCO." [*Id.* at 7.] When asked whether this takeover was "an asset purchase or a name change," Vaughan replied

> [t]estimony of a 6 year old, my recollection, I believe it was in bankruptcy at the time. The family who owned it, the Hoefers, were either pushed into or declared bankruptcy, I have no idea.

> The way I understand it, my father went and raised some capital with three other individuals in Sioux City, and I would assume bought the assets of J-D-D from the bankruptcy court.
>
> And my father in doing that sat down with the creditors and said, you know, if you'll support me and you support this decision, we'll not only continue our business relationship with you, I'll pay off the past debt of the Hoefer family and make everything whole. And that was part of the conditions of the sale, the bankruptcy – the judge -- and so my father paid off all the bad debt from the Hoefer family and borrowed the money to keep J-D-D, slash, FIMCO going.

[*Id.* at 7–8.] When asked if he was aware exactly what assets his father purchased, Vaughan stated "I would assume the little bit of tooling there was, names, the building, what little inventory there was, probably some rolling stock, a few patents. I don't know how the receivables and payables were divided up in the bankruptcy. I have no idea how that was divided up." [*Id.* at 8.]

Vaughan testified that, as he was six years old at the time his father founded FIMCO in 1966, he learned of the facts surrounding JDD and FIMCO because "sitting around a Christmas table for years, we had to hear the story every Christmas about how hard it was for my father when he first got started. So it's pretty ingrained in my head." [*Id.*] When again questioned regarding "the actual assets that were acquired by your father or" FIMCO, Vaughan responded "Christmas stories, yeah." [*Id.* at 9.] When asked if he was aware of any documents that reflect FIMCO's purchase of JDD's assets out of bankruptcy, Vaughan stated that, after his father's death in 2011, "about the only thing [he] ever found . . . was [a] balance sheet" that depicted JDD's troubled financial condition the year before, the year of, and the year after FIMCO bought JDD assets out of bankruptcy. [*Id.*]

Deere asserts, and the Court is constrained to agree, that "the material cited to support or dispute [this] fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Because Vaughan testified that his knowledge of how FIMCO was formed and

its relation to JDD came entirely from what his father told him while he was growing up, Deere contends that this evidence is hearsay and inadmissible to prove that FIMCO is JDD's successor in interest. [DN 98 at 20.]

Hearsay, defined as "a statement that: **(1)** the declarant does not make while testifying at the current trial or hearing; and **(2)** a party offers in evidence to prove the truth of the matter asserted in the statement," Fed. R. Evid. 801(c), is inadmissible at the summary judgment stage. Sixth Circuit law is clear that "[a] party opposing a motion for summary judgment cannot use hearsay or other inadmissible evidence to create a genuine issue of material fact." *Sperle v. Michigan Dep't of Corr.*, 297 F.3d 483, 495 (6th Cir. 2002). Although, at the summary judgment stage, assertions in opposition to summary judgment "need not themselves be in a form that is admissible at trial," the fact remains that "the party opposing summary judgment must show that [it] *can* make good on the promise of the pleadings by laying out enough evidence that *will be* admissible at trial to demonstrate that a genuine issue on a material fact exists." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (citing *Celotex,* 477 U.S. at 324). Accordingly, "[h]earsay evidence ... must be disregarded." *Id.* (quoting *Alpert v. United States,* 481 F.3d 404, 409 (6th Cir. 2007)).

Thus far, FIMCO has relied only on hearsay evidence consisting of what Vaughan's father told him regarding FIMCO's takeover of JDD. Not only that, but it appears Vaughan is unaware of the precise details of the asset purchase he alleges took place in 1966. Although Deere raised these evidentiary issue several times in its motion, FIMCO merely reiterates the same evidence in its response. [*See* DN 115 at 29; 31–32.] Because the Court cannot foresee any admissible form in which FIMCO could present this same evidence at trial, the Court is forced to

42

conclude that FIMCO has failed to raise a genuine dispute of material fact as to whether JDD is its predecessor in interest.

This notwithstanding, it appears that neither party disputes that FIMCO did come into existence in 1966 and used the green and yellow colors at that time. As discussed above, Deere alleges that its yellow and green colors were famous by 1923 or, at the latest, by 1950. It appears that Deere's justifications for choosing these precise dates comes from various publications made therein; for instance, the 1923 trade publication and the 1950 book. But the Court finds that the mere fact that Deere's use of yellow and green were referenced in 1923 and 1950 is insufficient, at this stage, to say that 1923 or 1950 are the years Deere's mark became so "widely recognized" so as to make it famous for dilution purposes. Indeed, our sister courts have stated that "general media assertions and acclamations of fame are not strong evidence" of fame because fame for trademark dilution purposes "is not proven through the words of trade publication articles declaring it so." *Maker's Mark*, 703 F. Supp. 2d at 697; 699 (holding that Maker's Mark's red dripping wax seal was not famous despite several articles referencing its notoriety). Although Deere has additionally presented evidence as to its advertising and sales figures, the Court finds that determining a precise year in which Deere's mark became famous would require the Court to weigh all of the evidence, an improper task for the Court at summary judgment. Because the Court finds that factual issues exist as to whether Deere's mark became famous and whether it became famous *before* FIMCO began its use, the Court will deny Deere's motion for summary judgment as to its dilution claim.

### 2. Functionality

Deere has also moved for summary judgment as to FIMCO's affirmative defense of functionality and its third counterclaim which seeks invalidation of Deere's registered

trademarks on the grounds that they are functional. [DN 98 at 27.] The registration of a mark on the principal register is "prima facie evidence of the validity of the registered mark," 15 U.S.C. § 1115(a), and creates a "rebuttable presumption that the trademark is valid." *Fuji Kogyo Co. v. Pac. Bay Int'l, Inc.*, 461 F.3d 675, 683 (6th Cir. 2006). Another way to show a mark's validity is through its 'incontestability.'" *Maker's Mark*, 679 F.3d at 417. Under 15 U.S.C. § 1065, a mark becomes incontestable after it "has been in continuous use for five consecutive years subsequent to the date of such registration and is still in use in commerce," provided that the owner of the mark filed an affidavit with the Director within a year after the five-year period runs affirming that the incontestability requirements have been met. 15 U.S.C. § 1065(3). Once a mark becomes incontestable, "the registration shall be conclusive evidence of the validity of the registered mark." § 1115(b). Though the Court will address whether Deere's marks have become incontestable below in addressing FIMCO's motion for summary judgment, all marks, even incontestable marks, are subject to certain statutory challenges, including a claim "[t]hat the mark is functional," § 1115(b)(8), a finding of which makes the mark invalid and requires cancellation. *See Maker's Mark*, 679 F.3d at 417–18.

"The functionality doctrine . . . forbids the use of a product's feature as a trademark where doing so will put a competitor at a significant disadvantage because the feature is 'essential to the use or purpose of the article' or 'affects [its] cost or quality.'" *Qualitex Co. v. Jacobson Prod. Co.*, 514 U.S. 159, 169 (1995) (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 850 n.10 (1982)). A mark may be functional in more than one way, but the theory FIMCO alleges in this case is that of "aesthetic functionality." A mark may be deemed aesthetically functional if it includes a feature "the 'exclusive use of [which] would put competitors at a significant non-reputation-related disadvantage.'" *TrafFix Devices, Inc. v. Mktg.*

*Displays, Inc.*, 532 U.S. 23, 32 (2001) (quoting *Qualitex*, 514 U.S. at 165). The Sixth Circuit has explained that "where an aesthetic feature (like color), serves a significant function ... courts should examine whether the exclusive use of that feature by one supplier would interfere with legitimate competition." *Maker's Mark*, 679 F.3d at 418 (quoting *Antioch Co. v. W. Trimming Corp.*, 347 F.3d 150, 155 (6th Cir. 2003)).

The Sixth Circuit has identified two different tests courts apply when considering whether a mark is aesthetically functional under this "competition theory." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 642 (6th Cir. 2002); *Maker's Mark*, 679 F.3d at 418. These are the "comparative alternatives" test and the "effective competition" test. *Abercrombie*, 280 F.3d at 642; *Maker's Mark*, 679 F.3d at 418. "The inquiry in both tests is factual in nature." *Id.* If either test is satisfied, a trademark will be deemed aesthetically functional and will be cancelled. *See Maker's Mark*, 703 F. Supp. 2d at 684.

### a.  The Comparable Alternatives Test

The comparative alternatives test "asks whether trade-dress protection of certain features would nevertheless leave a variety of comparable alternative features that competitors may use to compete in the market. If such alternatives do not exist, the feature is functional; but if such alternatives do exist, then the feature is not functional." *Abercrombie*, 280 F.3d at 642.

Deere sets forth three reasons which it contends demonstrate that FIMCO has comparable alternatives "because it could color its agricultural equipment with literally any color scheme other than green and yellow, at no detriment to itself." [DN 98 at 21–22.] FIMCO responds to each of these reasons, in essence, by asserting that no comparable alternatives exist "because farmers want to match their towed equipment with their John Deere tractors. Other colors would

obviously not match, and thus would put FIMCO at a significant non-reputation-related disadvantage." [DN 115 at 22.]

First, Deere argues that FIMCO already sells its equipment in many other colors and those products are still able to function as agricultural equipment. [DN 98 at 28–29.] Indeed, in his deposition, Vaughan testified that FIMCO's practice has always been to "allow people to come in, take our product and put their name on it and market it and it's still called FIMCO or a Schaben, but it's their colors." [DN 99-44 at 75–6.]  In response, FIMCO concedes that it sells its products in other colors, but contends that it only "does so because farmers want to match their towed equipment to their tractors, and not all tractors are green and yellow. So for customers of Case IH, FIMCO does make custom red/black colored equipment. But the vast majority of FIMCO's customers have John Deere tractors." [DN 115 at 24.]

Second, Deere asserts that several of FIMCO's competitors use color schemes that do not include yellow *and* green and are still able to compete in the market. Deere provides eight examples, including CropCare, which sells sprayers "with yellow tanks and silver frames," Sprayer Specialties, which sells sprayers with "grey bodies, grey tanks, and grey wheels," FAST Manufacturing, which sells sprayers and applicators with "black frames, yellow tanks, and yellow wheels," and Big John Manufacturing, which also sells sprayers with "black frames, yellow tanks and yellow wheels." [DN 98 at 29–30 (citing DN 98-2 (Felter Declaration) and exhibits).]   FIMCO responds by arguing that Deere "omits" that 38 other companies sell equipment in green *and* yellow, which again demonstrates that farmers want to match their equipment to their tractors. [DN 115 at 24–25; 28.] However, in its reply, Deere explains that, of the 38 companies FIMCO mentions, 35 have since, at Deere's request, ceased use of green and yellow color schemes. [DN 141 at 19 (citing DN 99-73 at 2).] Further, Deere states that one of

those companies, FAST, "transitioned from matching the Deere Colors to using yellow and black, and has found that it can compete just as effectively—in fact, its General Manager testified that FAST has not lost a single sale as a result of that color transition." [DN 98 at 35 (citing DN 98-1 at 4–5 (Roll Deposition); DN 99-79 at 3–4 (Roll Declaration)).] FAST's General Manager, Clay Roll, explained that

> following FAST's color transition, one of our longtime customers (who owns a Deere tractor and is extremely devoted to the Deere brand) asked me repeatedly if FAST could still manufacture a sprayer for him that had the green and yellow colors FAST had previously used. I had to tell him repeatedly that we could not sell him equipment in those colors. Eventually, he purchased one of FAST's sprayers in FAST's current colors of yellow and black.

[DN 99-79 at 4.]

Third, Deere argues that it would not be costly for FIMCO to use different color schemes on its equipment. [DN 98 at 28–31.] In response, FIMCO concedes that it would not "be disadvantaged due to increased costs to paint the equipment. Rather, the clear disadvantage for FIMCO is that farmers want their towed equipment to match their tractors." [DN 115 at 25.] However, the Sixth Circuit has noted that functional "features are ones that 'competitors would have to spend money not to copy but to design around.'" *Abercrombie*, 280 F.3d at 643 (quoting *W.T. Rogers Co. v. Keene*, 778 F.2d 334, 344 (7th Cir. 1985)). *See also Maker's Mark*, 703 F. Supp. 2d at 686 ("None of Cuervo's witnesses . . . convinced the Court that it would be difficult or costly for competitors to design around the red dripping wax trademark."); *Maker's Mark*, 679 F.3d at 418 ("The district court was not convinced 'that it would be difficult or costly for competitors to design around' the mark and we do not disagree. There is more than one way to seal a bottle with wax to make it look appealing, and so Cuervo fails the comparable alternatives test.") That FIMCO acknowledges it would not be costly to design around the green and yellow color scheme weighs against a finding that it has no comparable alternatives.

FIMCO concentrates much of its response comparing this case to *Deere & Co. v. Farmhand, Inc.*, 560 F. Supp. 85 (S.D. Iowa 1982), *aff'd*, 721 F.2d 253 (8th Cir. 1983), a 1982 district court case in which the court found that the color green used by John Deere was aesthetically functional because "farmers prefer to match their loaders to their tractor" and "that protection of John Deere green and the features that are common to both products would hinder Farmhand in competition." 560 F. Supp. at 98. As an initial matter, the Court notes, as Deere points out, that this thirty-five year old decision was rendered long before the Supreme Court addressed the aesthetic functionality doctrine in *Qualitex* in 1995 and *TrafFix* in 2001, and before the Sixth Circuit applied those standards in *Abercrombie* and *Maker's Mark*. [*See* DN 141 at 20–21.] Accordingly, the *Farmhand* court did not apply the modern standard for aesthetic functionality established by the Supreme Court in those cases, which requires a consideration of whether allowing trademark protection of a certain feature "would put competitors at a significant *non-reputation-related* disadvantage.'" *TrafFix*, 532 U.S. at 32 (quoting *Qualitex*, 514 U.S. at 165). Similarly, it did not apply the Sixth Circuit's comparable alternatives or effective competition tests that govern our resolution of this issue today.

Moreover, *Farmhand* is factually and legally distinguishable from the present case. In *Farmhand*, Deere sought to prohibit, entirely, the defendant's use of the particular shade of what it called "John Deere green." *Farmhand*, 560 F. Supp. at 88; 93; 96–97. This is in stark contrast to this case, in which Deere seeks protection of its green *and* yellow color scheme but has repeatedly stated that FIMCO is free to "use a number of other colors paired with green *or* yellow, or it could paint its equipment *all green* or *all yellow*." [DN 98 at 34 (emphasis added).]

It may present a different question if Deere sought to completely prohibit all use of the color green or all use of the color yellow, as was the case in *Farmhand*. But here, Deere seeks to

prohibit the use of a combination of the two. The Sixth Circuit has recognized that trademark rights in one specific color may differ from trademark rights in a combination of colors. In *Kerr Corp. v. Freeman Manufacturing & Supply Co.*, the plaintiff, Kerr, and the defendant, Freeman, were manufacturers and distributors of jewelry injection wax. No. 08-3330, 2009 WL 750986, at *1 (6th Cir. Mar. 23, 2009). Kerr alleged that Freeman infringed upon its trademark "rights by using Kerr's wax-color scheme, wax names, and 'flake' form." *Id.* at *4. Freeman admitted to using "the exact same set of colors that Kerr uses. It contends, however, that Kerr does not have protectable trade-dress rights in that set of colors because the colors are 'functional features' of the wax." *Id.* at 5. The court disagreed, explaining, in part, that

> whether any particular color provides a functional advantage is largely irrelevant, because Kerr does not claim trade-dress rights in any particular color. Rather, Kerr claims rights only in its overall color *scheme;* that is, in the eight colors, collectively, that it selected for its waxes . . . Nothing in the record suggests that Kerr's *scheme* is "essential to the purpose of" or "affects the cost or quality of" the waxes *Qualitex,* 514 U .S. at 165. Moreover, nothing in the record suggests that Freeman would be placed "at a significant non-reputation-related disadvantage" if it were forced to adopt a different scheme . . . Kerr's color scheme therefore is not functional."

*Id.* at *6.

Additionally, the Court agrees, as Deere argues, that courts have, since the decision in *Farmhand*, rejected the argument that a mere desire to match, alone, is sufficient for a finding of aesthetic functionality. For example, the Seventh Circuit has held that for "[a] design feature to be aesthetically functional [it] must be pleasing in itself; it is not enough that a person who owns two items with that feature wants a matched pair." *W.T. Rogers*, 778 F.2d at 344. *See also Leviton Mfg. Co. v. Universal Sec. Instruments, Inc.*, 409 F. Supp. 2d 643, 650 (D. Md. 2006) ("The court is not persuaded . . . that Leviton's distinct colors are 'aesthetically functional.' The

fact that USI may want to match the color of its devices so that they can be used with Leviton's electrical devices does not vitiate the purpose and the right of Leviton to protect its trade dress.").

Similarly, the Ninth Circuit has "squarely rejected the notion that 'any feature of a product which contributes to the consumer appeal and saleability of the product is, as a matter of law, a functional element of that product.'" *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1073 (9th Cir. 2006) (quoting *Vuitton Et Fils S.A. v. J. Young Enterprises, Inc.*, 644 F.2d 769, 773 (9th Cir. 1981)). Rather, the *Au-Tomotive* court held that

> [i]n practice, aesthetic functionality has been limited to product features that serve an aesthetic purpose wholly independent of any source-identifying function." *See Qualitex*, 514 U.S. at 166, 115 S.Ct. 1300 (coloring dry cleaning pads served nontrademark purpose by avoiding visible stains); *Publications Int'l, Ltd. v. Landoll, Inc.*, 164 F.3d 337, 342 (7th Cir. 1998) (coloring edges of cookbook pages served nontrademark purpose by avoiding color "bleeding" between pages); *Brunswick Corp. v. British Seagull Ltd.*, 35 F.3d 1527, 1532 (Fed. Cir. 1994) (color black served nontrademark purpose by reducing the apparent size of outboard boat engine); *Pagliero*, 198 F.2d at 343 (china patterns at issue were attractive and served nontrademark purpose because "one of the essential selling features of hotel china, if, indeed, not the primary, is the design").

*Id.* In *Au-Tomotive*, the court determined that "[a]ny disadvantage Auto Gold claims in not being able to sell Volkswagen or Audi marked goods is tied to the reputation and association with Volkswagen and Audi," and accordingly rejected the argument that Volkswagen and Audi's trademarks were aesthetically functional. *Id.* at 1074. Similarly, here, FIMCO argues that its customers "want to match their towed equipment with their John Deere tractors." [DN 115 at 22.] However, FIMCO has not explained why any disadvantage it would suffer if it were prohibited from using a combination of green and yellow would be a "*non-reputation-related disadvantage*", *TrafFix*, 532 U.S. at 32 (quoting *Qualitex*, 514 U.S. at 165); that is, a disadvantage *unrelated* to the reputation of John Deere brand tractors.

FIMCO states, repeatedly, that no comparable alternatives exist because farmers want their agricultural equipment to match and complement their tractors. [DN 115 at 22–25.] For this assertion, FIMCO points to the *Farmhand* decision, its five expert reports, and deposition testimony of two of Deere's witnesses. [*Id.* at 22–24.] As an initial matter, Deere argues that, based upon the testimony of Deere's expert witnesses, only some customers are concerned with matching. [DN 98 at 33.] But even assuming FIMCO's assertions about matching are correct, FIMCO has still made no attempt whatsoever to explain why the use of a different color scheme involving green *or* yellow (just not both) would not constitute a comparable alternative that would allow it to satisfy the needs of its customers.

Rather than respond to Deere's suggestions that FIMCO could, as comparable alternatives, use all green, all yellow, or some variation of green and another color or yellow and another color, FIMCO instead repeatedly states that "[a] different color in this case will *not* appeal to farmers because they specifically want to match their towed equipment to their tractors." [DN 115 at 25.] Again, even if this is the case, FIMCO did not offer any evidence to refute Deere's argument that an all green or all yellow sprayer, or "a sprayer that is green and black or yellow and gray 'complements' a tractor in Deere Colors by referencing them without matching them color-for-color." [DN 98 at 34.] Indeed, Deere cites deposition testimony from each of FIMCO's five expert witnesses admitting that such alternative color schemes would "complement" or not "clash" with Deere tractors, though some of them claimed that such alternative schemes would not "match". [*Id.* at 34 (citing DN 99-48 (Schwarz Deposition); DN 99-45 (Kessler Deposition); DN 99-46 (Staack Deposition); DN 99-47 (Perkins Deposition)).]

As in *Maker's Mark*, in which the Court found that "[t]here is more than one way to seal a bottle with wax to make it look appealing," here, the Court finds that FIMCO has failed to

carry its burden of demonstrating a genuine dispute of material fact as to whether "there is more than one way" to paint agricultural equipment to match and complement Deere tractors. *See Maker's Mark*, 679 F.3d at 418. Without more from FIMCO to persuade the Court that an inability to use the green *and* yellow color scheme would not provide a comparable alternative, and therefore would place FIMCO at a significant non-reputation related disadvantage, the Court finds that FIMCO fails this test.

### b. The Effective Competition Test

"The 'effective competition' test, asks ... whether trade dress protection for a product's feature would hinder the ability of another manufacturer to compete effectively in the market for the product." *Abercrombie*, 280 F.3d at 642. "If such hindrance is probable, then the feature is functional and unsuitable for protection. If the feature is not a likely impediment to market competition, then the feature is nonfunctional and may receive trademark protection." *Id. See Maker's Mark*, 679 F.3d at 418–19 ("As to the effective competition test, the district court found that 'red wax is not the only pleasing color of wax ... nor does it put competitors at a significant non-reputation related disadvantage to be prevented from using red dripping wax.'") Because the comparable alternatives and effective competition tests are similar, the parties' arguments relating to the effective competition test largely overlap with those for the comparable alternative test, and the Court similarly finds that FIMCO fails the effective competition test.

Here, FIMCO reiterates its same argument that "[u]ndoubtedly, FIMCO would be hindered from competing effectively in the market against Deere if it could not offer purchasing farmers the option to match their agricultural equipment to their tractors." [DN 115 at 26.] However, as Deere argues, and the Court agrees, FIMCO's "matching" argument, alone, is not adequate grounds for a finding of aesthetic functionality. [See Part II(2)(a) above.] The most

FIMCO offers in support of its effective competition argument is the five identical opinions of its expert witnesses, each of whom opine that "[b]ecause John Deere has a large share of the U.S. tractor and agricultural vehicle market, under these circumstances, it would be a substantial competitive disadvantage for FIMCO to not be able to offer its products in green and yellow." [DN 96-9; DN 96-11; DN 96-12; DN 96-13; DN 96-14.] However, neither FIMCO, nor its witnesses, have persuaded the Court that any disadvantage it would suffer if it were unable to offer equipment in green and yellow is *unrelated* to the reputation of John Deere. Rather, each of FIMCO's witnesses testified, in essence, that they feared they may lose sales if they were unable to match their equipment to their John Deere tractors. [*See, e.g.*, DN 96-10 (Yeazel Deposition) ("I'm afraid if we didn't have that option, we would run into . . . a few more of . . . those instances where we would . . . lose equipment because we didn't have the color to match it up."); DN 96-17 at 56 (Kessler Deposition) ("In the past, people have come to me and -- for instance, for the red sprayer there. That guy wants a red sprayer. He's not going to buy a green sprayer, probably."); DN 96-18 at 46 (Schwarz Deposition) (Customers "care greatly about what the appeal looks like when it's out in the field. They don't want a green tractor and a -- with yellow wheels attached to, you know, a red frame, necessarily, or a black frame. They would prefer it to match their tractor.").]

Based upon this testimony, it appears that the disadvantage claimed by FIMCO as a result of not being able to match Deere tractors color-for-color "is tied to the reputation and association with" John Deere, *Au-Tomotive*, 457 F.3d at 1074. And because it is not enough for purposes of aesthetic functionality that farmers "want[] a matched pair," *W.T. Rogers*, 778 F.2d at 344, the Court cannot say that FIMCO would be placed at a "significant non-reputation-related disadvantage." *TrafFix*, 532 U.S. at 32 (quoting *Qualitex*, 514 U.S. at 165). Accordingly,

FIMCO also fails the effective competition test, and Deere's motion for summary judgment with regard to FIMCO's affirmative defense of functionality and its third counterclaim seeking invalidation of Deere's registered trademarks on the grounds that they are functional is granted.

### 3. FIMCO's Defenses of Laches, Estoppel, Acquiescence, and Implied License

Deere has also moved for summary judgment on all of FIMCO's affirmative equitable defenses, which consist of laches, acquiescence, estoppel, and implied license. [DN 5 at 6–7.] In support of these defenses, FIMCO relies on letters sent by Deere to JDD, the company FIMCO alleges is its predecessor in interest, in 1944 and 1963. [DN 115 at 29–30.] The first letter, dated April 21, 1944, appears to take issue with the possibility that "the letters J-D-D mean John Deere Dealers." [DN 99-59 at 2.] Deere stated in the letter that it would not consider the use of such letter to constitute trademark infringement so long as FIMCO agreed to insert the name "Hoefer" above the "J-D-D" letters on its labels and to refrain from indicating in its advertisements that JDD meant John Deere Dealers. [*Id.*]

The second letter, dated September 18, 1963, takes issue with the fact that the use of the "J-D-D" letters, along with "the use of the John Deere colors; yellow and green . . . tend to mislead a purchaser into believing that he is buying a product made by John Deere." [DN 99-61 at 2.] FIMCO asserts that these letters demonstrate that Deere has long been aware of JDD's use of green and yellow and that FIMCO, as JDD's alleged successor in interest, is therefore protected by certain equitable defenses that have arisen due to Deere's delay in bringing suit. [DN 115 at 29–31.]

### a. Laches

Deere asserts, first, that FIMCO's laches defense fails as a matter of law, as laches does not preclude injunctive relief. [DN 98 at 39.] The Sixth Circuit characterizes the defense of

54

"[l]aches [a]s a negligent and unintentional failure to protect one's rights." *Elvis Presley Enterprises, Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 894 (6th Cir. 1991). "A party asserting laches must show: (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting it." *Chirco v. Crosswinds Communities, Inc.*, 474 F.3d 227, 231 (6th Cir. 2007) (quoting *Herman Miller, Inc. v. Palazzetti Imports and Exports, Inc.,* 270 F.3d 298, 320 (6th Cir. 2001)). However, the Sixth Circuit has expressly stated that, "[a]lthough laches precludes a plaintiff from recovering damages, it does not bar injunctive relief." *Kellogg Co. v. Exxon Corp.*, 209 F.3d 562, 568 (6th Cir. 2000) (citing *TWM Mfg. Co. v. Dura Corp.*, 592 F.2d 346, 349–50 (6th Cir. 1979); *Tandy Corp. v. Malone & Hyde, Inc.*, 769 F.2d 362, 366 n.2 (6th Cir. 1985)). *See also Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 412 (6th Cir. 2002) (Laches "does not prevent plaintiff from obtaining injunctive relief.") Rather, when a plaintiff "seek[s] injunctive relief only, . . . laches [i]s inapplicable and . . . [defendants] must prove acquiescence." *Kellogg*, 209 F.3d at 569.

Though FIMCO acknowledges the *Kellogg* case, it points out that the *Kellogg* court further indicated that while delay alone is insufficient to preclude injunctive relief, "there is that narrow class of cases where the plaintiff's delay has been so outrageous, unreasonable and inexcusable as to constitute a virtual abandonment of its right." *Id.* (quoting *Univ. of Pittsburgh v. Champion Prod. Inc.*, 686 F.2d 1040, 1044–45 (3d Cir. 1982); *Anheuser–Busch, Inc. v. DuBois Brewing Co.*, 175 F.2d 370, 374 (3d Cir. 1949) ("[M]ere delay by the injured party . . . would not bar injunctive relief. This doctrine, however, has its limits; for example, had there been a lapse of a hundred years or more, we think it highly dubious that any court of equity would grant injunctive relief against even a fraudulent infringer.")).

FIMCO argues that, here, Deere's alleged delay of "up to almost seventy years" fits the "outrageous, unreasonable[,] and inexcusable" standard so "as to constitute a virtual abandonment of its right." [DN 115 at 32–33 (citing *Kellogg*, 209 F.3d at 569; 574).] Specifically, FIMCO asserts that, while Deere claims it discovered FIMCO's use of green and yellow in 2011, "FIMCO maintains that Deere has been aware of FIMCO's (or its predecessor's) use of green and yellow for almost seventy years, and almost fifty years for its ag sprayers and applicators." [*Id.* at 33.] In support of this claim, FIMCO relies solely on the letters Deere sent to JDD in 1944 and 1963. [*Id.* at 34.] Although, as FIMCO argues, courts have recognized that equitable defenses extend "to successors-in-interest where privity has been established," *Radio Sys. Corp. v. Lalor*, 709 F.3d 1124, 1131 (Fed. Cir. 2013), FIMCO has failed to establish the requisite privity between it and JDD. One court explained the privity inquiry as follows:

> Whether two parties are in privity depends on the nature of their relationship in light of the alleged infringement. "The closer that relationship, the more the equities will favor applying the doctrine" of assignor estoppel. *Shamrock Techs.*, 903 F.2d at 793. Assessing a relationship for privity involves evaluation of all direct and indirect contacts. *See Intel*, 946 F.2d at 838.

*Mentor Graphics Corp. v. Quickturn Design Sys., Inc.*, 150 F.3d 1374, 1379 (Fed. Cir. 1998).

In *Mentor Graphics*, for instance, the court determined that two companies, Meta and Mentor, were in privity when "Mentor owns all of Meta's stock—a reliable indicator of extensive, if not complete, control over Meta's operations." *Id.* However, that court further noted that "[e]ven a party that owns less than a majority of a company's stock can still exercise effective control over the company's operations." *Id. See also Radio Sys. Corp. v. Lalor*, No. C10-828RSL, 2012 WL 254026, at *9 (W.D. Wash. Jan. 26, 2012), *aff'd in part, rev'd in part and remanded on other grounds*, 709 F.3d 1124 (Fed. Cir. 2013) (Finding privity where the parties did not dispute that one company, Innotek, was "a wholly owned subsidiary of Radio Systems or that Radio Systems purchased Innotek with an eye toward incorporating Innotek's

designs and technologies into its own product lines," "that Innotek and Radio Systems are headed by the same individual[,] or that Radio Systems, as demonstrated by its subsequent incorporation of Innotek's designs, exerts substantial control over its subsidiary.")

Here, Deere again argues that FIMCO has failed to establish that it is JDD's successor in interest such that the 1944 and 1963 letters can be attributed to FIMCO. [DN 141 at 23.] Therefore, Deere states that, while it did request that JDD stop using green and yellow on its liquid containers in 1963, "J-D-D apparently ceased to exist in 1966; and Deere learned of FIMCO's use of the Deere Colors in 2011." [*Id.*] As the Court noted above in Part II(A)(1) of this Memorandum Opinion and Order, FIMCO has simply failed to offer admissible evidence demonstrating FIMCO's privity with JDD. Rather, FIMCO has offered only the inadmissible hearsay testimony of Vaughan, which the Court agrees "cannot be presented in a form that would be admissible in evidence" at trial. Fed. R. Civ. P. 56(c)(2). Accordingly, the Court cannot find that the 1963 letter can serve as the basis for finding any unreasonable or inexcusable delay on Deere's part that amounts to virtual abandonment as discussed in *Kellogg*. For these reasons, Deere's motion for summary judgment with regard to FIMCO's affirmative defense of laches is granted.

**b. Acquiescence and Estoppel**

Because the defense of laches is unavailable, FIMCO must instead demonstrate acquiescence, estoppel, or implied license. The *Kellogg* court explained that, while "both laches and acquiescence require proof that the party seeking to enforce its trademark rights has unreasonably delayed pursuing litigation and, as a result, materially prejudiced the alleged infringer, acquiescence requires more." *Kellogg*, 209 F.3d at 569. Specifically, "acquiescence is intentional. Acquiescence requires 'a finding of conduct on the plaintiff's part that amounted to

an assurance to the defendant, express or implied, that plaintiff would not assert his trademark rights against the defendant.'" *Elvis Presley Enterprises*, 936 F.2d at 894 (quoting *Sweetheart Plastics, Inc. v. Detroit Forming, Inc.,* 743 F.2d 1039, 1046 (4th Cir. 1984)). Similarly, estoppel "requires more than a showing of mere silence on the part of a plaintiff; defendant must show that it had been misled by plaintiff through actual misrepresentations, affirmative acts of misconduct, [or] intentional misleading silence." *Nartron*, 305 F.3d at 412.

Although the Court has determined that Deere's 1944 and 1963 letters are not attributable to FIMCO for purposes of its affirmative defenses, the Court finds that FIMCO has nonetheless presented at least enough evidence to create a genuine dispute of material fact as to its defenses of acquiescence and estoppel. Specifically, FIMCO asserts that Deere discovered FIMCO's allegedly infringing use of green and yellow prior to 2011, the year in which Deere alleges it became aware of such use. In support of this argument, FIMCO states that it has long published catalogs featuring its green and yellow products "which have been widely available and promoted to the public at-large." [DN 115 at 30–31.] FIMCO further argues that it has displayed its green and yellow products "at multiple farm shows every year . . . Oftentimes, these shows have been held in conjunction with John Deere products and John Deere dealers. For Deere to suggest it somehow only just learned of FIMCO's color scheme in 2011 is disingenuous at best." [*Id.* at 31.] Further, FIMCO states that many dealers sell both Deere and FIMCO products, which "underscore[s] what is shown conclusively above: Deere has unreasonably delayed bringing suit for decades after it had notice of FIMCO's allegedly infringing activity." [*Id.*]

In his deposition, Vaughan testified that FIMCO representatives have attended several farm shows over the years at which it displays catalogs and products featuring green and yellow colors. [DN 115-11 at 28.] Vaughan testified that Deere representatives are also present at every

farm show, that Deere likewise displays product information and products in its own booths, and that company representatives "were always walking around" at the shows looking at other companies' booths. [Id. at 29–30.] Vaughan stated that he was "sure [Deere] w[as] like every other competitor I had out there. They came and collected a piece and took it home to take a look at it and figure out what it is we were doing." [*Id.* at 30.] Moreover, Vaughan testified that FIMCO's salespeople often visit and take product brochures and information to John Deere dealerships across the country. [*Id.* at 32–33.] This evidence indeed may tend to suggest that Deere representatives were aware of FIMCO's use of green and yellow at least prior to 2011.

Deere states, in opposition, that it "is not aware of any person at Deere with responsibility with respect to (or knowledge of) Deere's trademark enforcement policies who learned of FIMCO's infringing use of the Deere Colors before 2011." [DN 98 at 41 (citing DN 99-73 at ¶ 9 (Myers Declaration)).] However, the Court finds that between this assertion and FIMCO's arguments and deposition testimony to the contrary, there is likely a genuine dispute as to this fact. Drawing all inferences in favor of FIMCO as the nonmoving party, the Court is persuaded that a reasonable fact finder could find that Deere was aware of FIMCO's use of green and yellow prior to 2011 such that its failure to assert its rights amounted to an implied assertion that it would not assert those rights, *Elvis Presley Enterprises*, 936 F.2d at 894, or "intentional misleading silence." *Nartron*, 305 F.3d at 412. At the very least, because this matter is set for a bench trial in which the Court will be the designated trier of fact, the Court feels better making its decision on this issue after hearing and weighing all of the evidence presented at trial. Accordingly, Deere's motion for summary judgment on FIMCO's affirmative defenses of acquiescence and estoppel is denied.

### c. Implied License

Finally, the Court agrees that FIMCO has failed to raise a genuine factual dispute as to its affirmative defense of implied license. The Sixth Circuit indeed recognizes that implied licenses can arise in the trademark context. *See Big Cola Corp. v. World Bottling Co., Ltd.*, 134 F.2d 718, 721 (6th Cir. 1943) ("[A]lthough it may be said that the fact that a party fails to bind himself expressly to perform, may be an indication of lack of mutuality, nevertheless, upon a consideration of the entire contract, if his promise can be implied, the agreement is binding.") Courts in this Circuit have held that "[t]he test for an implied license is objective." *L.F.P.IP., Inc. v. Hustler Cincinnati, Inc.*, No. 1:09-CV-0913 WOB, 2011 WL 5024356, at *6 (S.D. Ohio Oct. 20, 2011), *aff'd sub nom. L.F.P.IP, LLC v. Hustler Cincinnati, Inc.*, 533 F. App'x 615 (6th Cir. 2013) (citing *Doeblers' Pennsylvania Hybrids, Inc. v. Doebler*, 442 F.3d 812, 824 (3d Cir. 2006), *as amended* (May 5, 2006)). For instance, the *L.F.P.IP.* court held that an implied license existed where the conduct of the parties clearly demonstrated that was the case. *Id.* Specifically, the defendant "paid licensing fees for years to LFP, uninterrupted and without protest." *Id. See also McCoy v. Mitsuboshi Cutlery, Inc.*, 67 F.3d 917, 920 (Fed. Cir. 1995) ("In some circumstances . . . the entire course of conduct between a patent or trademark owner and an accused infringer may create an implied license.")

Here, FIMCO argues that the parties "have had relatively close ties . . . stemming from their joint attendance at farm shows and" the fact that some dealers sell both FIMCO and Deere equipment. [DN 115 at 37.] FIMCO contends that this demonstrates that "both parties had a mutual understanding . . . that such use was implicitly permitted by Deere to the extent Deere could have prevented such use." [*Id.*] The Court disagrees. As an initial matter, FIMCO cites no evidence in support of these claims. Furthermore, the Sixth Circuit has indicated that "[a]n

obligation will be implied when it is clear that such was intended." *Big Cola Corp.*, 134 F.2d at 721. Here, the parties' conduct was not such that they intended FIMCO to have a license to use green and yellow colors. The Court agrees, as Deere argues, that "[n]o evidence shows that Deere and FIMCO ever had a relationship, much less one reflecting an understanding that FIMCO had a license to use the Deere Colors." [DN 98 at 47.] Therefore, Deere's motion for summary judgment on FIMCO's affirmative defense of implied license is granted.

## III.   FIMCO's Motion for Partial Summary Judgment [DN 100]

The Court now turns to FIMCO's motion for summary judgment, in which FIMCO seeks judgment as a matter of law on three claims: 1) that Deere has no trademark rights in yellow tanks on towed agricultural sprayers and applicators, 2) Deere's registered trademarks have not become "incontestable" with regard to towed sprayers and applicators, and 3) that farmers "desire to match their agricultural equipment to their John Deere tractor." [DN 100 at 1–2.] For the following reasons, FIMCO's motion is denied.

### 1.   Trademark Protection for Yellow Tanks

FIMCO has moved, first, for summary judgment on the issue of whether Deere has any enforceable trademark rights, either through its registrations or at common law, in "yellow tanks." [*Id.* at 2.]  FIMCO asserts that Deere does not, and therefore requests that the Court "dismiss with prejudice those portions of Claims 1-3 and Deere's Prayer for Relief that in any way relate to yellow tanks." [*Id.* at 10.]

#### a.   Deere's Registered Trademarks

In its motion, FIMCO asserts that, as all three of Deere's three registered trademarks "are silent as to yellow tanks," that [i]t is clear that the plain language of the Trademarks encompass only a green body and yellow wheels." [*Id.* at 9.] Similarly, FIMCO argues that the depictions of

Deere products in each of its trademark registrations, which each indicate green bodies with yellow wheels, support a finding that Deere has no right to the exclusive use of yellow tanks. [*Id.* at 9–10.]

In response, Deere argues that the mere fact that its registrations do not mention yellow tanks does not compel a finding that FIMCO's use of yellow tanks is non-infringing. [DN 113 at 13–16.]  Rather, Deere asserts that "the key legal questions at trial will be whether FIMCO's use of *identical* shades of green and yellow on its similar equipment creates a likelihood of confusion (the touchstone for trademark infringement) or a likelihood of dilution (the standard for trademark dilution)." [*Id.* at 16.] The Court agrees.

In determining whether a defendant's use of a mark infringes on the plaintiff's mark, the Sixth Circuit has identified eight factors for courts to consider. *Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982). These factors include: "1. strength of the plaintiff's mark; 2. relatedness of the goods; 3. similarity of the marks; 4. evidence of actual confusion; 5. marketing channels used; 6. likely degree of purchaser care; 7. Defendant's intent in selecting the mark; [and] 8. likelihood of expansion of the product lines." *Maker's Mark*, 679 F.3d at 419 (quoting *Frisch's*, 670 F.2d at 648). The third factor, similarity of the marks, "is a factor of considerable weight." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 283 (6th Cir. 1997). With regard to this factor, courts have explained that "[t]he appearance of the litigated marks side by side in the courtroom does not accurately portray market conditions." *Id.*

> Rather, courts must determine whether a given mark would confuse the public when viewed alone, in order to account for the possibility that sufficiently similar marks "may confuse consumers who do not have both marks before them but who may have a 'general, vague, or even hazy, impression or recollection' of the other party's mark."

*Id.* (citing *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1188 (6th Cir. 1988)). *See also Maker's Mark*, 679 F.3d at 421 (same).

In other words, to constitute infringing conduct, a defendant's mark need not be *identical* to the plaintiff's, but must simply be "sufficiently similar" so as to weigh in favor of a finding of likelihood of confusion. *See Daddy's*, 109 F.3d at 283*; see also AutoZone*, 373 F.3d at 795–96 (The marks "AutoZone" and "PowerZone," though bearing some similarity, were dissimilar enough "such that the likelihood of confusion [wa]s small."); *Maker's Mark*, 679 F.3d at 421–22 (adopting the district court's findings that the similarity factor narrowly favored Maker's Mark where, "though '[v]ery few consumers ... would buy one product believing it was the other,' the seals were facially similar."). In conducting this analysis, "courts must view marks in their entirety and focus on their overall impressions, not individual features." *Daddy's*, 109 F.3d at 283 (citing *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1109 (6th Cir. 1991)).

A similar standard governs dilution by blurring, which occurs due to an "association arising from the *similarity* between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark." 15 U.S.C § 1125(c)(2)(B). In evaluating a claim of dilution by blurring, one of the elements a plaintiff must prove is that the defendant's use of the junior mark "is likely to cause dilution by blurring . . . of the famous mark." § 1125(c)(1). Again, the junior mark need not be identical, but rather similar enough to give rise to an *association* that makes the famous mark less distinctive.

Accordingly, the Court cannot say, without weighing all of the relevant *Frisch's* factors and the relevant dilution factors, including the degree of similarity between Deere and FIMCO's marks, whether FIMCO's use of yellow tanks infringes or dilutes Deere's marks. Although

Deere cited evidence in its response to FIMCO's motion that it argues demonstrates a likelihood of confusion and likelihood of dilution [DN 113 at 16–19], as FIMCO did not move for summary judgment as to those broad claims, the Court will not weigh those factors at this stage. Accordingly, FIMCO's motion for summary judgment as to the narrow issue of whether yellow tanks are protected under Deere's registered marks is denied.

### b.  Common Law Trademark Rights

FIMCO further asserts that Deere has no common law right to prohibit FIMCO from using yellow tanks on its agricultural equipment. [DN 100-1 at 10.] FIMCO makes two arguments in support of this claim. First, FIMCO claims that Deere did not manufacture or sell yellow tanks in the United States between 1968 and 2013, and second, FIMCO claims prior and continuous use of yellow tanks on its sprayers and applicators since the 1930s. [*Id.* at 10–12.] In response, Deere asserts that FIMCO has failed to establish either of these facts as true and that, as with Deere's registered trademarks, the relevant inquiry will be whether the similarity of the marks is likely to cause confusion, not whether FIMCO has copied Deere's marks exactly. [DN 113 at 20.]

"A party establishes a common law right to a trademark only by demonstrating that its use of the mark was 'deliberate and continuous, not sporadic, casual or transitory.'" *Circuit City Stores, Inc. v. CarMax, Inc.*, 165 F.3d 1047, 1054–55 (6th Cir. 1999) (quoting *La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.,* 495 F.2d 1265, 1272 (2d Cir. 1974)). Another court explained that, "put another way, '[c]ommon law trademark rights develop when goods bearing the mark are placed in the market and *followed by continuous commercial utilization.*'" *EAT BBQ LLC v. Walters*, 47 F. Supp. 3d 521, 528 (E.D. Ky. 2014) (quoting *McDonald's Corp. v. Burger King Corp.*, 107 F. Supp. 2d 787, 790 (E.D. Mich. 2000)). Here,

64

Deere alleges in its complaint that, "[b]y reason of Deere's extensive use and promotion, Deere has obtained a protected right to the exclusive use of green-bodied wheeled agricultural equipment with yellow tanks or wheels, both in the Commonwealth of Kentucky and elsewhere in the United States." [DN 1 at 8.] FIMCO alleges, however, that Deere has no common law rights because it has not continuously used its green and yellow colors on tanks.

In support of its argument that Deere has no common law rights in yellow tanks specifically, FIMCO points to deposition testimony from Dahlstrom, Deere's archivist, in which Dahlstrom stated that the earliest color photograph he was able to find of a John Deere agricultural sprayer with a yellow tank was from 1968. [DN 100-7 at 4–5.] Dahlstrom also testified regarding products Deere sold in 1964 and 1960 which he believed used yellow tanks and, although he could not say for sure, he believed all of these products "were more than likely" sold in the United States. [*Id.* at 6–7.] FIMCO further states in its motion that Dahlstrom "testified that Deere sold those agricultural sprayers in the 1960s and did not begin offering a towed agricultural sprayer in the United States again until it entered into a private label agreement with FAST" in 2013. [DN 100-1 at 11.] However, as Deere correctly points out in its response, "FIMCO cites *no* evidence for this assertion, and nothing in Mr. Dahlstrom's deposition transcript supports this statement." [DN 113 at 21.] FIMCO further cites to deposition testimony of Clay Roll, FAST's General Manager [DN 100-3], who testified that, prior to 2012 or 2013, he was "not aware of any demand by Deere, oral, electronic, or written . . . in which Deere communicated to Fast that it wanted Fast to stop using the colors green and yellow on its trailed ag equipment." [DN 100-3 at 5.]

However, as Deere points out, Roll is the General Manager of FAST, not a Deere employee. [DN 113 at 22.] Although he may have knowledge about Deere's trademark

enforcement efforts with regard to his *own* company, Roll's testimony simply does not (and likely could not) address Deere's enforcement efforts with regard to all other companies prior to 2013, during which time FIMCO alleges Deere did not attempt to enforce its trademarks. [*See* DN 100-1 at 11.] Finally, FIMCO's assertion that "Deere failed to put forth any evidence that they manufactured or sold towed agricultural equipment, *i.e.* sprayers and nutrient applicators, in the United States from 1968 through 2013" misunderstands the parties' burdens at this stage. Deere has not moved for summary judgment on its claim of common law trademark infringement. Rather, FIMCO has moved for summary judgment on the specific issue of whether Deere has common law rights in *yellow tanks*. Accordingly, it is FIMCO's burden, at this stage, to demonstrate that there is no genuine dispute of material fact as to whether Deere has common law trademark rights in yellow tanks. *See* Fed. R. Civ. P. 56(c); *Laster*, 746 F.3d at 726 (citing *Celotex*, 477 U.S. at 324. FIMCO has not met this burden here.

In its response, Deere argues that "towed agricultural equipment" includes, not only sprayers and applicators, but also "numerous other products sold by Deere, including" non-self-propelled sprayers, non-self-propelled nutrient applicators, "fertilizer spreaders; haying machines, such as balers, mower-conditioners, disk mowers, and flail choppers; tillage machines, such as liquid applicators, field cultivators, and mulch finishers; and seeding machines, such as planters, air seeders, and grain drills." [DN 113 at 22 (citing DN 113-12 at ¶¶ 4, 6 (Myers Declaration)).] Deere states that it has been selling both towed and wheeled agricultural equipment in green and yellow "consistently since at least 1905," [*id.* (citing DN 99-3 at ¶ 47–48; DN 113-12 at ¶ 4– 6.)], and that starting in the 1950s, Deere has sold its agricultural equipment "with green bodies, yellow wheels, and yellow accents on the upper part of the equipment." [*Id.* (citing DN 99-3 at ¶¶ 56–69).] Finally, Deere contends that, since the 1960s, it

66

"has sold numerous agricultural sprayers with green bodies, yellow wheels, and yellow tanks in the United States after 1968." [*Id.* (citing DN 99-17 at 3–4 (Dahlstrom Declaration)).] Accordingly, Deere argues, and the Court agrees, that the evidence FIMCO cited in its motion is insufficient to demonstrate the *absence* of any genuine dispute of material fact as to whether Deere's use of yellow tanks was continuous after 1968.

FIMCO further asserts that it, through its alleged predecessor, JDD, has been using yellow tanks on its agricultural equipment continuously since the 1930s. [DN 100-1 at 11–12.] In support of this claim, FIMCO again cites to the deposition testimony of Vaughan, who testified that JDD was using green and yellow on its agricultural equipment from "either [19]32 or [19]38 forward." [DN 100-4 at 4.] FIMCO further relies on color photographs dated December 9, 1957 which depict a JDD sprayer called "Big Butch" featuring yellow tanks and wheels with green accents, [DN 100-6 at 1–8).], and a JDD catalog dated 1960 which advertises "Big Butch" with yellow tanks. [DN 5-1 at 3.]  However, as the Court discussed above, FIMCO has not presented any evidence that could be presented in an admissible form at trial to establish the connection between it and JDD such that this use is attributable to FIMCO. Accordingly, the Court finds that this, too, is insufficient to demonstrate the absence of a genuine dispute of material fact as to FIMCO's prior, continuous use of yellow tanks.

But even if FIMCO ultimately demonstrates that Deere has not acquired common law rights in yellow tanks specifically, this would not end the inquiry. As with Deere's registered marks, the ultimate question for trial will be, not whether FIMCO's use of green and yellow is identical to Deere's, but whether it is similar enough to the trademarks Deere *does have* to create a "likelihood of confusion" or "likelihood of dilution." *See Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760–63 (6th Cir. 2005) (identifying the *Frisch's* likelihood-of-confusion factors as applying

to plaintiff's "claim of infringement of an unregistered mark."); *Maker's Mark*, 703 F. Supp. 2d at 697 ("[T]rademark dilution inquires whether a senior user's distinctive and famous mark is being diluted by another's use of a *similar* mark that weakens the strength or damages the reputation of the senior mark. (emphasis added)). Parsing out Deere's trademarks in this manner is not the appropriate method of analysis. *See Daddy's*, 109 F.3d at 283 ("[C]ourts must view marks in their entirety and focus on their overall impressions, not individual features.")

In its reply, FIMCO argues that the determination whether Deere has valid trademarks covering yellow tanks is a prerequisite to the likelihood of confusion and likelihood of dilution analyses. [DN 124 at 5 (citing *Maker's Mark,* 703 F. Supp. 2d 671).] Although FIMCO is certainly correct that, "[f]or a trademark to be enforceable, it must be valid," *Maker's Mark*, 679 F.3d at 417, this does not mean that the valid trademark must be identical to the allegedly infringing mark. Again, although FIMCO argues that Deere has acquired no registered or common law trademarks in yellow tanks, it has not argued that Deere has no registered or common law trademarks whatsoever. Accordingly, the ultimate analysis will require a determination whether, when compared to the valid trademarks Deere does own, FIMCO's marks are sufficiently similar. Therefore, FIMCO's motion for summary judgment as to the issue of whether Deere has common law trademark protection for yellow tanks is denied.

### 2. Incontestability of Deere's Registered Marks

Next, FIMCO has moved for summary judgment on the issue of whether Deere's three registered trademarks have become "incontestable" under 15 U.S.C. § 1065. [DN 100-1 at 12.] As noted above, registration of a trademark is "prima facie evidence of the validity of the registered mark," 15 U.S.C. § 1115(a), and creates a "rebuttable presumption that the trademark is valid." *Fuji Kogyo*, 461 F.3d at 683. A mark that has been registered for at least five years

becomes incontestable provided that the owner of the mark files, within one year following a five-year period of use, a "Section 15" affidavit averring that "those goods or services stated in the registration on or in connection with which such mark has been in continuous use for such five consecutive years and is still in use in commerce," that there has been no adverse decision as to the owner's right to the marks, and that there are no such challenges pending either in the courts or in the PTO. § 1065(1)–(3). Incontestability is "conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce." § 1115(b). However, even incontestable marks are subject to certain enumerated defenses and defects, including a claim that the underlying registration or incontestable right was obtained by fraud, that the registrant abandoned the mark, or that the mark is functional. § 1115(1)–(2), (8).

Deere filed Section 15 affidavits for its '103 and '576 Registrations in October 1996 and for its '095 Registration in April 2016. [DN 113-5 at 2; DN 113-6 at 2; DN 113-7 at 5.] Each affidavit affirms that Deere used the marks on the goods identified in the registrations continuously in commerce for five years after the marks were registered and that they are still used in commerce on all goods listed in the registration, with the exception of any goods specifically noted in the Section 15 affidavits as not being in continuous use. [*See* DN 113-5 at 2; DN 113-6 at 2; DN 113-7 at 6.]

Here, FIMCO asserts that "there is no evidence that Deere manufactured or sold towed agricultural sprayers and nutrient applicators in the United States since the 1960s," meaning it has not used its marks continuously on those products, and therefore that Deere "is entitled only to a rebuttable presumption of ownership, which FIMCO fully intends to dispute at trial given FIMCO's substantial and continuous prior use of yellow tanks." [DN 100-1 at 13 (citing

*Brittingham v. Jenkins*, 914 F.2d 447, 454–55 (4th Cir. 1990) ("Brittingham did not use the . . . mark continuously in connection with the sale of goods for the required five-year period following registration. Consequently, incontestability never attached to Brittingham's trademark registration . . . Accordingly, Brittingham's registration entitles him only to a rebuttable presumption of ownership.")). In support of this argument, FIMCO cites to deposition testimony of Brian Myers, the Manager of Deere's Business Partnerships and Crop Care Platform, in which Myers testified that, to his knowledge, "there has not been" a trailed agricultural sprayer in the United States and, until about 2013, Deere did not sell a trailed nutrient applicator in the United States. [*Id.* (citing DN 100-8 at 11–12).]

In response, Deere contends that a closer examination of the language of each of its three Registrations, and the Section 15 affidavits it filed as to each, demonstrates that each is incontestable or, at a minimum, that genuine factual issues exist as to incontestability. First, Deere asserts that, because its '103 Registration makes no mention of sprayers or applicators, FIMCO's argument that Deere's marks have not achieved incontestability due to a failure to continuously use those products is inapplicable to the '103 Registration. [DN 113 at 27.] In its reply, FIMCO appears to agree with this point, and asserts that this acknowledgment amounts to a concession by Deere and that "this Court could grant summary judgment to FIMCO on any and all of Deere's claims encompassing the '103 Trademark." [DN 124 at 9.] The Court disagrees. Rather, the fact that the '103 Registration does not mention sprayer or applicators merely means that FIMCO's argument that Deere has not satisfied the continuous use requirement as to those products does not apply to affect the incontestability status of Deere's '103 Registration. Accordingly, FIMCO's summary judgment motion with regard to the incontestability of Deere's '103 Registration is denied.

70

Next, the '576 Registration includes "sprayers" in its list of goods. [*See* DN 1-2 at 2.] As FIMCO points out, in response to the question whether "there has not been, to your knowledge, a trailed sprayer sold by John Deere in the United States," Myers responded "[t]o my knowledge, that is correct." [DN 100-8 at 11.] FIMCO alleges that this statement is an acknowledgment by Deere's employee that Deere does not sell trailed agricultural sprayers in the United States, and therefore that the continuous use requirement for incontestability is not satisfied. [DN 124 at 10.] However, as Deere points out, "the '576 Registration includes 'sprayers' but does not specify whether those sprayers are towed or self-propelled." [DN 113 at 28.] And because FIMCO does not dispute that Deere sells self-propelled sprayers in the United States, [DN 100 at 3], the Court finds its argument that Deere fails the continuous use requirement unpersuasive. However, even if Myers' testimony was sufficient to suggest a lack of continuous use as to trailed agricultural sprayers, Deere's Section 15 affidavit, which avers that Deere *has* satisfied the continuous use requirement with regard to sprayers [DN 113-6 at 2], makes this fact genuinely disputed. Accordingly, FIMCO's motion for summary judgment as to the incontestability of Deere's '576 Registration is denied.

The '095 Registration includes "nutrient applicators" in its list of goods which, Myers testified, were not offered for sale by Deere in the United States until 2013. [DN 100-8 at 11–12.] But the Court again finds that because Deere's Section 15 affidavit states that Deere *has* continuously used its green and yellow colors on nutrient applicators [DN 113-7 at 6], that the parties genuinely dispute this fact. Therefore, FIMCO's motion for summary judgment as to the incontestability of Deere's '095 Registration is also denied.

### 3. Desire to Match

Finally, FIMCO has requested "that this Court determine, as a matter of law, that farmers want their implements to match their tractors." [DN 100-1 at 15.] As an initial matter, it appears that this is an improper determination for the Court to make at the summary judgment stage. Federal Rule of Civil Procedure 56 requires a party, in a motion for summary judgment, to "identify[] each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). Here, the statement that "farmers want their implements to match their tractors" is not a claim or defense, nor is it an element of a claim or defense. Rather, it is the basis for FIMCO's argument, as cited in its pleadings and briefing, that Deere's marks are functional and therefore invalid because FIMCO would be placed at a competitive disadvantage if it were prohibited from using green and yellow. [*See* DN 5 at 15; DN 115 at 19–28; DN 124 at 13–17.]  This factual determination is not a proper matter to be decided at the summary judgment stage. However, even if this were a proper issue for summary judgment, the Court finds that this fact is genuinely disputed.

It its motion, FIMCO relies, in part, on the 1982 *Farmhand* decision from the Southern District of Iowa. [DN 100-1 at 14.] FIMCO asserts that the court in that case "made a determination that farmers desire to "match" their agricultural equipment to their John Deere tractors." [*Id.* (citing *Farmhand*, 560 F. Supp. at 91).] And indeed, the *Farmhand* court did make that factual determination, but a critical distinction is that the court made that determination in the "findings of fact" section of its opinion following a *bench trial*, in which the Court was the designated finder of fact. *See Farmhand*, 560 F. Supp. at 88; 91. Accordingly, the Court is not persuaded by that finding here.

In this case, far from FIMCO's contention, it is not "uncontroverted" that "farmers want their agricultural equipment to match their tractors." [*See* DN 100-1 at 13.] In support of this claim, FIMCO relies, in addition to the *Farmhand* decision, on the opinions of its five expert witnesses, each of whom conclude that

> once a U.S. prospective customer has identified two or more pieces of towed agricultural equipment that satisfies their purchase criteria, if that purchaser owns a John Deere tractor, the use of the colors green and yellow on such equipment become important to the purchase decision because such purchasers desire to match their agricultural equipment to their John Deere tractor.

[DN 96-9 (Yeazel Report); DN 96-11 (Stack Report); DN 96-12 (Schwarz Report); DN 96-13 (Kessler Report); DN 96-15 (Perkins Report).] However, Deere has pointed to deposition testimony from Kessler, one of FIMCO's experts, in which Kessler stated that "'roughly half' of his customers 'want to match their equipment with their tractor,'" and that about half of that group of customers thinks of color as a "primary consideration." [DN 113 at 36 (citing DN 100-13 at 3–4) (Kessler Deposition).] Deere also cites deposition testimony of Yeazel, Perkins, Staack, and Schwarz, in which each expert acknowledges that color is important to some customers, but not to all customers. [*Id.* at 37 (citing DN 99-49 (Yeazel Deposition); DN 99-47 (Perkins Deposition); DN 99-46 (Staack Deposition); DN 99-48 (Schwarz Deposition)).] Accordingly, at this stage, the Court is a long way from concluding, as FIMCO, requests, that all U.S. farmers want their equipment to match their tractors. Therefore, FIMCO's motion for judgment as a matter of law as to this issue is denied.

## CONCLUSION

For the reasons stated herein, **IT IS HEREBY ORDERED** as follows:

1. FIMCO's Motion in Limine to Exclude Testimony of Deere's Expert William Shanks [DN 95] is **DENIED**.

2. Deere's Motion to Exclude Witnesses Mark Schwarz, David Staack, Albert Kessler, Todd Yeazel, and Cindy Perkins [DN 96] is **GRANTED in PART and DENIED in PART**.

3. Deere's Motion to Strike FIMCO's Assertions About its Sales in Opposition to Deere's Summary Judgment Motion [DN 122] is **DENIED as MOOT.**

4. Deere's Motion to Strike New Evidence Submitted by FIMCO on Reply in Support of its Motion for Partial Summary Judgment [DN 132] is **DENIED**.

5. Deere's Objections to FIMCO's Evidence in Support of FIMCO's Motion for Summary Judgment [DN 113-13] are **OVERRULED**.

6. FIMCO's Motion for Leave to Submit Additional Evidence [DN 151] is **DENIED as MOOT**.

7. Deere's Motion for Leave to File a Sur-Reply in Opposition to FIMCO's Motion for Leave to Submit Additional Evidence is [DN 158] **DENIED as MOOT**.

8. Plaintiff Deere's Motion for Summary Judgment [DN 99] is **DENIED in PART** with respect to its dilution claim and FIMCO's affirmative defenses of acquiescence and estoppel but **GRANTED in PART** with respect to FIMCO's defense and counterclaim of functionality and FIMCO's affirmative defenses of laches and implied license.

9. Defendant FIMCO's Motion for Partial Summary Judgment [DN 100] is **DENIED**.

cc:    Counsel