UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CASE NO. 5:15-CV-105-TBR

DEERE & COMPANY,                                    PLAINTIFF/COUNTER-DEFENDANT

v.

FIMCO INC., d/b/a/ SCHABEN
INDUSTRIES,                                         DEFENDANT/COUNTER-CLAIMANT


**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## I. INTRODUCTION

Plaintiff, Deere & Company ("Deere"), brings this action alleging that Defendant, FIMCO, Inc. ("FIMCO"), is acting in violation of federal trademark and common law by producing and distributing trailed agricultural sprayers and applicators bearing green and yellow colors that are indistinguishable from the green and yellow colors Deere uses on its agricultural equipment.[1] Specifically, Deere asserts that FIMCO's actions constitute (1) federal trademark infringement in violation of 15 U.S.C. § 1114, (2) federal false designation of origin and unfair competition in violation of 15 U.S.C. § 1125(a), (3) federal trademark dilution in violation of 15 U.S.C. § 1125(c), and 4) common law trademark infringement in violation of the laws of Kentucky. [DN 1 at 6–9 (Complaint).] Deere seeks a permanent injunction prohibiting FIMCO from "using the Deere Colors trademark in connection with its sprayers and wheeled agricultural equipment, as well as an injunction ordering [FIMCO] to cease using yellow tanks or wheels in connection with wheeled agricultural equipment having green vehicle bodies." [*Id.* at 1–2.]

---

[1] The parties have stipulated to the facts that the green and yellow paint colors used by Deere and FIMCO are "indistinguishable from each other to the naked eye" and "indistinguishable from each other when appearing on equipment in the field." [DN 164 at 1–2 (Stipulated Facts).]

This Court conducted a five-day bench trial in which it heard testimony from several Deere employees, including Brian Myers, Manager of the Business Partnerships, Crop Care Platform; Doug Felter, Product Marketing Manager of the Application Equipment department; Neil Dahlstrom, Manager of Corporate Archives and History; and Aaron Wetzel, Vice President of the Global Crop Care Platform at Deere. Deere also called as witnesses Hal Poret, a survey expert; Greg Thompson, Sales Lead at Heritage Tractor in Lawrence, Texas; and Clay Roll, General Manager of FAST Manufacturing, Inc. in Windom, Minnesota.

On behalf of FIMCO, the Court heard testimony from Shannon Persoma, paralegal at the law firm of Koley Jessen in Omaha, Nebraska; Kevin Vaughan, Owner and CEO of FIMCO; Albert Kessler, Manager for the Sprayer Systems and Precision Equipment departments of Stutsman, Inc. in Hills, Iowa; Mark Schwarz, Acting Store Manager for FIMCO's company store in Columbus, Nebraska; Todd Yeazel, National Sales Manager for Fertilizer Dealer; Cindy Perkins, Co-Owner of Perkins Sales, Inc. in Bernie, Missouri, and Dave Wipson, President and COO of FIMCO.

Additionally, both parties submitted designated deposition testimony, counter-designations, and objections. [DN 220 (Deere's Amended Submission of Deposition Designations, Counter-Designations, and Objections); DN 221 (FIMCO's Submission of Deposition Designations, Counter-Designations, and Objections).] Deere designated the deposition testimony of Robert Conley, a retired FIMCO employee; Rob Goltz, FIMCO's National Account Manager; Mark Schwarz; Kevin Vaughan; and Dave Wipson. [DN 220.] FIMCO designated deposition testimony of Neil Dahlstrom; Lant Elrod, Manager of Creative Services for the Agriculture and Turf Divisions at Deere; Doug Felter; Brian Myers; and Barry Nelson, Manager of Media Relations at Deere. [DN 221.]

Following the bench trial, the parties filed post-trial proposed findings of fact and conclusions of law. [DN 337; DN 338.] Pursuant to Federal Rule of Civil Procedure 52, the Court will now make its findings of fact and conclusions of law. For the reasons explained in this opinion, the Court concludes that FIMCO's use of green and yellow on trailed agricultural sprayers and applicators infringes on and dilutes Deere's trademarks in violation of 15 U.S.C. § 1114, § 1125(a), § 1125(c), and Kentucky common law. The Court also finds that FIMCO failed to prove the elements of its affirmative defenses of acquiescence and estoppel. Based on these findings, the Court will issue a permanent injunction prohibiting FIMCO's future use of the green and yellow color combination.

## II. STANDARD

Rule 52 of the Federal Rules of Civil Procedure requires that, "[i]n an action tried on the facts without a jury . . . the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). "The findings and conclusions . . . may appear in an opinion or a memorandum of decision filed by the court." Fed. R. Civ. P. 52(a)(1). "In considering a district court's decision following a bench trial," this Court's findings of fact are reviewed "under the clearly erroneous standard. Conclusions of law, on the other hand, are reviewed *de novo.*" *Overton Distributors, Inc. v. Heritage Bank*, 340 F.3d 361, 366 (6th Cir. 2003) (quoting *Burzynski v. Cohen,* 264 F.3d 611, 616 (6th Cir. 2001)).

## III. EVIDENTIARY DETERMINATIONS

Numerous evidentiary determinations remain to be ruled on in this case. The Court will address all objected-to exhibits, testimony, and deposition designations on which it relies in making its findings of fact and conclusions of law set out herein. For those exhibits on which the Court does not rely, however, the Court will not address the parties' objections thereto.

## IV.  FINDINGS OF FACT

### A.  <u>The Parties</u>

1.  Deere is organized under the laws of Delaware, with its principal place of business located at One John Deere Place, Moline, Illinois 61265.

2.  FIMCO is organized under the laws of Iowa, with its principal place of business located at 800 Stevens Port Drive, Suite DD836, Dakota Dunes, South Dakota 57049. FIMCO is registered to do business in the State of Kentucky and has a registered agent for service in Kentucky. FIMCO also has a storefront location at 3303 Pembroke Road, Hopkinsville, Kentucky 42240.

### B.  <u>The Parties' Brands</u>

#### (1) Deere

3.  Deere was founded in 1837. Today, it is a multi-billion dollar company and does business worldwide. In 2016, for example, Deere had over $26 billion in global sales. [Tr. Vol. 1B at 14 (Doug Felter Testimony).]

4.  For more than 100 years, Deere has sold a wide variety of agricultural, forestry, lawn, and garden equipment. Deere is what is known as a "long line" or "full line" company, meaning it "offers all or very nearly all of the equipment that a farmer would need to carry out a complete cropping cycle from tillage to planting to spraying and on to harvest." [*Id.* at 20–21.]

5.  In addition to Deere, other "long line" or "full line" companies include Case New Holland Global, which operates both Case IH and New Holland, and AgCo. [*See id.* at 20; Tr. Vol. 1A at 45–46 (Brian Myers Testimony); Tr. Vol. 5B at 39 (Dave Wipson Testimony).]

6. Deere sells its products in the United States only through authorized independent dealerships. [Tr. Vol. 1B at 14 (Felter Testimony).] Deere sells its equipment to its dealers which, in turn, sell it to end-users. Deere has slightly over 1,300 dealer locations in the United States. [*Id.* at 16.] Forty-nine out of fifty states in the U.S. have dealerships that sell Deere equipment. [*Id.*]

7. Deere is the leading seller of agricultural tractors in the United States, accounting for approximately fifty to sixty percent of large agricultural tractors sold today. [*Id.* at 27.]

8. Nearly all of Deere's agricultural equipment is painted using green and yellow colors. [Tr. Vol. 1A at 31 (Myers Testimony); Tr. Vol. 1B at 8 (Felter Testimony).] The only agricultural equipment that Deere does not paint green and yellow is that purchased by entities such as government agencies or municipalities which desire to purchase their equipment painted bright orange for increased visibility. [Tr. Vol. 1A at 31 (Myers Testimony); Tr. Vol. 1B at 8 (Felter Testimony).]

9. Deere is the only manufacturer of green and yellow tractors in the United States. [Tr. Vol. 5B at 101–102 (Wipson Testimony).]

### (2) FIMCO

10. FIMCO was incorporated on January 10, 1966. [Tr. Vol. 3A at 54 (Kevin Vaughan Testimony); DX-168 (FIMCO Articles of Incorporation).]

11. FIMCO's Articles of Incorporation list the names, addresses, and signatures of five incorporators. [*See* DX-168 at 3.] One incorporator, Tom Vaughan, was the father of the current CEO and sole owner of FIMCO, Kevin Vaughan.

12. Kevin Vaughan was born on November 25, 1960. [Tr. Vol. 3A at 32 (Vaughan Testimony).]

13. Vaughan, now FIMCO's CEO and sole shareholder, testified that he began to receive stock in FIMCO from his father when he was in high school and ultimately became the sole shareholder in 2002. [*Id.* at 38–42.]

14. Today, FIMCO has two divisions within the company. [Tr. Vol. 5B at 40–41 (Wipson Testimony).] The first is its lawn and garden division, which currently uses the "FIMCO" brand. [*Id.* at 41.] FIMCO's FIMCO-branded lawn and garden equipment is typically painted white, red, and black. [*Id.*] In this division, FIMCO sells primarily fifteen to forty gallon lawn and garden sprayers. [*Id.* at 41–42.] FIMCO also sells attachments for lawn and garden tractors, including, for example, carts, aerators, and spikers. [*Id.* at 42.] Wipson estimated that FIMCO makes up nearly 80% of the market share for lawn and garden equipment in the U.S. [*Id.*]

15. FIMCO's second division is its agricultural division, which currently uses the "Ag Spray" brand. [*Id.* at 41–43.] FIMCO's Ag Spray division is made up of equipment that it primarily painted green and yellow. [*Id.* at 43.] Through its Ag Spray division, FIMCO sells such products as large agricultural implements, including trailed agricultural sprayers and liquid nutrient applicators. [*Id.*] Generally, this equipment features between 1,000 to 2,000 gallon tanks, and are "designed to go in a field, row crop, towed behind a decent-sized tractor." [*Id.*] Other Ag Spray-branded products include smaller sprayers, three-point hitch-mounted sprayers, utility task vehicle (UTV) sprayers, spot sprayers, and fluid-handling equipment. [*Id.* at 43–44.] In addition, FIMCO is "the largest parts supplier in the country for all the various major brands of companies." [*Id.* at 44.]

16. FIMCO's sales of its large agricultural sprayers and applicators, which are the subject of this litigation, currently make up about 4% of FIMCO's overall revenue. [*Id.* at 46.] Wipson

testified that a few years ago, sales of large agricultural sprayers and applicators made up approximately 10% of FIMCO's total revenue, which was the highest it had ever been. [*Id.*] Wipson further testified that "the majority of [FIMCO's] customers are not large ag customers. We have a lot of customers that just buy tanks or just buy parts or just buy pumps or they buy our spot sprayers. That is the majority of our customers. We don't have a large customer base that buys all this big green steel that's" the subject of this litigation. [*Id.* at 109.]

17. Before FIMCO began solely using the Ag Spray brand for equipment in its agricultural division, which started around 2013, FIMCO also sold its agricultural equipment under other brands, one of which was called Schaben. [*Id.* at 48–49; 94–95.] FIMCO acquired the Schaben brand in 1998. [Tr. Vol. 3B at 81 (Vaughan Testimony).] FIMCO began phasing out the Schaben brand around 2013 to consolidate its brands under the Ag Spray name, [Tr. Vol. 5B at 48–29 (Wipson Testimony)], however, used Schaben equipment remains in the marketplace today.

18. While Deere sells its equipment only through authorized dealers, who then sell to end users, [Tr. Vol. 1B at 14 (Felter Testimony)], FIMCO does sell equipment directly to end users. [Tr. Vol. 5B at 51–52 (Wipson Testimony).] FIMCO sells its equipment through trade shows, magazines, radio advertising, traveling salesmen, its website, and at its ten physical locations. [*Id.* at 52.] However, FIMCO also sells its equipment to distributors, who sell the products to dealers, who then sell to end users. [*Id.* at 63.]

19. FIMCO sells trailed agricultural sprayers and applicators, which both require a tractor to operate. FIMCO often advertises its sprayers and applicators in pictures attached to Deere

tractors. [*See* Tr. Vol. 5B at 102–104 (Wipson Testimony); PX-30; PX-31; PX-218 at 4; PX-221 at 4.]

20. Twenty-four authorized John Deere dealers also sell FIMCO's trailed agricultural equipment. [*See* Tr. Vol. 1B at 17–18 (Felter Testimony) (identifying dealerships); Tr. Vol. 5B at 113–16 (Wipson Testimony) (identifying dealerships).]

21. Today, depending on the economy, FIMCO employs between 300 and 800 people. [Tr. Vol. 3A at 32 (Vaughan Testimony).]

22. Vaughan testified that he started helping his father out at FIMCO when he was about eight years old. [Tr. Vol. 3A at 35 (Vaughan Testimony).] Vaughan testified that, at that time, "[w]e were in the oil business." [*Id.*]

23. Vaughan further testified that, throughout the 1960's and 1970's, he observed FIMCO sell equipment the majority of which was green and yellow. [*Id.* at 36.] However, the Court will address below whether it finds that FIMCO proved this to be true by a preponderance of the evidence.[2]

24. FIMCO is what is known as a "short line" company, meaning it does not sell every piece of equipment that would be necessary for a farmer to complete a full cropping cycle. [Tr. Vol. 1B at 21–22 (Felter Testimony).] Rather, short line companies "offer[ ] a smaller range of agricultural equipment. Typically, it's only trailed equipment, and it's usually focused on just a few specific product categories." [Tr. Vol. 1A at 46 (Myers Testimony).]

---

[2] The Court notes that Deere objected to numerous portions of Vaughan's testimony due to a lack of foundation and lack of personal knowledge. [*See, e.g.*, Tr. Vol. 3A at 42, 44, 68; Tr. Vol. 3B at 9, 19, 44–45, 105.] Though the Court does cite several portions of Vaughan's trial testimony, the Court notes that it only considered this testimony to the extent the Court found it to be supported by proper knowledge and foundation and to the extent it has probative value.

**C.  The Marks at Issue**

25. The dispute in this case centers on FIMCO's use of a green and yellow color combination on its trailed agricultural sprayers and liquid nutrient applicators.

26. Deere uses green and yellow on numerous types of agricultural equipment, including agricultural tractors, self-propelled sprayers and trailed nutrient applicators.

27. FIMCO uses green and yellow on trailed sprayers and trailed liquid nutrient applicators.

28. Generally speaking, agricultural sprayers and agricultural applicators are "both [ ] used to apply some type of material – liquid, gas, solid, like a fertilizer – to crops." [Tr. Vol. 5A at 36 (Kessler Testimony); Tr. Vol. 5A at 73–74 (Schwarz Testimony).]

29. Both Deere and FIMCO market their sprayers and applicators to farmers and farming operations. [Tr. Vol. 1A at 47 (Myers Testimony).]

**D.  Deere's Use of Green and Yellow Throughout Its History**

30. As the Court will discuss in greater detail below in making its conclusions of law, among the factors relevant in this case are the extent to which Deere has marketed, advertised, and sold products bearing its trademarks and the extent to which the public recognizes Deere's trademarks. Accordingly, the Court will now make findings of fact as to those factors.

**(1) Marketing and Advertising**

31. For decades, Deere has marketed and advertised its green and yellow equipment extensively in the United States. In 1904, Deere spent $33,683.77 on advertising, which represented a little over 1% of its total expenditures for the year. [PX-35; Tr. Vol. 1B at 76 (Dahlstrom Testimony).] By 1957, these numbers rose to $5,381,026 and 1.4%, respectively. [PX-37; Tr. Vol. 1B at 79 (Dahlstrom Testimony).] And by 1966, these numbers were $10,964,785 and about 1%. [PX-683; T. Vol. 1B at 79–80 (Dahlstrom Testimony).]

32. The vast majority of Deere's advertising throughout the years has featured and/or mentioned its use of green and yellow on Deere tractors and other Deere agricultural equipment. [*See, e.g.*, PX-50 (1921 advertising brochure featuring John Deere stag plows colored in green and yellow); PX-52 (1940 John Deere annual product catalog featuring a green and yellow Deere tractor pulling a green and yellow Deere combine); PX-131 (1954 advertisement in the Agricultural Institute Review for a toy tractor discussing "the green and yellow of John Deere tractors"); PX-62 (1966 John Deere annual product catalog featuring a green and yellow tractor with green bodies, yellow wheels, and yellow accents); PX-76 (1971 John Deere advertising brochure showing a green and yellow Deere tractor pulling a green and yellow Deere sprayer with a yellow tank); PX-85 (1980 advertising brochure showing a green and yellow sprayer); PX-71 (1986 John Deere annual product catalog showing a green and yellow Deere tractor pulling a green and yellow Deere hay baler); PX-104 (1999 advertising brochure featuring green and yellow Deere tractors and green and yellow sprayers with yellow tanks); PX-114 (2007 advertising brochure for green and yellow Deere sprayers); *see also* Tr. Vol. 1B at 82–102 (Dahlstrom Testimony).]

33. Today, Deere advertises using numerous forms of media, including print, digital, radio, and television. [Tr. Vol. 1B at 9 (Felter Testimony).] Deere also displays its brand at farm and trade shows, at which its dealers distribute information with which to market Deere equipment. [*Id.*]

34. In 2016, Deere spent roughly $80 million on advertising its agricultural equipment, a substantial portion of which was spent in the United States. [*Id.* at 13.]

## (2) Amount and Geographic Extent of Sales

35. Since its early years, Deere's sales in the United States have been substantial. [*See, e.g.*, PX-146 (1950 Comptroller's Report showing total U.S. sales of $296,355,729); PX-683 (1966 Comptroller's Report discussing yearly sales of more than $1 billion, though not identifying how much of that was in the U.S).]

## (3) Actual Recognition by the General Consuming Public

36. Deere's use of green and yellow on its tractors and other agricultural equipment over the years has also been recognized in multiple third party publications such as newspapers, magazines, and books.

37. Before approximately 1964, however, nearly all of this recognition was in the form of regional and trade publications, and Deere's archivist, Dahlstrom, stated that he did not "know the circulation individually of th[o]se papers." [Tr. Vol. 1B at 112 (Dahlstrom Testimony).] Rather, Dahlstrom testified that those newspapers "would have been in general circulation *in the towns that they were printed in*." [*Id.* at 115 (emphasis added).][3] *See, e.g.*, PX-641 (1930 article from the Greensburg Daily News in Greensburg, Indiana referring to the "John Deere Colors (Green and Yellow)"); PX-715 (1939 article from the Coshocton Tribune in Coshocton, Ohio);[4] PX-642 (1947 article from the Advocate Messenger in Danville, Kentucky referring to "the John Deere colors of yellow and green"); PX-648 (1950 article from the *Hutchinson News Herald* in Hutchinson, Kansas stating that a John Deere

---

[3] At trial, FIMCO objected to Deere questioning Dahlstrom, Deere's archivist, about his expert opinion relating to when Deere's use of green and yellow colors came to be well known by the general public in the United States. [*See* Tr. Vol. 1B at 103–109.] The Court agrees with FIMCO that Dahlstrom was not qualified to offer the opinion that the Deere colors have been well known since the early 20th century. As such, the Court only relied on Dahlstrom's testimony to the extent he explained the many historical materials introduced at trial.

[4] FIMCO also objected to the admission of PX-715 on the grounds that it was not timely produced by Deere. Because the Court can discern no prejudice on behalf of FIMCO resulting from the admission of this exhibit, and because the Court has permitted FIMCO to introduce certain documents that were produced very late in this litigation, the Court overrules this objection.

exhibit at the county fair "will be in the company's green and yellow colors"); PX-650 (1951 article from the *Pella Chronicle* in Pella, Iowa referring to John Deere Day as "The Day of the Green & Yellow");[5] PX-653 (article from the *Iola Register* in Iola, Kansas); PX-660 (1954 article from the *Cedar Rapids Gazette* in Cedar Rapids, Iowa discussing a toy "John Deere tractor in bright green and bright yellow"); PX-666 (1963 article from the *Des Moines Register* in Des Moines, Iowa referring to "The familiar green and yellow Deere tractors and other farm equipment").] In 1963, in celebration of Deere's 125th anniversary, the State of Illinois, issued all license plates in Deere's "green and yellow colors." [PX-663; PX-664; PX-665; PX-667 at 4.]

38. Deere also points to a 1950 novel by Elswyth Thane, *The Reluctant Farmer*, in which she twice referred to John Deere, first as "the bright John Deere green and yellow" and second as "the usual bright John Deere green and yellow." [PX-148.] Again, however, though Thane may have been "a well-known author in her day," [DN 337 at 26], Deere did not present any evidence regarding the circulation or volume of sales of Thane's novel.

39. Beginning in 1964, however, Deere and its use of green and yellow began to be featured in national publications. In 1964, a piece of green and yellow Deere agricultural equipment was featured on the cover of *Forbes*. [PX-670.] In 1966, Deere's then-CEO, William A. Hewitt, was featured on the cover of *Forbes* along with a piece of green and yellow Deere equipment behind him. [PX-672.] The 1966 *Forbes* article stated that "Deere cares a great deal about

---

[5] FIMCO objected to the admission of PX-641 and PX-650 on grounds of Rule 401, Rule 403, hearsay, and foundation. [DN 282 at 28.] The Court will overrule these objections, however. The Court finds these publications to be relevant and probative to show various instances of recognition of John Deere's use of green and yellow during various time periods. Moreover, the Court does not find that these publications contain hearsay because the Court is not relying on them for the truth of the statements contained therein, but rather simply as evidence that the statements were, in fact, printed at those times. However, even if these publications did contain hearsay, they fall within the ancient documents exception codified in Federal Rule of Evidence 803(16), which provides a hearsay exception for "[a] statement in a document that is at least 20 years old and whose authenticity is established." Fed. R. Evid. 803(16).

any piece of equipment that bears the green and yellow Deere colors and the Deere prancing stag symbol." [PX-672 at 3.] Also in 1966, *Fortune* featured a photo of a Deere tractor being used in a testing exercise and, in an accompanying article, wrote, "In the vanguard of the columns of ever more sophisticated machines will be green-and-yellow mechanical giants." [PX-673.] In 1968, Deere was mentioned in *Businessweek*'s article about a Deere competitor, Massey-Ferguson, in which Massey-Ferguson's vice-president for farm machinery was quoted stating that "The dominance of John Deere is awesome . . . Why, they're so strong in Illinois that even the state license plates were green and yellow [the Deere colors] one year." [PX-674 (alterations in original).] Because these publications were circulated nationally, the Court finds that they are entitled to more weight in the determination of when Deere's use of green and yellow likely gained "actual recognition."

**E. Deere's Registered Trademarks for Green and Yellow Colors**

40. Deere has three trademarks registered with the United States Patent and Trademark Office ("PTO") involving its green and yellow color scheme. [Tr. Vol. 1A at 32–35 (Myers Testimony); PX-1, PX-2, PX-3.]

41. The first registered trademark, Registration Number 1,502,103 (the " '103 Registration"), was registered on August 30, 1988. The '103 Registration covers "agricultural tractors, lawn and garden tractors, trailers, wagons, and carts." The '103 Registration identifies the date of first use of the claimed mark in commerce as December 31, 1918. The '103 Registration indicates that the mark includes a bright green body or frame of the agricultural vehicle and bright yellow wheels. [*See* PX-1.]

42. The second registered trademark, Registration Number 1,503,576 (the " '576 Registration"), was registered on September 13, 1988. The '576 Registration covers "wheeled agricultural,

lawn and garden, and material handling machines, namely, tillage machines, haying machines, harvesting machines, mowers, cutters, shredders, sprayers, loaders, spreaders, planting machines, and snow removal machines." The '576 Registration identifies the date of first use of the claimed mark in commerce as December 31, 1905. The '576 Registration indicates that the mark includes a bright green color on the body and frame of the machine and bright yellow wheels. [*See* PX-2.] Myers testified that, in his experience, "wheeled agricultural equipment" includes both trailed and self-propelled machines. [*See* Tr. Vol. 1A at 33–34 (Myers Testimony).]

43. The third registered trademark, Registration Number 3,857,095 (the " '095 Registration"), was registered on October 5, 2010. The '095 Registration covers "tractor-towed agricultural implements, namely, balers, mower-conditioners, disk mowers, flail choppers . . . nutrient applicators, [and] planters and seeding machines." The '095 Registration identifies the date of first use of the claimed mark in commerce as December 31, 1905. The '095 Registration indicates that it "consists of the color combination green and yellow in which green is applied to an exterior surface of the machine and yellow is applied to the wheels." [*See* PX-3.]

44. At trial, Deere also entered into evidence three "Section 15 Affidavits" it filed with the PTO verifying that the '103, '576, and '095 Registrations were all used in commerce for five consecutive years following their date of registration in connection with all of the goods listed in the Registrations (except loaders) and that they were still used in commerce at the time of the filing of the Affidavits. [*See* PX-150; PX-151; PX-152.] Deere filed Section 15

affidavits for its '103 and '576 Registrations in October 1996 and for its '095 Registration in April 2016. [*See* PX-150; PX-151; PX-152.][6]

45. Deere presented evidence at trial, both through Myers' testimony and through exhibits, to support findings that it has, as it averred in its Section 15 Affidavits, used green and yellow on "a wide variety of Deere-branded wheeled agricultural equipment." [*See* Tr. Vol. 1A at 35–42 (Myers Testimony); PX-6–8; PX-238; PX-239; PX-241; PX-243;[7] PX-250–69; PX-275–79; PX-283; PX-285; PX-286, PX-288; PX-290–92; PX-296; PX-296.] This evidence includes a liquid nutrient applicator, [PX-6], another type of nutrient applicator called a strip till machine, [PX-8; PX-243], a dry fertilizer nutrient applicator, [PX-238], self-propelled sprayers, [PX-7; PX-252], and a trailed spreader [PX-279], trailed planters, [PX-295]. Certain of the nutrient applicators, such as one of the strip till machines, were sold in the U.S. in 2008 or 2009. [PX-243; Tr. Vol. 1A at 20 (Myers Testimony).] FIMCO did not challenge the exhibits or cross-examine Myers on these topics. Finding this evidence credible, and without evidence to the contrary, the Court finds that Deere indeed used its green and yellow color scheme in commerce on wheeled agricultural sprayers and trailed nutrient applicators for at least 5 consecutive years as set out in its Section 15 Affidavits.

## F. **Deere's Use of Green and Yellow on Sprayers and Applicators**

46. Deere uses a green and yellow color scheme on its trailed nutrient applicators and its self-propelled agricultural sprayers. Specifically, the color scheme utilizes a green frame, yellow wheels, and yellow tanks.

---

[6] FIMCO objected to the admission of PX-150, PX-151, and PX-152 on hearsay grounds. [DN 282 at 10.] However, the Court admitted these exhibits at trial over FIMCO's objection. [Tr. Vol. 1A at 34–35.]

[7] Though FIMCO initially objected to the admission of PX-243 on grounds of foundation as to date, [DN 282 at 11], FIMCO did not object to its admission at trial. [Tr. Vol. 1A at 35–27 (Myers Testimony).] Accordingly, the Court considers FIMCO's objection to PX-243 withdrawn.

47. Trailed nutrient applicators require a tractor to operate, while self-propelled sprayers have their own engine, transmission, and steering wheel and do not use a tractor to operate. [Tr. Vol. 1A at 86 (Myers Testimony).]

48. The following photograph is an example of a John Deere trailed nutrient applicator attached to a John Deere tractor. [*See* PX-6; Tr. Vol. 1A at 38 (Myers Testimony).]



49. The following photograph is an example of a John Deere self-propelled agricultural sprayer. [*See* PX-7; Tr. Vol. 1A; DN 229 at 41 (Myers Testimony).]



50. Deere did not begin selling trailed liquid nutrient applicators in the United States until 2013. [Tr. Vol. 1B at 28 (Felter Testimony).] However, Deere was selling other types of nutrient applicators, including gas and solid nutrient applicators, in the United States in 2011 and, for some products, as early as 2009. [Tr. Vol. 1A at 35–42, 112–13 (Myers Testimony).]

51. Deere does not offer a trailed agricultural sprayer for sale in the United States.

**G. FIMCO's Use of Green and Yellow on Sprayers and Applicators**

52. Today, FIMCO sells trailed agricultural sprayers and trailed liquid nutrient applicators. [Tr. Vol. 1B at 24 (Felter Testimony); Tr. Vol. 1A at 27 (Myers Testimony).] Both of these types of equipment require a tractor to operate. [Tr. Vol. 1B at 24–25 (Felter Testimony); *see also* Tr. Vol. 1A at 45 (Myers Testimony); Tr. Vol. 5A at 73 (Schwarz Testimony).]

53. FIMCO offers its trailed sprayers and liquid nutrient applicators for sale in green and yellow; specifically, with green bodies and frames, yellow wheels, and yellow tanks.

54. FIMCO did not begin offering trailed liquid applicators until approximately 2005 or 2006. [Tr. Vol. 3B at 60 (Vaughan Testimony).]

55. Unlike Deere, FIMCO has company stores that sell FIMCO products. [Tr. Vol. 5B at 52 (Wipson Testimony).] Customers can also purchase FIMCO equipment directly from FIMCO's website. [*Id.*]

56. FIMCO has used multiple brands for its agricultural equipment, including, most notably, Schaben and Ag Spray. FIMCO phased out the Schaben brand beginning in 2013 and consolidated its brands under the Ag Spray brand. [Tr. Vol. 1A at 47–48 (Myers Testimony); Tr. Vol. 5B at 48–29 (Wipson Testimony).]

57. The following is an example of a FIMCO Ag Spray-branded nutrient applicator. [*See* PX-331.]



58. The following is an example of a FIMCO trailed agricultural sprayer. [*See* PX-301.]



59. FIMCO's trailed sprayers and applicators are predominantly painted green and yellow, though customers can also order their equipment in other colors. [*See* Tr. Vol. 3B at 60–61 (Vaughan Testimony).]

## H. **When FIMCO Began Selling Green and Yellow Agricultural Sprayers**

60. A dispute exists in this case as to when FIMCO first began using green and yellow on trailed agricultural equipment.[8] As the Court noted above, FIMCO was incorporated in 1966. However, FIMCO claims that its alleged predecessor in interest company, J-D-D Lubricants Company ("JDD Lubricants" or "JDD"), first began using green and yellow on agricultural products in the early to mid-1900s, and that that use can be attributed to FIMCO.

---

[8] As the Court will address in detail below in its Conclusions of Law, this determination is relevant to Deere's trademark dilution claim.

61. Before he and others incorporated FIMCO, Vaughan's father, Tom Vaughan, worked at JDD Lubricants. [Tr. Vol. 3A at 42 (Vaughan Testimony).] In this case, FIMCO alleges that FIMCO was formed using assets that were purchased from JDD when it was in bankruptcy.

62. In support of this argument, FIMCO has produced multiple contracts, in addition to various categories of circumstantial evidence, which it contends demonstrate that certain assets were purchased from JDD and, in turn, used to form FIMCO.

### (1) DX-167A

63. The first of these documents is DX-167A,[9] which is a document labeled "Contract" which states that it was entered into between J.D.D. Manufacturing Co., Robert J. Hoefer, William H. Hoefer, Chris P. Hoefer, and Jon M. Cochran, "not individually, but as an agent for a group of Investors." [DX-167A at 1.]

64. DX-167A recites that "J.D.D. is insolvent" and that "Cochran, as agent for a group of investors, desires to purchase certain assets of J.D.D." [*Id.*]

65. DX-167A further recites that "J.D.D. agrees to sell, assign, transfer, and convey to Cochran, or his designee and/or assignee, the equity of record in" six categories of property. [*Id.* at 2.] These categories include (a) "merchandise and inventory as set out in Exhibit A hereto attached," (b) "machinery and equipment, furniture, office machines, fixtures, and trade fixtures as set out on Exhibit B hereto attached," (c) "trucks, vehicles, and other rolling stock set out on Exhibit C hereto attached," (d) "accounts receivable set out on Exhibit D hereto attached," (e) "patents, trademarks, copyrights and tradename set out on Exhibit E hereto attached," and (f) "all real estate owned by J.D.D. consisting of land and buildings in the

---

[9] DX-167, which FIMCO initially introduced, was an incomplete copy of the document due to a copying error. DX-167A is a correctly-copied version of the document with all pages intact.

vicinity of 1st and Court Streets, Sioux City, Iowa, more specifically described on Exhibit F hereto attached." [*Id.*]

66. DX-167A provides that, in exchange for the above-described property, Cochran agreed to pay J.D.D. $60,000. [*Id.*]

67. The "Contract" portion of DX-167A is seven pages. [*Id.* at 1–7.] DX-167A also has six exhibits attached, Exhibits A, B, C, D, E, and F.

68. Exhibit E to DX-167A identifies the trademarks being transferred from J.D.D. to Cochran as "J-D-D," "Big Butch", and Spra-White." [*See* DX-167A at Exhibit E.]

69. Exhibit C to DX-167A lists "J-D-D Manufacturing Co. Fixed Assets," specifically, trucks and automobiles. [*See* DX-167A at Exhibit C.] Exhibit C to DX 167A also has what appears to be handwriting on it. Portions of Exhibit C appear to have been underlined and the last three lines have lines drawn through them. Dollar amounts are written to the right of nearly each truck and automobile listed in Exhibit C. Underneath all listed trucks and automobiles, the dollar amounts are totaled to "$57600.00," however that figure also has a line drawn through it.

### (2) DX-204

70. At trial, Deere pointed out, as it had also done prior to the start of the trial, that DX-167, the first "Contract" document FIMCO produced, was incomplete in that the bottoms of each page were cut off. [*See* Tr. Vol. 4A at 72–79 (Vaughan Testimony); Tr. Vol. 4B at 3–5.]

71. In response, FIMCO's counsel contacted Joe Gill, FIMCO's CFO, to request a complete copy of the document. [Tr. Vol. 4B at 6.] What Gill sent, however, was DX-204, a document which Deere pointed out is actually a different document than DX-167.

72. To remedy this confusion, FIMCO's counsel again contacted Gill, who overnighted a box of FIMCO records that was taken from the safe at FIMCO's office in Sioux City, Iowa to Paducah, Kentucky. [*See* Tr. Vol. 5B at 138–43.]

73. One of the documents included in this box of documents was DX-167A, which the parties agree appears to be a complete copy of DX-167, which FIMCO initially introduced but was incomplete due to a copying error. [Tr. Vol. 5B at 142–43; *see also* footnote 9, *supra*.]

74. Another document included in the box was DX-204, which is a document that is nearly identical but varies slightly from DX-167A.

75. DX-204 is a series of unstapled pages, though there are staple marks at the top indicating that the document was stapled at one time. The first seven pages of DX-204 are identical to the first seven pages of DX-167A. *See* DX-204 at 1–7. Specifically, the first page is labeled "Contract" and contains the same identified parties, recitals, purchase price, and identical signatures as DX-167A. [*See* DX 167A; DX 204.]

76. DX-204 also has some handwriting on it. The words "Purchase Agreement" are handwritten on the top left hand corner of the first page and "Schedule B" is handwritten on the top right hand corner of the first page.

77. Additionally, unlike DX-167A, DX-204 is missing Exhibit B. In DX-167A, Exhibit B is a ten page long exhibit detailing the machinery, tools, equipment, office furniture and fixtures, and factory furniture and fixtures that were to be transferred from JDD to Cochran in the sale of assets. [*See* DX 167A, Exhibit B at 1–10.]

78. However, DX-204 contains the same Exhibits A, C, D, E, and F as DX-167A, though they are out of order. [*See* DX 204 Exhibits.]

79. Exhibit C to DX-204, unlike Exhibit C to DX-167A does not have lines or dollar amounts drawn on it. Exhibit C does, however, have the same "Total $57600.00" written underneath all of the listed trucks and automobiles, though the figure is not crossed out as it is in Exhibit C to DX-167A. [*See* DX-204 Exhibit C.]

### (3) Analyzing DX-167A and DX-204

80. Despite minor variations in handwriting and one missing Exhibit, DX-167A and DX-204 are virtually the same document. Indeed, the Court finds that DX-167A and DX-204 are photo copies of the same Contract.

81. DX-167A and DX-204 are both printed on slightly yellowed paper, apparently due to the old age of both documents.

82. The seven-page "Contract" portions of both documents are printed on 8.5 x 14 inch paper, as are some Exhibits. Some Exhibits, such as Exhibit C and E, are printed on 8.5 x 11 inch paper in both documents.

83. The five signatures on page six of the "Contract" on both DX-167A and DX-204 are identical, as both are photo copies of the same piece of paper. These signatures are those of Robert Hoefer, Tom Vaughan, William Hoefer, Chris Hoefer, and Jon Cochran. [*See* DX-167A at 6; DX-204 at 6.]

84. The two signatures on page seven of the "Contract" on both DX-167A and DX-204 are identical, as both are photo copies of the same piece of paper. These signatures are those of R.E. Pecaut, the Vice President and Senior Trust Officer of First National Bank in Sioux City, Iowa, and Milton Glazer. [*See* DX-167A at 7; DX-204 at 7.]

85. When held up to the light, the bottoms of several pages of both DX-167A and DX-204 have the words "Xerox Copy Paper" watermarked on them. [*See* DX-167A; DX-204.]

Accordingly, the Court finds that neither DX-167A nor DX-204 is the original "Contract" between JDD, the Hoefers, and Cochran. However, the Court finds that both documents are *copies* of the original Contract between those parties and adequately evidence the original document.

86. This is further evidenced by the fact that the signatures in each document are identical copies of each other. Moreover, though DX-204 is missing Exhibit B and though the remaining Exhibits in DX-204 are out of order, the Court finds that this is of minimal importance, as the fact that DX-204 has had the staples removed likely explains the disordered and missing pages. In all relevant aspects, DX-167A and DX-204 are the same and do not contradict each other.

87. Deere argues that the inconsistencies between DX-167A and DX-204 warrant exclusion of all documents in their entirety. The Court disagrees. Rather, the Court is satisfied that such inconsistencies are minimal and do not compromise the probative value of the documents. Accordingly, Deere's objections to the admission of DX-167A and DX-204 are overruled.

**(4) Whether FIMCO Proved that the Contingencies Outlined in DX-167A and DX-204 Were Carried Out and Whether they, Together with Other Evidence, Demonstrate that the Assets Purchased by Cochran Were Used to Form FIMCO**

88. The next issue for the Court becomes whether there is sufficient evidence to find that the contingencies outlined in DX-167A and DX-204 (together, the "Contract") were carried out and whether those assets were acquired by and used to form FIMCO. Though there is no direct evidence as to these findings, there is some circumstantial evidence.

89. The parties agree that DX-167A and DX-204 do not make any reference to FIMCO. [Tr. Vol. 4A at 80 (Vaughan Testimony); *see also* DX-167A; DX-204.]

90. Moreover, Vaughan admitted at trial that he does not have tangible proof that the contingencies detailed in the agreement were, in fact, carried out. [Tr. Vol. 4A at 83–90, 100.] However, Vaughn testified multiple times that "common sense would tell [him] the transaction would not have gone through if those things would not have been taken care of." [*Id.* at 100.]

91. Additionally, as Deere has pointed out repeatedly, Vaughan does not "actually have any documents showing that FIMCO, as a corporation, actually acquired any assets from J-D-D." [*Id.* at 68, 100; *see also* DN 193 at 7 ("FIMCO admits it does not have the assignment between the investors placing the assets into FIMCO.").]

92. However, FIMCO was incorporated just ten days after Cochran purchased the "certain assets" outlined in the agreement. DX-167A and DX-204, which the Court finds sufficient to evidence the Contract between JDD, the Hoefers, and Cochran, are dated December 31, 1965. [*See* DX-167A; DX-204.] FIMCO's Articles of Incorporation were filed just ten days later on January 10, 1966. [DX-168.] Cochran, who purchased the assets from JDD, is listed as an incorporator of FIMCO along with Tom Vaughan, Milton Glazer, and two others. [DX-168 at 3.]

93. The Contract lists certain contingencies, including that Cochran is to pay JDD $60,000 by delivering that sum to First National Bank in Sioux City, Iowa, as the escrow holder, on or before January 5, 1966; that JDD will deliver the assets to First National Bank on or before January 5, 1966; that JDD will deliver all deeds, bills of sale and assignments to Cochran that are necessary to effectuate the transfer of the assets; that, on January 10, 1966, the First National Bank will pay the $60,000 to JDD's creditors, and that between January 1, 1966 and the date on which possession is transferred, Milton Glazer would assume possession of all of

JDD's assets as trustee in possession with right to operate in the interim. [*See* DX-167A; DX-204.]

94. True, Vaughan does not have documents showing that the contingencies in the contract were carried out. [Tr. Vol. 4A at 83–90, 100 (Vaughan Testimony).] As a result, Deere asserts that "it has not been established that any of the assets that are the subject of the [Contract] were, in fact, transferred or could, in fact, be transferred to FIMCO." [Tr. Vol. 3A at 120-21.] However, the corresponding dates between the Contract and the Articles of Incorporation, along with other circumstantial evidence, does tend to suggest that the contingencies were sufficiently carried out and that the assets were, in fact, transferred to FIMCO.

95. For instance, after its incorporation, FIMCO operated the same plant that JDD operated out of. [Tr. Vol. 3A at 70, 121 (Vaughan Testimony).]

96. There is also evidence that FIMCO continued to manufacture and sell *some* of the products that JDD manufactured and sold. [Tr. Vol. 3A at 78 (Vaughan Testimony).] Specifically, FIMCO remained in the oil business until approximately 1982. [*See id* at 132.] Among the evidence introduced at trial was a photograph of two old empty motor oil cans sitting side by side. [DX-12.] Both cans have "J-D-D" printed at the top, but the can on the right also has "FIMCO, Inc." printed at the bottom. [*Id.*] Vaughan explained that, after he started working at FIMCO, he observed other empty oil cans that did not have "FIMCO" printed on them from "before we owned the business." [Tr. Vol. 3A at 122–24.]

97. However, the relevant question for trademark purposes is not whether the contingencies of the Contract were carried out or whether FIMCO acquired the assets of JDD, but whether FIMCO "acquired the trademarks and good will of [JDD], the bankrupt" entity. 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 18:29 (5th ed.). In making

that determination, "[t]he test is whether the assets purchased are sufficient to enable the buyer to 'go on in real continuity with the past.'" *Id.* (citing *Merry Hull & Co. v. Hi-Line Co.*, 243 F. Supp. 45, 51 (S.D. N.Y. 1965); s*ee also Mut. Life Ins. Co. v. Menin*, 115 F.2d 975, 977 (2d Cir. 1940). Today, courts focus on whether the transfer of assets and trademarks enable the purchaser "to produce the goods at quality levels identical to those enjoyed by" the previous owner's customers before the transfer. *Matter of Roman Cleanser Co.*, 802 F.2d 207, 209 (6th Cir. 1986). Specifically, "a trademark may be validly transferred without the simultaneous transfer of any tangible assets, as long as the recipient continues to produce goods of the same quality and nature previously associated with the mark." *Defiance Button Mach. Co. v. C & C Metal Prod. Corp.*, 759 F.2d 1053, 1059 (2d Cir. 1985). In other words, "[a]s long as the mark has significant remaining value and the owner intends to use it in connection with substantially the same business or service, the public is not deceived." *Id.* at 1060. *See also* Restatement (Third) of Unfair Competition § 34 (1995) ("In the final analysis, the question is whether the assignee has acquired enough of the assignor's business to maintain continuity in the use of the designation. Thus, some courts now recognize that an assignment of a mark followed by the assignee's use of the designation to identify goods, services, or a business substantially similar to the assignor's is itself sufficient to permit the assignee to assert the assignor's priority in the use of the designation. An assignee's use is substantially similar to the use by the assignor if the expectations of consumers who rely on the presence of the designation after the assignment will be substantially fulfilled.").

98. In this case, even assuming, though without deciding, that sufficient evidence exists from which to infer that FIMCO acquired the "certain assets" of JDD such that it also acquired rights in the timing of JDD's use of green and yellow, the relevant inquiry is whether FIMCO

actually carried on using the green and yellow "in real continuity" with JDD's past use of green and yellow. FIMCO offered three categories of evidence as to this point. First, FIMCO offered several FIMCO "Sprayer Parts Books" from 1966 to 2000; second, the trial testimony of Kevin Vaughan; and third, the designated deposition testimony of Robert Conley. However, as the Court will discuss below, having considered all of this evidence, the Court finds that FIMCO has not carried its burden of proving "real continuity" with JDD's use of green and yellow on trailed agricultural sprayers by a preponderance of the evidence.

99. The first evidence of JDD's use of green and yellow on a piece of trailed agricultural equipment comes from 1957. Specifically, FIMCO offered into evidence photographs of trailed agricultural sprayers painted green and yellow that are dated December 9, 1957. [Tr. Vol. 3A at 84–85 (Vaughan Testimony); [see also DX-10, DN 244-6 at 16–21.][10] In all three photographs, the sprayer is attached to a John Deere tractor.

100.    But aside from the December 1957 photographs of a JDD "Big Butch" green and yellow trailed sprayer attached to a John Deere tractor, FIMCO did not produce any photographs of subsequent trailed agricultural equipment sold by JDD. FIMCO provided "Big Butch" Parts Books from 1962, 1963, and 1964, however, none of these feature actual photographs and none feature whole agricultural sprayers. [See DX-14; DX-15; DX-16.] Though these Parts

---

[10] At trial, FIMCO initially introduced DX-10, which FIMCO's counsel explained is a photocopied version of DX-203, a green binder containing various historical JDD and FIMCO documents. Deere objected to the admission of both DX-10 and DX-203, arguing that they are "a whole mélange of documents collected together, not in their original form, and many of it is separate pages so that you can't even tell where they came from or what the date is." [Tr. Vol. 3B at 27–28.] In most respects, the Court agrees. However, with respect to the December 1957 photographs, the Court finds them to be properly authenticated due to the date stamps on the back of each. [See DX-10, DN 244-6 at 16–21.] And with regard to the loose leaf advertisements for sprayers and canopies which the Court references, the Court only relied on them for the purpose of agreeing with Deere that those documents do not prove that FIMCO carried on JDD's use of green and yellow. Accordingly, Deere's objections to the admission of DX-10 and DX-203, in only these limited respects, are overruled.

    Next, though FIMCO ultimately introduced DX-203, which is the original green binder containing the large collection of documents, herein, the Court will refer to DX-10, a photocopy of many of those documents, which is part of the electronic record in the case, for purposes of making it clear to the readers to which pages the Court is referring.

Books have some green and yellow colors on the front covers and on some pages inside, they are not shown on any agricultural equipment. [*See* DX-14; DX-15; DX-16.] Moreover, each of these three parts books is dated *before* FIMCO's 1966 incorporation. FIMCO also produced two loose-leaf illustrated advertisements which depict green and yellow JDD "Big Butch" sprayers, however, FIMCO was unable to date either of these advertisements. [*See* DX-10, DN 244-7 at 7, 14–15.]

101.   Even more importantly, FIMCO has not produced any photographs or even illustrated advertisements of green and yellow whole agricultural sprayers sold by FIMCO from the time of its incorporation in 1966 until 1998. Though FIMCO introduced various pieces of evidence that, in some instances, contain green and yellow colors, the colors are never on whole agricultural equipment and never in actual photographs. For instance, FIMCO presented an example of FIMCO's letterhead which describes FIMCO as "manufacturers of JDD oils and greases" and "Big Butch farm and industrial equipment." [DX-18.] In addition, FIMCO produced "Sprayer Parts Books" from 1966, [DX-19], 1967, [DX-20]; 1968, [DN 21], 1969, [DX-22], 1970, [DX-23], 1971, [DX-24], 1972, [DX-25], 1973, [DX-26], 1974, [DX-27], 1975, [DX-28], 1976, [DX-29], 1977, [DX-30], 1978, [DX-31], 1979, [DX-32], 1980, [DX-33], 1981, [DX-34], 1982, [DX-35], 1983, [DX-36], 1984, [DX-37], 1985, [DX-38], 1986, [DX-39], 1987, [DX-40], 1988, [DX-41], 1989, [DX-42], 1990, [DX-42], 1991, [DX-44], 1992, [DX-45], 1993, [DX-46], 1994, [DX-47], 1995, [DX-48], 1996, [DX-49], and 1997, [DX-50]. Though some of these parts book mention "Big Butch," none of them advertise or depict a fully-assembled Big Butch agricultural sprayer in green and yellow or even sprayer parts in green and yellow. At most, some of the catalogs, such as the 1969 catalog, have portions of pages that are colored green and yellow, but not on any agricultural

*equipment*. [*See* DX-22.] The cover of the 1969 catalog depicts a parts cabinet on the cover, the top portion of which is bright yellow, the bottom portion of which is grey. [*Id.*] The background of the page is green on the top and bright yellow on the bottom. [*Id.*] However, at no place does the catalog depict green and yellow used on a Big Butch agricultural sprayer.

102.    The 1970, 1971, 1972, and 1973 Sprayer Parts Books depict "[m]ounted or trailer type field sprayers," on the last page, however, the depictions are all in black and white. [DX-23; DX-24; DX-25; DX-26.]

103.    Moreover, the majority of the Sprayer Parts Books do not feature a green and yellow color scheme at all throughout the pages, but rather a variety of other color combinations, such as yellow and black, [DX-19; DX-23; DX-24], yellow and blue, [DX-20], red and black, [DX-21; DX-25; DX-26; DX-33; DX-36; DX-37; DX-43], green and white, [DX-27; DX-29; DX-35], red and white, [DX-28; DX-30; DX-32; DX-40; DX-41; DX-42; DX-44; DX-46], blue and white, [DX-35], or red, white, and black, [DX-38; DX-39; DX-45; DX-49; DX-50.]

104.    When asked about the Sprayer Parks Books, Vaughan testified that "everything in [them] pertains to the sprayers that we have manufactured and sold for over 40, 50 years. All these parts coincide with all the sprayers before my dad owned the company, and after my father owned the company." [Tr. Vol. 4B at 100 (Vaughan Testimony).] However, when asked why none of the documents show those sprayers, Vaughan responded that the sprayers are "not on the parts books." [*Id.*] Later, Vaughan again stated that "the whole goods were not in those [parts] books." [*Id.* at 112.] However, the only books FIMCO produced from that period are

parts books. FIMCO did not produce for the court any other FIMCO catalogs that do show whole sprayers.

105.    In 1996 and 1997, the titles of the books were changed to "Sprayer and Sprayer Parts Book" rather than just "Sprayer Parts Book" as were the titles in years prior. [*See* DX-49; DX-50.] Those catalogs *do* feature photographs of whole trailed agricultural sprayers, however, they are all shown in red and white. [*See* DX-40; DX-50.] Specifically, the cover of the 1996 Sprayer and Sprayer Parts Book shows a trailer sprayer with a white tank, white wheels, and a red frame and accents. [DX-49; DN 221-1 at 65–66 (Robert Conley Deposition Testimony).] The cover of the 1997 Sprayer and Sprayer Parts Book features a wheeled trailed sprayer with a white tank, red frame, and red boom. [DX-50; DN 221-1 at 67 (Conley Deposition Testimony).]

106.    Not until the 1998 "Sprayers & Sprayer Parts" catalog do we see an actual photograph of a green and yellow trailed agricultural sprayer. [DX-51.] Specifically, the cover of the 1998 catalog features a green and yellow trailed agricultural sprayer being pulled by a John Deere tractor. [*Id.*] 1998 was also the year FIMCO acquired the Schaben brand. [Tr. Vol. 3B at 81 (Vaughan Testimony).]

107.    Vaughan testified at trial that FIMCO did continue to make and sell certain products that JDD made and sold. For example, Vaughn testified that FIMCO "carried forward" a JDD green and yellow canopy "that went on tractors and combines and swathers." [Tr. Vol. 3A at 77–78 (Vaughsn Testimony); DX-10, DN 244-4 at 1.] However, the only evidence the Court has of such a green and yellow canopy is from a JDD Lubricants advertisement, with no tangible evidence that the same product was later sold by FIMCO. Vaughan's testimony, without any corroborating evidence, is insufficient.

108. With regard to the December 1957 photographs of green and yellow Big Butch agricultural sprayers, Vaughn testified that, in his time working at FIMCO, FIMCO "made this sprayer for many years." [Tr. Vol. 3A at 85 (Vaughan Testimony).] However, Vaughan then testified that his work with that particular type of Big Butch sprayer consisted of selling replacement parts for *used* sprayers rather than manufacturing any new sprayers. [*Id.* at 86.] Vaughan also stated that he "still ha[s] people come in and ask for parts for sprayers like this today." [*Id.*] However, Vaughan's testimony specifically focused on selling *parts* for that type of sprayer.

109. Though Vaughan testified that there was a time when FIMCO was selling new Big Butch sprayers, Vaughan testified that his recollection of this was from when he "was just a little kid." [*Id.* at 88.] Specifically, Vaughn testified that when he "was little," he used to help stencil "Big Butch" on agricultural sprayers as they were being put together. [*Id.*] However, the fact that Vaughn's recollection of these events is from when he was a small child, combined with the fact that *no* tangible evidence exists showing a green and yellow Big Butch sprayer following FIMCO's incorporation, leads the Court to give this testimony little weight.

110. Vaughan also testified that, in his time working at FIMCO, he often referenced JDD sprayer catalogs from before FIMCO's incorporation in 1966. Vaughan explained that customers who had bought JDD sprayers in, for example, 1957, 1961, or 1962, would come in to FIMCO to buy replacement parts. [*Id.* at 96.] According to Vaughan, farmers would reference old JDD catalogs to identify the sprayer they had purchased, which would then allow FIMCO employees to determine which parts the farmer needed. [*Id.*] However, at the very most, this testimony, along with the many FIMCO "Sprayer Parts Books," show that

FIMCO was in the business of selling *replacement parts* for JDD sprayers. There is still no evidence that FIMCO sold whole green and yellow agricultural sprayers in continuity with JDD's past business of doing so.

111. What's more, during many of the events about which Vaughan sought to testify, Vaughan was a young child. Vaughan was born on November 25, 1960. [*Id.* at 32.] FIMCO was incorporated when Vaughan was about six years old, on January 10, 1966. [*Id.* at 54; DX-168 (FIMCO Articles of Incorporation).] Though the Court has great respect for Vaughn's intimate involvement with FIMCO from a very young age, it is nonetheless hesitant to rely on certain portions of his testimony relating to that early time period without accompanying corroborating evidence.

112. Vaughan also testified that "[w]hen the ag economy was going down in the '80s and the farm crunch hit and farmers' farms were getting repossessed, the farm stores basically walked away from the big trailer sprayers, the side mounts, and the pull-type sprayers." [Tr. Vol. 3A at 130 (Vaughan Testimony).] And "as the economy changed . . . the farm stores said, 'We want to stay in the sprayer business, but we're going to get in the lawn and garden business. We're going to start selling push mothers, string trimmers, and riding tractors.'" [*Id.* at 131.] Vaughn explained that, when FIMCO got into the lawn and garden business, "that's where FIMCO started to take off." [*Id.*] According to Vaughan, FIMCO "never walked away from the ag business. There just wasn't that much business there. People weren't buying stuff. The ag economy was in a serious recession." [*Id.* at 132.]

113. Robert Conley, who testified by designated deposition testimony, worked at FIMCO from 1972 until his retirement in 2011. [DN 221-1 at 5–6 (Conley Deposition Testimony).] Though FIMCO asserts that Conley testified that he "personal[ly] observed FIMCO's use of

the colors green and yellow on tractor towed agricultural sprayers," [DN 338 at 24], the Court does not find this testimony to be persuasive. As an initial matter, the majority of Conley's testimony was that, during his time at FIMCO, "customers would come in and ask for parts to repair their equipment. And there's a way to identify some of this equipment. We used old catalogs and such from the previous company and from the start of FIMCO in, I believe, '66." [*Id.* at 6.] Conley worked in the "parts room" at FIMCO from approximately 1973 to 1981, the focus of which "was filling parts orders that were phoned in and ship[ping] them out to dealers, customers around." [*Id.* at 24.] When asked "whether FIMCO, starting in 1966, continued to sell similar sprayers in green and yellow colors" as JDD had before, Conley responded "Yes." [*Id.* at 48.] Though he acknowledged that he did not begin working at FIMCO until 1972, he testified that he knew that FIMCO had sold green and yellow sprayers between 1966 and 1972 because he helped customers service FIMCO sprayers from that time period after he began working there. [*Id.* at 49.] Conley testified that, to identify the correct parts to service those sprayers, he referenced "old [FIMCO] catalogs" that featured those sprayers. [*Id.*] However, FIMCO did not provide the Court with *any* of the FIMCO catalogs from that period from which a customer could have identified which agricultural sprayer they owned. Rather, the only thing FIMCO produced are the "Parts Books" that do not depict fully assembled sprayers in green and yellow, but rather only advertise sprayer *parts*, and usually in black and white. Yet again, without corroborating evidence, the Court is not inclined to give much weight to Conley's testimony relating to events that occurred from 1966 to 1972, prior to the start of his employment with FIMCO.

114.    In sum, the Court finds that FIMCO has shown that it continued to sell *replacement parts* for Big Butch sprayers and, later, after the Big Butch name was phased out, sprayer parts

more generally. However, the Court finds that FIMCO has *not* carried its burden of proving, by a preponderance of the evidence, that FIMCO continued to manufacture and sell whole green and yellow trailed agricultural sprayers and/or applicators. Because FIMCO has failed to prove this by a preponderance of the evidence, it has likewise failed to show that it carried on this aspect of JDD's business "in continuity." Therefore, FIMCO has failed to prove by a preponderance of the evidence that it continued to manufacture trailed agricultural sprayers in green and yellow between its formation in 1966 and when it first appeared in a Sprayer and Sprayer Parts Book in 1998.

**I.** **Other Common Colors Used on Agricultural Sprayers and Applicators**

115. After John Deere, the other main brand of tractor in the United States is sold by Case International, also known as Case IH. Case IH uses predominantly "red and black or gray" on its tractors. [Tr. Vol. 1B at 47 (Felter Testimony); Tr. Vol. 5A at 107 (Yeazel Testimony); Tr. Vol. 5B at 51 (Wipson Testimony).]

116. To match Case IH's red tractors, many short line manufacturers also sell trailed agricultural equipment in red and black. [Tr. Vol. 3B at 54 (Vaughan Testimony); Tr. Vol. 5A at 107 (Yeazel Testimony).]

**J.** **Deere's Enforcement Efforts Regarding Other Companies' Use of Green and Yellow**

117. Several other companies in addition to FIMCO have made use of a green and yellow color combination on agricultural equipment throughout the years. [*See* Tr. Vol. 1A at 63–64 (Myers Testimony).]

118. Myers testified that, from the late 1980s through today, Deere has actively enforced its trademarks involving the use of green and yellow on agricultural equipment. [Tr. Vol. 1A at 58 (Myers Testimony).]

119. In 1989, Deere reached a settlement agreement with Bradford Industries, Inc. under which Bradford "agree[d] to cease using a green color on its agricultural equipment to the same extent that Unverferth Manufacturing Company, Inc. is required to cease using a green color on its agricultural equipment pursuant to the terms of any Injunction issued by the Court in the suit pending . . ." [*See* PX-364 at 2.]

120. On September 26, 1990, Deere obtained a civil judgment against Unverferth Manufacturing Co., Inc. in the Northern District of Ohio. [*See* PX-629 at 1–2.] Pursuant to that Judgment, the court "permanently enjoined [Unverferth] from making or selling agricultural equipment bearing any of [Deere's] trademarks or trade dress comprising a green color with yellow trim, including . . . defendant's trademark consisting of a green vehicle body or frame with yellow wheels, as covered by U.S. Trademark Registration No. 1, 502, 103." [*Id.* at 1.]

121. Between 2001 and July 2016, Deere corresponded with companies it believed to be infringing on its trademarks via letter and email requesting that such companies cease the use of the green and yellow color combination. [*See* PX-350–355; PX-358; PX-361, PX-363–365, PX-367, PX-369, PX-371, PX-375, PX-378, PX-381, PX-382, PX-384, PX-386, PX-388, PX-390–393, PX-395–404, PX-407–412, PX-414–416, PX-420–431, PX-433, PX-438, PX-439, PX-441–443, PS-445–447, PX-456–458, PX-462, PX-463, PX-465, PX-479, PX-480, PX-484, PX-485, PX-490–498, PX-500–502, PX-504, PX-505, PX-507, PX-508, PX-514, PX-518, PX-520, PX-524, PX-525, PX-530, PX-532, PX-544–547, PX-549, PX-552, PX-553, PX-562, PX-563, PX-565–574, PX-576, PX-578, PX-580–583, PX-586, PX-588, PX-597, PX-601, PX-604–608, PX-610–615, PX-617, PX-624–626, PX-628–639.][11]

---

[11] Though FIMCO objected to several of Deere's exhibits regarding its trademark enforcement correspondence on grounds of hearsay, Rule 401, and Rule 403, [DN 282], the Court admitted all of these exhibits at trial. [Tr. Vol. 1A

122. Some of these communications resulted in settlement agreements in which the allegedly infringing companies agreed to cease use of the green and yellow color combination. [*See, e.g.*, PX-353; PX-364.]

123. In total, out of the approximately forty companies which Deere asked to cease use of the green and yellow color combination, "all but three of them agreed to stop." [Tr. Vol. 1A at 64 (Myers Testimony).] These three companies include Bestway (also known as RHS), Unverfeth (which owns Top Air), and FIMCO. [*Id.*]

**K. Deere's Knowledge of FIMCO's Use of Green and Yellow**

124. Deere claims (through Myers, its corporate representative) that it first learned of FIMCO's use of green and yellow in 2011. [*Id.* at 67.] Specifically, Myers stated that he observed FIMCO equipment painted green and yellow at a farm show called the Farm Progress Show. [*Id.*] Myers testified that, thereafter, he reported his observation to Deere's trademark department. [*Id.*] Myers also testified that, in preparation for his testimony as corporate representative, he "learned that there was a report to the Deere trademark law group about FIMCO using green and yellow colors in 2010." [*Id.*]

125. Between November 2012 and March 2015, Deere corresponded with FIMCO in an attempt to get FIMCO to cease its use of green and yellow on its agricultural equipment. [*Id.* at 67–68.] When those attempts failed, Deere brought the instant suit in April 2015. [*See* DN 1 (Complaint).]

126. FIMCO asserts, however, that Deere must have learned about its use of the green and yellow color scheme prior to 2010 or 2011 due to old correspondence with JDD, FIMCO's

---

at 59–61.] The Court did so on the basis that Deere was offering these exhibits under the business records exception to the hearsay rule. [*Id.*] Additionally, because the Court did not rely on these exhibits for the truth of their contents, but rather only as evidence that Deere *sent* various pieces of enforcement correspondence, the Court need not exclude them on hearsay grounds.

alleged predecessor, FIMCO's sales of its products, and the close proximity of Deere and FIMCO products at various farm shows. [*See, e.g.*, Tr. Vol. 4B at 152 (Vaughan Testimony).]

**(1) Deere's Correspondence with JDD**

127.    In a letter dated April 21, 1944, Deere's counsel sent a demand letter to Chris Hoefer, the President of JDD Lubricants, in reference to Deere's concern that the letters "JDD" were meant to stand for "John Deere Dealers." [*See* DX-164.] Therein, Deere's counsel states that Deere considered the "revised form of label" that FIMCO submitted and "decided to take the position that the new label will not be an infringement upon our trade-mark rights, provided that you follow our suggestion to insert the name, HOEFER, in prominent letters above the letters J-D-D, and include on the label a notice similar to the one you originally had there to the effect that the J-D-D Lubricants Co. is the only company connected with or responsible for the manufacture or distribution of J-D-D Motor Oil without our name appearing in such notice. We also ask that you do not use any statements in any of your advertising matter from which it might be inferred that the letters J-D-D mean John Deere Dealers." [*Id.*]

128.    In a letter dated October 2, 1946, JDD's counsel sent a letter to Chris Hoefer explaining that Deere did not object to the new labels JDD was using. [*See* DX-165.]

129.    In a letter dated September 18, 1963, Deere's Counsel sent another letter to JDD's counsel. Therein, Deere's counsel wrote that "The use of the letters J-D-D (which apparently stand for John Deere Dealers) together with the use of the John Deere colors; yellow and green, on the [motor oil] containers tend to mislead a purchaser into believing that he is buying a product made by John Deere, whether or not such deception is actually intended. Referring to the matter of intent, however, it would seem clear that the name "J-D-D" and the

yellow and green colors were deliberately chosen for a purpose." [*See* DX-166.] Deere's counsel further stated that, though Deere "d[id] not require our dealers to refrain from handling competing products, it is nonetheless our intention to see that the ultimate customer, i.e., the farmer or other owner of the machine, is not misled into thinking he is buying a John Deere product when in fact he is not." [*Id.*]

130.    Though DX-166 indeed reflects that Deere knew of JDD's use of green and yellow on oil cans, it does not establish that Deere had any knowledge of JDD's alleged use of green and yellow on Big Butch sprayers. [*See* Tr. Vol. 4A at 117 (Vaughan Testimony).] Moreover, Vaughan agreed that he had no way of knowing whether Deere ever discovered that JDD used green and yellow on other agricultural equipment. [*Id.* at 118.]

131.    Contrary to FIMCO's contention, the evidence shows that Deere *did* enforce its trademarks against JDD both with regard to its use of the letters "JDD" and its use of green and yellow on motor oil cans.

### (2) FIMCO's Equipment Sales and Display of Green And Yellow Equipment at Farm Shows

132.    Vaughan testified at trial that, from 1981 forward, he attended farm shows at which FIMCO prominently displayed its green and yellow equipment. [Tr. Vol. 3B at 92 (Vaughan Testimony).] However, as the Court found above, FIMCO did not provide adequate evidence proving that it sold green and yellow trailed agricultural equipment until pictures of that equipment appeared on the cover of its 1998 Sprayers Sprayer Parts catalog. [*See* DX-51.]

133.    Vaughan further testified that "John Deere corporate" was present at many of the same farm shows where FIMCO featured its green and yellow equipment and that Deere "would come in [FIMCO's] booth. They would take pictures. They even talked to us about making lawn and garden sprayers for them." [Tr. Vol. 3B at 92 (Vaughan Testimony).] However,

FIMCO presented no pictures of its green and yellow equipment at farm shows during this time period and presented no evidence as to when and at which farm shows it allegedly encountered "John Deere corporate." Moreover, during his deposition, FIMCO's counsel asked Vaughan whether Deere attended the same farm shows as FIMCO and whether "there [is] any way [Vaughan] could imagine that John Deere would not have been able to know that for the last 50 years FIMCO has been using each and every year the colors green and yellow." [Tr. Vol. 4B at 154 (quoting Vaughan Deposition).] In response, Vaughan stated only that "They would have to be blind." [*Id.*] Vaughan did not mention *anything* about Deere taking pictures of FIMCO equipment at farm shows or discussing the possibility of FIMCO manufacturing lawn and garden sprayers for Deere. Moreover, when asked on cross-examination how Vaughan knew the individuals who had taken pictures of FIMCO equipment were from John Deere corporate, he replied simply that "[t]hey had shirts on that said John Deere." [*Id.* at 155.] However, Vaughan stated multiple times that these events took place "a long time ago . . . Many years ago." [*Id.*] The Court finds this testimony, by itself, to be insufficient to establish that individuals responsible for trademark enforcement at Deere had knowledge of FIMCO's use of green and yellow by virtue of the display of those colors at farm shows.

134.    Although Doug Felter testified that he first learned of FIMCO's Schaben brand, and its use of green and yellow, at a farm show in 2008 or 2009, he testified that he did not report this observation because he "didn't recognize the need to." [Tr. Vol. 1B at 24 (Felter Testimony).]

135.    Moreover, though some dealers sell both Deere and FIMCO products, John Deere dealers are not employed by Deere, not controlled by Deere, and are not required to police Deere's

trademarks in any way. [*Id.* at 19–20.] Moreover, Deere does not place any limitations or restrictions on the types or brands of products that its dealers may sell. [*Id.* at 20.]

136.    Additionally, Deere offered evidence at trial that FIMCO's business has expanded dramatically in several ways since the mid-1990s, including expansion in FIMCO locations, employees, salespeople, advertising expenditures, and farm show attendance. [*See* Tr. Vol. 4A at 40–59 (Vaughan Testimony).] This, too, lends support for a finding that Deere did not have knowledge of FIMCO's use of green and yellow equipment until 2010 or 2011.

### a) Expansion of FIMCO locations

137.    Vaughan testified that until the mid-1990s, the only location at which FIMCO had operations was in Sioux City, Iowa, and North Sioux City, South Dakota. [*Id.* at 41.]

138.    In 1995, FIMCO opened a location in Tempe, Arizona. [*Id.*]

139.    In 1998, FIMCO acquired its Schaben brand, and with it, a store in Columbus, Nebraska and a store in Newton, Kansas. [*Id.* at 42.]

140.    In 1999, FIMCO opened another Schaben location in Bakersfield, California. [*Id.* at 42–43.]

141.    In the early 2000s, FIMCO acquired the AgSouth brand, and with it, a location in Kentucky. [*Id.* at 43.]

142.    In 2008, FIMCO acquired the AgSpray brand, and with it, locations in Dothan, Alabama and Greenwood, Mississippi. [*Id.* at 43–44.]

143.    In the mid to late 2000s, FIMCO opened new locations in Fargo, North Dakota and Mankato, Minnesota. [*Id.* at 44.]

144.    In approximately 2013, FIMCO opened a location in Othello, Washington. [*Id.* at 44–45.]

145. Today, FIMCO has a total of ten locations in ten different states. [*Id.* at 44–46; PX-222 (2016 FIMCO Ag Spray Catalog).]

### b) Expansion of FIMCO Employees

146. In 1995, FIMCO had approximately thirty to fifty employees. [Tr. Vol. 4A at 48.]

147. By 2000, FIMCO had between 200 and 300 employees. [*Id.*]

148. The number of FIMCO employees did not increase between 2000 and 2005, when FIMCO had approximately 125 to 200 employees. [*Id.* at 48–49.]

149. Today, FIMCO employs several hundred people. [*Id.* at 49.]

150. At trial, Vaughan agreed that, between 1995 and the present, "there's been a dramatic expansion in the number of [FIMCO] employees." [*Id.* at 50.]

### c) Expansion of FIMCO Salespeople

151. Vaughan estimated that, in 1980 and 1990, FIMCO had two salespeople. [*Id.* at 50–53.]

152. Vaughan estimated that, by 1995, FIMCO had three salespeople. [*Id.* at 53.]

153. By 2000, Vaughan testified that the number of salespeople had jumped to between fifteen and twenty-five. [*Id.*]

154. By 2010, Vaughan estimated that FIMCO had approximately fifty salespeople. [*Id.*]

155. Finally, by 2016, FIMCO had approximately sixty salespeople. [*Id.* at 54.]

### d) Expansion of FIMCO's Advertising Expenditures

156. Vaughan testified in his deposition and at trial that, when his father ran the company, he did not spend a lot of money on advertising or promotion because it was not his priority and because his father was frugal. [*Id.* at 55.]

157. By around 1995, FIMCO's advertising budget was up to $50,000, but perhaps less. [*Id.* at 56.]

158. In 2000, FIMCO's advertising budget had risen to $150,000 to $200,000. [*Id.*]

159. By 2011, FIMCO's advertising budget was approximately $700,000. [*Id.* at 57.]

160. In recent years, FIMCO's advertising budget has been approximately $1 million. [*Id.* at 57–58.]

### e) Expansion of FIMCO's Farm Show Attendance

161. As of 1986, FIMCO attended between six and twelve farm shows a year. [*Id.* at 58.] By 1995, FIMCO still attended no more than twelve shows a year. [*Id.*]

162. By 2000, FIMCO was attending approximately fifteen to twenty farm shows a year. [*Id.*]

163. By 2005, this figure increased to "at least a couple dozen" shows a year. [*Id.* at 58–59.]

164. As of 2011, FIMCO was attending about fifty farm shows a year. [*Id.* at 59.]

165. Vaughan testified that, today, FIMCO attends "maybe a little less" than fifty farm shows a year "because the ag economy has turned down." [*Id.*]

### f) Summary of FIMCO's Expansion

166. At trial, Vaughan agreed that, overall, "we've seen a dramatic expansion in FIMCO's business in multiple respects since the late 1990s." [*Id.*]

167. Due to FIMCO's significant expansion between the late 1990s and today, the Court finds Myers' testimony that Deere did not learn of FIMCO's use of green and yellow until 2010 or 2011 to be credible.

## L. Expert Testimony

### (1) Confusion Expert

168. Deere called its survey expert, Hal Poret, to testify about confusion. [*See* Tr. Vol. 2B (Poret Testimony).]

169.   In support of its state and federal trademark infringement claims and its federal false designation of origin and unfair competition claim, Deere submitted Poret's two confusion surveys, a 2014 Schaben Confusion Survey and a 2016 Ag Spray Confusion Survey. [*Id.* at 9.]

170.   Poret used identical methodologies to conduct the Schaben Confusion Survey and the Ag Spray Confusion Survey, with the only difference being that the Ag Spray Confusion Survey had a larger sample size. [*Id.* at 10.] There were 100 participants in the Schaben Confusion Survey and 200 participants in the Ag Spray Confusion Survey. [*Id.* at 12.]

171.   To collect the respondents for each survey, Poret "used an online panel that was crop farmers, and the screening questions ensured that the only people who took the survey were those who work with sprayers and applicators." [*Id.* at 10.] The group of respondents included "anybody who works with that equipment," rather than being limited solely to purchasers of the relevant equipment, because, according to Poret, "in the case of large items like farming equipment where there might be some purchasers but many people who work with the equipment and encounter it every day, it's common to define consumers to include the types of people who work with the equipment." [*Id.* at 11.] Specifically, "the survey was assessing whether there would be confusion when encountering the equipment in the field, not literally in a sales situation. So it made sense to survey the kinds of people who will encounter the equipment in the field to see if there's confusion out there." [*Id.*] However, "anybody who worked in advertising or market research or for a company that manufactures farming equipment or who has somebody in their family in one of those positions was screened out, which is a standard quality control procedure." [*Id.*]

172.     Poret designed each survey as an "Eveready" survey, which "is one where you only show [respondents] the allegedly infringing equipment and you ask questions to see if on their own people name the plaintiff." [*Id.* at 14.] Poret testified that he used the Eveready method in this case "because it's more conservative. Because the only way confusion can occur is if the people taking the survey look at the green/yellow, check Schaben or Ag Spray equipment, and they think of Deere on their own." [*Id.*]

173.     For the Schaben Confusion Survey, respondents were shown a picture of a piece of green and yellow Schaben agricultural equipment with the word "SCHABEN" written on the yellow tank. [*Id.* at 16; PX-699.]

174.     For the Ag Spray Confusion Survey, respondents were shown a picture of a piece of green and yellow Ag Spray agricultural equipment with "AG SPRAY" written on the yellow tank. [Tr. Vol. 2B at 15 (Poret Testimony); PX-700.]

175.     The control groups for both confusion surveys were shown a picture of a piece of yellow and black crop care equipment with "CROP CARE" written on the yellow tank. [Tr. Vol. 2B at 15 (Poret Testimony); PX-701.]  Poret explained that, "by keeping the color yellow [in the control image], which is one of the colors that Deere uses, that really . . . should maximize how many people named Deere in the control, which then minimizes the confusion rate" to make that number more accurate. [Tr. Vol. 2B at 17 (Poret Testimony).] "The control group is taking the rate of people who named Deere when shown a piece of equipment that does not have the Deere color scheme, and it's subtracting that entire percentage" to obtain the net percentage. [*Id.* at 25.]

176.     All three photos "were meant to represent what a crop farmer might see in the field in use." [*Id.* at 16.]

177.    Poret testified that the images shown to the respondents purposely displayed the logo of the Schaben and Ag Spray equipment because he "wanted to make sure that the respondents actually did get a chance to see the name Schaben or Ag Spray as prominently on the equipment as they could." [*Id.* at 16.]

178.    For both surveys, respondents were asked multiple questions, including who they believed made the equipment and, if they had an opinion, why, whether they believed that the equipment was approved or sponsored by any other company, and if so, why, and whether they thought that any company that makes the equipment is affiliated with any other company, and if so, why. [*Id.* at 18.] Respondents were told that if they did not have an opinion, they should not guess. [*Id.* at 17.] The questions were "completely open-ended" rather than providing multiple choice answers or a list of several answer choices. [*Id.* at 18.]

179.    The Schaben Confusion Survey resulted in a net confusion level of 22.0% who believed the equipment was made by, approved by, or affiliated with Deere. [*Id.* at 20; *see also* PD-4 at 4.]

180.    The Ag Spray Confusion Survey resulted in a net confusion level of 39.0% who believed the equipment was made by, approved by, or affiliated with Deere. [Tr. Vol. 2B at 20; s*ee also* PD-4 at 4.]

181.    At trial, FIMCO adduced testimony from its opinion witnesses regarding the typical gender of purchasers of the large agricultural equipment at issue in this litigation. All four of these witnesses testified that, nearly every time, the purchaser of such equipment is male. [*See* Tr. Vol. 5A at 30–31 (Kessler Testimony); Tr. Vol. 5A at 71 (Schwarz Testimony); Tr. Vol. 5A at 109 (Yeazel Testimony); Tr. Vol. 5B at 20–21 (Perkins Testimony).] As far as the Court can tell, this is an attempt to discredit the strength of Poret's Schaben and Ag Spray

Confusion surveys, which did not limit survey respondents to only males. The Court will discuss the effect, if any, that this factor has on the probative value of Poret's survey below in making its conclusions of law.

182.    In sum, the Court finds that the Schaben and Ag Spray Confusion surveys were conducted reliably and are entitled to weight, and therefore provide evidence in support of Deere's state and federal trademark infringement claims and its federal false designation of origin and unfair competition claim.

### (2) Dilution Expert

183.    Poret also testified about trademark dilution. [*See* Tr. Vol. 2B at 25–34 (Poret Testimony).]

184.    In support of its federal trademark dilution claim, Deere submitted Poret's two dilution surveys, a 2014 Schaben Dilution Survey and a 2016 Ag Spray Dilution Survey. [*Id.* at 25.]

185.    Poret conducted the Dilution Surveys using nearly identical methodologies as the Confusion Surveys. Though he surveyed different individual people, he used the same universe of crop farmers who actually work with agricultural sprayers and applicators. [*Id.*] Poret again surveyed 100 individuals for the 2014 Schaben Dilution Survey and 200 individuals for the 2016 Ag Spray Dilution Survey. [*Id.* at 26.]

186.    Poret used the same three photographs for the Dilution Surveys as he used for the Confusion Surveys. [*Id.* at 27; PX-699; PX-700; PX-701.] For the Schaben Dilution Survey, Poret used two different pictures, one of a Schaben green and yellow trailed sprayer, [PX-699], and one of a CropCare yellow and black trailed sprayer for the control group, [PX-701.] For the Ag Spray Dilution Survey, Poret again used two pictures, one of an Ag Spray

green and yellow trailed liquid nutrient applicator, [PX-700], and the same CropCare yellow and black trailed sprayer for the control group, [PX-701.]

187.    Poret explained how the Dilution Surveys were conducted as follows: "each respondent saw only one of these pictures. They were given the same instructions as in the confusion survey about not guessing. And if they don't have an opinion, they should say so. They were asked different questions going to the issue of association. So they were asked whether any companies came to their mind when they were looking at this. And if so, what companies and what made that come to their mind. So in the case of dilution, we're seeing what percentage of people think of Deere when they see this equipment." [Tr. Vol. 2B at 27–28 (Poret Testimony).]

188.    As with the Confusion Surveys, participants in the Dilution Surveys were not given a list of answer choices, but rather were provided with empty spaces to fill in whatever company came to mind. [*Id.* at 28.] "Deere was never mentioned to them or shown to them." [*Id.*]

189.    Also like the Confusion Surveys, the percentage of respondents in the control group for each survey who identified Deere when viewing the CropCare equipment, which has a yellow and black color scheme, was subtracted from the percentage of respondents who named Deere when viewing the green and yellow Schaben or Ag Spray equipment in each survey. The resulting percentage was the net percentage for each survey. [*Id.* at 29.]

190.    The Schaben Dilution Survey resulted in a net of 38% of respondents who answered "that Deere came to mind when they were viewing the Schaben equipment." [*Id.*]

191.    The Ag Spray Dilution Survey resulted in a net of 43% of respondents who answered that Deere came to mind when they viewed the Ag Spray equipment. [*Id.*]

192.    In sum, the Court is satisfied that the Schaben and Ag Spray Dilution surveys were conducted reliably and are entitled to weight, and therefore provide strong evidence in support of a finding that crop farmers associate the green and yellow color scheme on agricultural equipment with Deere.

### (3) Fame Survey

193.    Poret also testified about another survey he performed, which was designed to measure the "fame" of Deere's use of green and yellow colors on agricultural equipment. This survey was conducted between May 6, 2016 and May 19, 2016. [*Id.* at 35.]

194.    For the Fame Survey, Poret surveyed a total of 400 people, with 200 in the test group and 200 in the control group. [*Id.* at 31.] For this survey, Poret surveyed "members of the general public, a representative sample of general consumers." [*Id.* at 32.] Poret explained that he surveyed individuals of different genders and different geographic locations "because fame is supposed to be measured among the general consuming public, not any particular niche where the product might be more well-known." [*Id.* at 32–33.]  Accordingly, Poret surveyed "a nationally representative geographic sample, so it would include people from all over the place even if farming is not as big there." [*Id.* at 33.]

195.    Poret used a total of four images in the Fame Survey. [*Id.*] These images were of an orange vacuum cleaner, [PX-702], a navy and red striped women's shirt, [PX-703], a green and yellow John Deere agricultural tractor, [PX-704], and an orange agricultural tractor, [PX-705.] All images had all brand names and logos removed from the products featured therein. Specifically, the John Deere tractor did not include the name "John Deere" or the leaping deer logo. [Tr. Vol. 2B at 33 (Poret Testimony).]

196. Respondents in the test group were shown the images of the green and yellow tractor, the shirt, and the vacuum cleaner. [*Id.*] Respondents in the control group were shown the images of the orange tractor, the shirt, and the vacuum cleaner. [*Id.*] The respondents in both groups were then asked about each of the three items, specifically, about whether they recognized the items and whether they held a belief about what company or brand the item came from. [*Id.*]

197. Poret explained that he used the images of the shirt and vacuum cleaner along with the images of the tractors "to not have the tractor stand out as the focus of the survey so it doesn't get undue attention. The respondents don't have any reason to think the tractor is any more important than any of the other items, and they don't feel as compelled to try to come up with a company or brand name." [*Id.* at 34.]

198. After subtracting out the 2% noise rate from the control group, the Fame Survey resulted in a net of 74% of respondents who identified John Deere as the brand or maker of the green and yellow tractor. [*Id.*]

199. FIMCO argues that Poret's survey used flawed methods by attempting to measure the fame of green and yellow as used on a John Deere tractor as opposed to the fame of green and yellow as used on a John Deere sprayer or applicator. [*See* Tr. Vol. 2B at 40–45; DN 338 at 21–23.] The Court will address the effect of this critique below in its analysis of the fame of Deere's mark.

**M. Fact Witnesses**

200. Both parties called witnesses who sell or have sold the agricultural equipment at issue in this case to testify about their experiences selling green and yellow agricultural equipment to farmers.

**(1) Deere's Fact Witnesses Regarding Agricultural Sales**

**1. Greg Thompson**

201. Greg Thompson is the store lead at an agricultural sales company called Heritage Tractor in Lawrence, Kansas. [Tr. Vol. 2A at 67 (Thompson Testimony).] Heritage Tractor is "a turf, construction, and agricultural dealership specializing in John Deere sales." [*Id.*] It has nine locations throughout eastern Kansas and western Missouri. [*Id.* at 68–69.]

202. Thompson works with customers who are contemplating purchasing agricultural equipment at Heritage Tractor. [*Id.* at 69.] Thompson testified that, with regard to customer knowledge, "[w]e've got guys that can afford anything and know very little about anything, and we've got guys that can just barely get something financed but know something about everything." [*Id.* at 70.] Thompson stated that he works with customers who are very knowledgeable about all agricultural brands and types of equipment as well as customers who have very little knowledge about the range of brands and types of equipment. [*Id.*] Thompson testified that there is "[a] huge range" of knowledge among customers regarding agricultural brands and products. [*Id.*]

203. Heritage Tractor sells several types of Deere agricultural products, including, for example, tractors, haying machines, planters, sprayers, and nutrient applicators. [*Id.* at 71.] Heritage Tractor also sells other brands, including Land Pride, Bush Hog, KUHN, and Ag Spray, a brand of FIMCO. [*Id.* at 71–72.] In the past, Heritage Tractor also sold Schaben, a former brand of FIMCO. [*Id.* at 72.]

204. Thompson testified that, since he has been at Heritage Tractor beginning in 2011, customers have commented to him that the colors of Ag Spray and Schaben are "similar to or the same as" Deere's colors and that they "look like John Deere equipment." [*Id.* at 73.]

Additionally, Thompson testified that customers have commented that they want to match their trailed agricultural equipment to the color of their tractors. [*Id.* at 74.] Accordingly to Thompson, customers say things like "'Does it come in Deere colors?' 'Does it match my John Deere tractor?' 'Does it come in green and yellow?' I mean, it's expressed in multiple ways." [*Id.* at 75.]

205. With regard to confusion, Thompson stated that, when he began working at Heritage Tractor in 2011, when assisting customers, he "would go and grab two brochures off our shelf . . . A lot of them sit there side by side. So I'd grab the Schaben brochure, John Deere brochure, and I'd hand them to customers, and I'd have them ask, 'Hey, so are those both John Deere?'" [*Id.* at 76.] Thompson stated that he would reply, "Well, that says 'Schaben' at the top," and customers would reply "Okay. Is it made by John Deere?" [*Id.*] Thompson testified that he "remember[s] having to go to [his] manager and say, 'So what's the situation here?' And he explained to me that Schaben was a separate company and we order it from a separate place, and I was able to clear it up just fine." [*Id.*]

206. Next, Thompson testified about a second instance of confusion that occurred "[a] couple years ago," when a customer, MMP Farms, who owned an 8300 John Deere tractor, sought to trade in its Blu-Jet nutrient applicator. [*Id.*] Thompson testified that he brought the customer brochures for both John Deere and Schaben agricultural products, and the customer commented, "So are they both John Deere, or are they just -- what are these?" [*Id.*] Thompson stated that he replied, "This is Schaben. We order this from a different company." [*Id.*] Thompson testified that the customer then replied "Well, it's nice they both match my 8300 [tractor]." [*Id.*]

207.   Thompson also testified about a third encounter involving alleged confusion. Thompson explained that, while in his office near the showroom, a customer came in and said, "Hey, can you tell me about those John Deere three-point sprayers over there?" [*Id.* at 77.] Because Thompson knew that they did not have any John Deere three-point sprayers in the showroom and had none in stock, he walked out to see what equipment the customer was referencing. [*Id.*] Thompson testified that it turned out the customer was in fact talking about an Ag Sprayer three-point sprayer rather than a Deere three-point sprayer. [*Id.*] Thompson additionally testified that other walk-in customers have made similar comments and estimated that this has happened approximately 40 times. [*Id.*] Thompson estimated that about 35 out of those 40 were "active in farming." [*Id.* at 78.]

208.   Thompson testified that a new self-propelled agricultural sprayer generally does not directly compete with a new trailed agricultural sprayer. [*Id.* at 82.] Specifically, Thompson agreed that the price of a new Deere self-propelled sprayer ranges from approximately $170,000 to $500,000, while a new Ag Sprayer trailed sprayer ranges from approximately $20,000 to $60,000. [*Id.* at 81–82.]

### (2) FIMCO's Fact Witnesses Regarding Agricultural Sales[12]

### 1. Albert Kessler

209.   Albert Kessler is the vice-president of the precision agriculture department at Stutsman, Inc. in Hills, Iowa. [Tr. Vol. 5A at 10 (Kessler Testimony).]

210.   Kessler testified that "[m]ost of the farmers who come in to buy equipment from me have done a lot of search -- searching around, try to find out the best product for accomplishing

---

[12] Initially, FIMCO titled its witness disclosures for Kessler, Schwarz, Yeazel, and Perkins, as "Disclosure of Opinion Testimony (Whether Lay or Expert)." At trial, Deere objected to the Court considering these witnesses as expert witnesses, but stated that it had no problem with the witnesses testifying as to their experiences, perceptions, and opinions. [Tr. Vol. 5A at 7–9.] FIMCO indicated that it did not have a problem with its witnesses being considered lay witnesses. [*Id.* at 9.] Accordingly, the Court will consider them as such.

their goal that they're farming with. And -- and they ask a lot of – different farmers, they -- they look on the web page to try to find information out to do the best they can buying the best piece of equipment." [*Id.* at 22–23.] He further testified that most shoppers he has encountered are "experienced farmers" and that "they're generally knowledgeable about the equipment and the functions of the equipment." [*Id.* at 23.] On the other hand, Kessler acknowledged "that some farmers know more about certain agricultural equipment than others," and therefore that there is "a range of knowledge about the specifications, the brands, and all aspects of different farming equipment among farmers." [*Id.* at 39–40.]

211. Moreover, Kessler agreed that the frequency with which farmers purchase sprayers and applicators also varies. Kessler stated that "[i]t could be every year. It could be 20 years. It ranges." [*Id.* at 40.]

212. Kessler further testified that, in the used market for trailed agricultural equipment today, the predominant colors of such equipment are "[b]y far, green and yellow." [*Id.* at 26.] Additionally, Kessler testified that he does not solely associate the colors green and yellow with John Deere. [*Id.*] On cross-examination, Kessler agreed that what he meant by this statement was that "other companies use those colors on their equipment." [*Id.* at 32.]

213. With regard to confusion, Kessler testified that, in his experience interacting with customers and prospective customers, he had never encountered individuals who told him they were "confused as to the manufacturer of green and yellow trailed ag equipment." [*Id.* at 27, 38–39.] However, Kessler also testified that, if a farmer saw a piece of green and yellow agricultural equipment in a field from a distance, "[i]f they did not see the name of it, they wouldn't know" the brand. [*Id.* at 45.] But Kessler opined that if a farmer saw a green and yellow trailed agricultural sprayer in a field from a distance, farmers could not think the

equipment was manufactured by Deere because Deere has "never made a pull-type sprayer," and most "farmers are smart enough to know that there is no such thing." [*Id.* at 50–52.]

214.    Kessler additionally testified as to the differences between self-propelled agricultural sprayers, which Deere sells, and trailed agricultural sprayers, which Deere does not sell. [*Id.* at 27–28.] Specifically, Kessler explained that a self-propelled sprayer costs an average of approximately $300,000, while a trailed sprayer costs an average of $50,000. [*Id.* at 28, 35.] Additionally, as the names suggest, self-propelled sprayers do not require a tractor to operate, while trailed sprayers do require a tractor. [*Id.* at 28, 36.] In other words, Kessler agreed that "a farmer who's considering purchasing a trailed sprayer or trailed applicator is always a farmer who either has purchased or is going to purchase a tractor." [*Id.* at 36.]

215.    Finally, Kessler testified that, if two pieces of equipment, one green and yellow and one green and black, both meet a prospective purchasers criteria (including price, quality, and warranty), in his experience a customer with a Deere tractor would desire to buy the piece of equipment that would match their Deere tractor. In other words, Kessler opined that "[m]ost farmers . . . definitely want to match," and would therefore likely purchase the green and yellow piece of equipment. [*Id.* at 28–29.] Kessler agreed that the reason a "hypothetical consumer . . . who cares about and wants those green and yellow colors [wants them] . . . because those are the colors they identify with their Deere tractor[]." [*Id.* at 48.]

### 2. Mark Schwarz

216.    Mark Schwarz is a regional vice-president at FIMCO. He oversees six locations primarily in the western United States. [Tr. Vol. 5A at 53–54 (Schwarz Testimony).]

217.    Schwarz testified that farmers "do a great deal of homework in the purchasing process. They start out primarily looking for whether it's a sprayer applicator. There's a lot of research

to do as far as the size of sprayer from the tank size to the boom size to the tire size to the spacing, the row spacing they farm, the kind of products they're going to put down. And it's -- it's an important piece of equipment to their farm. It takes care of their crops through the whole year and protects they're livelihood, so they do a great amount of research on what they're going to buy before they buy it." [*Id.* at 62.]

218. Schwarz stated that the colors green and yellow are "not at all" solely associated with Deere. Rather, Schwarz stated that "[i]f you've attended farm shows in the past and you've walked and attended a farm show, you can walk down the aisles and see plenty of green and yellow equipment in the past." [*Id.* at 64–65.]

219. Schwarz, like Kessler, testified that, in the used market for trailed agricultural equipment today, the most prominent colors of equipment are green and yellow. [*Id.* at 65.]

220. With regard to confusion, Schwarz stated that he has "never experienced confusion in the marketplace. The farmers that I've dealt with are extremely knowledgeable individuals, and they -- they're very familiar that in our product line, John Deere has not built a pull-type sprayer, so I've never seen any confusion." [*Id.* at 67.] Schwarz also testified that he had not observed any confusion with regard to trailed liquid nutrient applicators. [*Id.*]

221. Schwarz opined that self-propelled sprayers do not compete directly with trailed sprayers. [*Id.*] Rather, according to Schwarz, self-propelled sprayers cost anywhere between $300,000 and $400,000, while trailed sprayers cost less than $100,000. [*Id.*]

222. Schwarz testified that, all other factors (including price, quality, service, and relationship) being equal, if a farmer with a Deere tractor could choose between a green and yellow or black and white piece of trailed agricultural equipment, the farmer is "going to acquire the piece of equipment that matches the tractor they're pulling it with, so it would be green and

yellow." [*Id.*] When asked why this was, Schwarz replied "[b]ecause they want the equipment to complement it. As they go to the field, they like to look good." [*Id.* at 67–68.]

223.    Like Kessler, Schwarz testified that he does not solely associate green and yellow colors on agricultural equipment with Deere because "[t]here's many other manufacturers that have and continue to manufacture green and yellow pulled equipment." [*Id.* at 69–70.]

224.    According to Schwarz, with regard to frequency of purchasing, "[s]ome farmers may trade every year, every couple years. Some farmer[s] may trade them every five years or ten years. It varies depending on the customer." [*Id.* at 78.]

225.    Schwarz stated that FIMCO "sell[s] primarily green and yellow because primarily most of the customers have green and yellow tractors, and they want to match their tractors." [*Id.* at 79.]

226.    Schwarz opined that when farmers see green and yellow trailed agricultural equipment, farmers "may think of Deere," however "I think they're going to think of a lot of other people as well. If it's a disc, they may think of Deere. If it's a sprayer, an applicator, I think primarily they're going to think of many other manufacturers before Deere." [*Id.* at 82.]

227.    Schwarz further testified that, while a farmer who observes a green and yellow tractor in a field would assume that tractor is sold by Deere, a farmer who observes a trailed sprayer in a field "would assume it's one of the ten [other] manufacturers . . . that manufacture[d] trailed sprayers," such as Bestway, Top Air, Sprayer Specialties, Summers, FAST, Hardi, Minden Machine, Forest Manufacturing, or Big John. [*Id.* at 64, 86.] This is because "John Deere has never manufactured a trailed sprayer." [*Id.* at 87.]

228.    Schwarz likewise opined that a farmer would likely not assume that a green and yellow trailed nutrient applicator was sold by John Deere, but rather "would state it was one of the

many manufacturers that [he] answered before." [*Id.* at 88–89.] Schwarz explained that, though a small percentage of farmers may think a trailed nutrient applicator was sold by Deere, Deere has only been in that market for approximately two years, while other manufacturers have been in the market "for some time." [*Id.* at 89.]

### 3. Todd Yeazel

229.     Todd Yeazel is the National Sales Manager for Fertilizer Dealer Supply. [Tr. Vol. 5A at 91, 93–94 (Yeazel Testimony).] Fertilizer Dealer Supply "sells fertilizer equipment, application equipment, [and] storage equipment for fertilizers and ag chemicals." [*Id.* at 91.] Fertilizer Dealer Supply does business primarily in the "corn belt" of the United States, which includes, according to Yeazel, North Dakota, South Dakota, Nebraska, Missouri, Iowa, Minnesota, Wisconsin, Illinois, Kentucky, Tennessee, Indiana, Michigan, Ohio, and to some extent Pennsylvania. [*Id.* at 94–95.] Yeazel has experience selling both new and used trailed agricultural equipment. [*Id.* at 95.]

230.     Yeazel testified that he typically attends, depending on the year, somewhere between six and ten farm shows a year. [*Id.* at 97.] Fertilizer Dealer Supply maintains booths at farm shows and Yeazel has been in charge of manning those booths in the past. [*Id.*] Yeazel explained that "one of [his] jobs is to know what the competition is doing and what they're bringing, if they're bringing something [new]. So [he] walked" the booths at the shows. [*Id.* at 98.]

231.     Yeazel stated that, throughout his experience and observations in selling trailed agricultural sprayers and applicators, the most prominent color that he has observed used on those types of equipment is green and yellow; specifically, "yellow on the wheels and tank and green on the frame." [*Id.* at 99.]

232.    According to Yeazel, customers who are shopping for trailed agricultural equipment are "very knowledgeable. It's . . . a big piece of equipment for them to buy. It's an important job it's going to do. It may have been a job that they hired done in the past, but now they're doing it themselves. It's . . . time sensitive, and it affects their bottom line. They are very serious about it." [*Id.* at 101.] Yeazel further noted that customers "come in with . . . with a lot of information on a lot of other people's equipment." [*Id.* at 102.] Additionally, Yeazel explained that, in his experience, a customer's decision to purchase trailed agricultural equipment is "very planned. You know, planned out seasons ahead a lot of times. They start talking seasons ahead before they buy it, in my opinion." [*Id.*]

233.    However, Yeazel acknowledged, as did Kessler and Schwarz, that there is a range of knowledge among farmers about agricultural equipment. [*Id.* at 120.]

234.    Yeazel also testified that several different short-line manufacturers have sold trailed agricultural equipment with yellow wheels, yellow tanks, and green frames, and therefore that he does not solely associate those colors with one specific manufacturer. [*Id.* at 103.]

235.    However, Yeazel agreed that if a customer called and requested a piece of trailed agricultural equipment in "the John Deere colors," he would know that the customer meant bright green and bright yellow. [*Id.* at 130–131.]

236.    Yeazel further testified that he has never experienced a time when a customer confused a piece of green and yellow trailed agricultural equipment as being manufactured by Deere when it was not. [*Id.* at 104, 107.]

237.    Yeazel also opined that a self-propelled agricultural sprayer does not compete directly with a trailed agricultural sprayer because the two types of equipment represent "[t]wo different markets. Two different needs for the end-user. Two different business models." [*Id.*]

Moreover, Yeazel explained that "you could be looking at a 30 or $50,000 trail[ed] sprayer and a $150,000 self-propelled sprayer, and that's on the low end of the self-propelleds." [*Id.* at 105.]

238.    Yeazel responded that a hypothetical customer who owns a John Deere tractor and has the choice between a piece of trailed agricultural equipment that is green and yellow or a piece that is red and black, provided that both meet his purchase criteria, "will pick the green and yellow." [*Id.* at 106.] This is because, according to Yeazel, the farmer "wants to match up with his tractor." [*Id.*]

239.    Yeazel also testified that manufactures also sell trailed agricultural equipment in red and black to match the other prominent brand of tractors in the United States, manufactured by Case International, which is red. [*Id.* at 107.] Yeazel agreed that this is because, in his experience, companies sell trailed agricultural equipment to match a farmer's tractor. [*Id.*]

**4. Cindy Perkins**

240.    Cindy Perkins co-owns and works at a company called Perkins Sales, Incorporated in Missouri. [Tr. Vol. 5B at 3 (Perkins Testimony).] Perkins Sales is in the business of agricultural equipment sales. [*Id.*] Perkins sales is located in Missouri, but sells to customers primarily in Arkansas, Louisiana, Mississippi, and Florida. [*Id.* at 7.]

241.    Perkins testified that Perkins Sales has a booth at approximately five farm shows a year. [*Id.* at 7.] And before Perkins started attending farm shows for her business, she attended at least one farm show a year as a farmer since approximately 1980 or 1981. [*Id.* at 8.]

242.    Perkins testified that, in her experience selling various brands of trailed agricultural equipment, "[m]ost of the [brands] that [Perkins Sales] sell[s], they will offer them either in green and yellow and red and gray or red and white and blue. [*Id.* at 12.] Perkins further

testified that the most common color of trailed agricultural equipment that she sells is green and yellow. [*Id.*]

243.     With regard to customer knowledge, Perkins testified that customers are "very careful about, you know, what they buy, the features they have, how accurate it is. They will ask me questions . . . They want brochures. They want me to look something up on the internet for them if they . . . aren't very internet savvy. But most of our customers are pretty internet savvy . . . ." [*Id.* at 13.] Oftentimes, according to Perkins, customers will come in to look at a piece of equipment that they do not plan to purchase until the next year. [*Id.*] "So they do their homework. This is something they are going to base their livelihood on, so it's not something that they do lightly. And they're going to go out and they're going to apply hundreds of thousands of dollars worth of chemical or fertilizer to fields that are going to affect what comes up at the end of the year, so they definitely -- you know, they take great care in finding out even -- they'll get on blogs and, you know, talk to other farmers and make sure that what they're getting is exactly what they want and going to do the job they expect it to do." [*Id.* at 14.]

244.     Perkins also testified that farmers may only purchase a sprayer or applicator every five to ten years. [*Id.* at 26–27.]

245.     Perkins explained that her customers typically prefer to purchase trailed agricultural equipment in green and yellow because, when "people have green and yellow tractors . . . they kind of have almost . . . a fleet mentality. They like everything to look, you know, like the same, match, and have – be complementing one another. As far as colors go, they like everything to look the same." [*Id.* at 15.]

246.     In response to the question of whether, in her experience at her store or at farm shows, any customer or prospective customer ever confused a piece of trailed agricultural equipment as being manufactured by Deere when it was not, Perkins replied "No. It's never happened." [*Id.* at 15.]

247.     Perkins testified that, in the year leading up to her testimony in this case, she "queried some people that [she] trust[s] that come in and just posed that question to them" about whether they had ever confused a piece of Schaben or Ag Spray equipment as a piece of Deere equipment, "[a]nd they absolutely agreed with [her], 'No, I've never had that confusion.'" [*Id.* at 26.]

248.     Perkins additionally opined that green and yellow colors are "not solely" associated with Deere. She testified that "obviously John Deere has had that color, but, I mean, it's been something that has been available for as long as we've been selling equipment, you know. Whenever they have a range of colors that are available, that's always been included." [*Id.* at 16.]

249.     Perkins, like Kessler, Schwarz, and Yeazel, testified that a hypothetical customer who owns a John Deere tractor would choose a green and yellow piece of trailed agricultural equipment "every time" over a red and white piece of equipment, provided that both pieces meet the purchaser's criteria in terms of price, features, capability, and warranty. [*Id.* at 16–17.] Perkins explained that this is because the farmers "desire it to match their tractor." [*Id.* at 17.] Conversely, Perkins testified that a farmer who has a Case IH tractor, which is red, would "usually" want the red and white piece of trailed agricultural equipment to match their Case IH tractor. [*Id.*]

250.   Perkins testified that a self-propelled agricultural sprayer and a trailed agricultural sprayer are "[n]ot at all" in direct competition with each other. [*Id.* at 18.] This is because, according to Perkins, "different farming practices require different equipment, and you don't have the same farming practices that you would use if you used a self-propelled against a trailed ag." [*Id.*] Moreover, Perkins stated that there is "[a] huge price difference" between the two. [*Id.* at 19.] Specifically, "the self-propelleds are probably four times to five times more than a trailed ag." [*Id.*]

251.   However, Perkins also conceded that, though sprayers and applicators are different types of equipment, they both perform the same fundamental function of "put[ting[ some type of material, be that a liquid, a gas, or a solid-like fertilizer, onto crops." [*Id.* at 25.]

## V.   CONCLUSIONS OF LAW

1.   Deere seeks injunctive relief for FIMCO's alleged acts of trademark infringement, false designation of origin and unfair competition, and trademark dilution in violation of federal and Kentucky law.

2.   FIMCO asserts the affirmative defenses of acquiescence and estoppel, as well as counterclaims for a declaratory judgment finding that it has not violated any federal or state trademark laws.

### A.  __Trademark Infringement__

3.   Deere's trademark infringement claims relate to FIMCO's use of green and yellow colors on its trailed nutrient applicators and agricultural sprayers.

4.   "A party proves trademark infringement by showing (1) that it owns a trademark, (2) that the infringer used the mark in commerce without authorization, and (3) that the use of the alleged infringing trademark 'is likely to cause confusion among consumers regarding the origin of

63

the goods offered by the parties.'" *Coach, Inc. v. Goodfellow*, 717 F.3d 498, 502 (6th Cir. 2013) (quoting *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.,* 502 F.3d 504, 515 (6th Cir. 2007)).

5.  To determine whether a likelihood of confusion exists, courts in the Sixth Circuit consider eight factors, often referred to as the "*Frisch's* factors." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997) (citing *Frisch's Restaurants, Inc. v. Elby's Big Boy, Inc.,* 670 F.2d 642, 648 (6th Cir. 1982) ("*Frisch I*")).

6.  Courts "assess each factor with respect to the relevant consumer market; potential buyers of the "junior" product (here, [FIMCO's green and yellow sprayers and applicators]) are the relevant consumers." *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410, 419 (6th Cir. 2012) (citing *Leelanau Wine Cellars,* 502 F.3d at 518).

7.  The *Frisch's* factors "imply no mathematical precision, but are simply a guide to help determine whether confusion is likely.... The ultimate question remains whether the relevant consumers are likely to believe that the products or services are affiliated in some way." *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 703 F. Supp. 2d 671, 689–90 (W.D. Ky. 2010) (Heyburn, J.), *aff'd*, 679 F.3d 410 (6th Cir. 2012) (quoting *Daddy's,* 109 F.3d at 280).

8.  The eight *Frisch's* factors, and the Court's analysis of each as applied to this case, are as follows.

### (1) Strength of the Senior Mark

9.  The strength factor "focuses on the distinctiveness of a mark and its recognition among the public." *Maker's Mark*, 679 F.3d at 419 (quoting *Therma–Scan, Inc. v. Thermoscan, Inc.,* 295 F.3d 623, 631 (6th Cir. 2002)). "The Sixth Circuit has noted that '[t]he stronger the

trademark, the more likely it is that encroachment on it will produce confusion.'" *Maker's Mark*, 703 F. Supp. 2d at 689–90 (quoting *Champions Golf Club v. Champions Golf Club,* 78 F.3d 1111, 1117 (6th Cir. 1996)).

10. Whether a mark is "strong" requires an evaluation of both 1) conceptual strength and 2) commercial strength. *Maker's Mark*, 679 F.3d at 419 (citing 2 J. Thomas McCarthy*, McCarthy on Trademarks and Unfair Competition* § 11.83 (4th ed.)). Conceptual strength refers to the "'placement of the mark on the spectrum of marks,' which encapsulates the question of inherent distinctiveness." *Id.* (citing 2 McCarthy, *supra*, at § 11.83). Commercial strength refers to "the marketplace recognition value of the mark." *Id.* (quoting 2 McCarthy, *supra*, at § 11.83). "In other words, '[a] mark is strong if it is highly distinctive, i.e., if the public readily accepts it as the hallmark of a particular source; it can become so because it is unique, because it has been the subject of wide and intensive advertisement, or because of a combination of both.'" *Id.* (quoting *Homeowners Grp. v. Home Mktg. Specialists, Inc.,* 931 F.2d 1100, 1107 (6th Cir. 1991)).

11. Certainly, the green and yellow color scheme as it is used on John Deere tractors is a "strong trademark[] in that the public readily accepts [it] as [a] hallmark[] of" John Deere." *Gen. Motors Corp. v. Keystone Auto. Indus., Inc.*, 453 F.3d 351, 356 (6th Cir. 2006). The evidence at trial wholly supports this conclusion. [*See, e.g.*, Tr. Vol. 5A at 43 (Kessler Testimony) (Agreeing that "any farmer . . . who sees a green and yellow tractor will think it's from Deere."); Tr. Vol. 5A at 81 (Schwarz Testimony) (Agreeing that "a farmer who sees green and yellow on a tractor is going to understand John Deere is the source, the maker of that tractor."); Tr. Vol. 5A at 121 (Yeazel Testimony) (Agreeing that he does not "know of any other company that makes green and yellow tractors except Deere."); Tr. Vol. 5B at 27

(Perkins Testimony) (Agreeing that "it's common knowledge that Deere makes green and yellow tractors.").]

12. However, the strength of the green and yellow color scheme as it is used on other John Deere equipment, such as trailed nutrient applicators, is not as strong. True, due to the incontestability of Deere's trademarks for wheeled agricultural machines, [PX-2; PX-151], and tractor-towed agricultural implements, [PX-3; PX-152], Deere's trademarks on those products "are presumed to be strong marks." *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 794 (6th Cir. 2004). However, FIMCO "can rebut the presumption of . . . strength by proving extensive third-party *use* of similar marks." *Id.* (citing *Data Concepts, Inc. v. Digital Consulting, Inc.,* 150 F.3d 620, 625 (6th Cir.1998)). Specifically, the Sixth Circuit has "recognize[d] that 'extensive third-party uses of a trademark [may] substantially weaken the strength of a mark.'" *Maker's Mark*, 679 F.3d at 420 (quoting *Homeowners,* 931 F.2d at 1108; *Herman Miller, Inc. v. Palazzetti Imps. & Exps., Inc.,* 270 F.3d 298, 317 (6th Cir. 2001)). FIMCO offered extensive evidence as to this point at trial. Specifically, FIMCO showed that, throughout the years, several other short-line manufacturers have manufactured trailed agricultural equipment in green and yellow.

13. For instance, Schwarz testified at trial that, when farmers see green and yellow trailed agricultural equipment, they "may think of Deere," however "I think they're going to think of a lot of other people as well. If it's a disc, they may think of Deere. If it's a sprayer, an applicator, I think primarily they're going to think of many other manufacturers before Deere." [Tr. Vol. 5A at 82 (Schwarz Testimony).] This is because there have "been many, many companies over the past 20 years that [Schwarz has] been in the industry that have manufactured green and yellow pull-type equipment." [*Id.* at 89.] Schwarz further testified

that if "you've walked and attended a farm show, you can walk down the aisles and see plenty of green and yellow equipment in the past." [*Id.* at 65; s*ee also* Tr. Vol. 5A at 32 (Kessler Testimony) (Agreeing that "other companies use those colors on their equipment."); Tr. Vol. 5A at 99 (Yeazel Testimony) ("[T]here was many [companies] over the years that have produced either a sprayer or a side dresser or both with green and yellow.").]

14. In the past, as many as 40 companies have used green and yellow on agricultural products. Between the late 1980s and today, Deere sent communications to these companies requesting that they cease using the green and yellow color combination. Today, all but 3 companies have agreed to stop. [Tr. Vol. 1A at 63–64 (Myers Testimony)].

15. Due to other companies' use of green and yellow in the past, Deere's use of green and yellow on its agricultural implements is not as strong an indicator of source as is the use of green and yellow on its tractors. This is true despite the fact that, as of 2017, only three companies continue to use it.

16. However, this does not mean that the green and yellow color scheme as used on Deere agricultural implements has no strength or distinctiveness at all. On the contrary, Schwarz testified that Deere remains among the companies that may come to mind when a farmer sees a piece of green and yellow trailed agricultural equipment. Moreover, the Schaben and Ag Spray Confusion and Dilution surveys, which the Court will address in greater detail below, also tend to indicate that farmers think of Deere when shown a piece of trailed green and yellow agricultural equipment. [*See* Tr. Vol. 2B at 20, (Poret Testimony); *see also* PD-4 at 4.]

17. Overall, due to the extensive third-party use of green and yellow on trailed agricultural equipment, the Court finds that this color scheme is likely not the "hallmark" of Deere. Accordingly, this factor weighs in favor of FIMCO, though only slightly.

### (2) Relatedness of the Goods or Services

18. The Sixth Circuit has explained that "[c]ases generally fit into one of three categories regarding the relatedness of the goods and services of the parties. First, if the parties compete directly by offering their goods or services, confusion is likely if the marks are sufficiently similar; second, if the goods or services are somewhat related but not competitive, the likelihood of confusion will turn on other factors; third, if the goods or services are totally unrelated, confusion is unlikely. *Daddy's*, 109 F.3d at 282 (citing *Champions*, 78 F.3d at 1118). Moreover, "goods 'are 'related' not because they coexist in the same broad industry, but are 'related' if the services are marketed and consumed such that buyers are likely to believe that the services, similarly marked, come from the same source, or are somehow connected with or sponsored by a common company.'" *Id.* at 282–83 (quoting *Homeowners,* 931 F.2d at 1109). "The question is, are the [goods or services] related so that they are likely to be connected in the mind of a prospective purchaser?" *Id.* (quoting *Homeowners,* 931 F.2d at 1109). Additionally, "courts must examine whether the products of the parties perform the same function, concentrating on 'whether consumers will be confused as to the origin of the product.'" *Id.* (quoting *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1187 (6th Cir. 1988) (*Wynn Oil I*)).

19. In this case, the evidence shows that the goods at issue are closely related. Broadly speaking, both parties sell large agricultural sprayers and applicators. More specifically, with regard to

trailed agricultural liquid nutrient applicators, which both Deere and FIMCO sell, the parties are in direct competition.

20. With regard to agricultural sprayers, it is undisputed that Deere only sells self-propelled agricultural sprayers in the United States, while FIMCO only sells trailed agricultural sprayers in the United States. Although the parties do not sell the same type of sprayer, and although there is typically a vast price difference between self-propelled and trailed sprayers, both types of sprayers perform the same basic function; that is, applying some type of substance to crops. *See id.* at 283 (quoting *Wynn Oil I*, 839 F.2d at 1187 ("holding that bulk car wax and complete car washing service of one party and car care products of other party offered consumers the fundamentally same thing: a clean car")). As a result, the Court finds that a significant overlap exists between goods sold by FIMCO and goods sold by Deere. *See id.* ("The District Court found that, although plaintiff concentrates on selling *used* instruments and defendant does not, the fact that both parties sell retail musical instruments increases the likelihood of confusion. The overlap of the goods and services offered by both parties, especially their emphasis on electronic instruments, does support the conclusion that some potential consumers of one party could fulfill their needs by buying instead from the other party.") (internal citations omitted). Accordingly, the relatedness factor weighs in favor of Deere.

### (3) Similarity of the Marks

21. In analyzing whether senior and junior marks are similar, "courts must determine whether a given mark would confuse the public when viewed alone, in order to account for the possibility that sufficiently similar marks may confuse consumers who do not have both marks before them but who may have a general, vague, or even hazy, impression or

recollection of the other party's mark." *Maker's Mark*, 679 F.3d at 421 (citing *Daddy's,* 109 F.3d at 283). To that end, "courts must view marks in their entirety and focus on their overall impressions, not individual features." *Daddy's,* 109 F.3d at 283 (citing *Homeowners*, 931 F.2d at 1109). The similarity factor is one "of considerable weight." *Id.* (citing *Champion's Golf Club*, 78 F.3d at 1119).

22. FIMCO's use of green and yellow on trailed sprayers and applicators is highly similar to Deere's use of green and yellow on self-propelled sprayers and trailed applicators. First, FIMCO has stipulated to the facts that the green and yellow paint colors used by Deere and FIMCO are "indistinguishable from each other to the naked eye" and "indistinguishable from each other when appearing on equipment in the field." [DN 164 at 1–2 (Stipulated Facts).]

23. Second, the placement of the green and yellow colors on the parties' respective agricultural equipment is also very similar. FIMCO's sprayers and applicators predominantly feature yellow tanks, yellow wheels, and green frames. [*See, e.g.*, PX-301; PX-331.] Likewise, Deere's sprayers and applicators feature yellow tanks, yellow wheels, and green frames. [*See, e.g.*, PX-6; PX-7.]

24. FIMCO argues, however, that there are "many differences between the appearances of the [parties'] products. [DN 338 at 9 (FIMCO's Amended Proposed Findings of Fact and Conclusions of Law).] Specifically, FIMCO argues that its equipment is "predominantly yellow, with black, green and silver accent colors and a white sticker on the frame." [*Id.*] Additionally, FIMCO emphasizes that the "Ag Spray" brand is "prominently displayed in conspicuous, distinctive black lettering, on the tank of all FIMCO prayers and applicator[s]. [*Id.*] Finally, FIMCO questioned Myers on cross examination about Deere's use of some

gray and stainless steel tanks (rather than yellow) on its self-propelled sprayers. [*See* Tr. Vol.
1A at 94–97 (Myers Testimony); DX 103; PX-269, p. 1; PX-267, p. 7.]

25. However, the Court's task when analyzing this factor is to glean the "overall impressions" of
FIMCO's products rather than focusing on "individual features." *Daddy's*, 109 F.3d at 283.
And while FIMCO products may contain some black and silver accents, the vast majority of
exhibits introduced at trial displaying FIMCO trailed agricultural sprayers and applicators in
color feature, most notably, bright green and bright yellow, with green used on the frame of
the equipment and yellow used on the wheels. [*See, e.g.*, DX-58 (2004 Schaben Catalog
Cover); DX-59 (2005 Schaben Catalog Cover); DX-60 (2006 Schaben Catalog Cover); DX-
61 (2007 Schaben Catalog Cover); DX-62 (2008 Schaben Catalog Cover); DX-63 (2009
Schaben Catalog Cover); DX-64 (2010 Schaben Catalog Cover); DX-65 (2011 Schaben
Catalog and Parts Book Cover); DX-66 (2012 Schaben Catalog and Parts Book Cover); DX-
67 (2013 Schaben Catalog and Parts Book Cover); DX-69 (2010 Ag Spray Catalog and Parts
Book Cover); DX-70 (2011 Ag Spray Catalog and Parts Book Cover); DX-71 (2012 Ag
Spray Catalog and Parts Book Cover); DX-72 (2013 Ag Spray Catalog and Parts Book
Cover); DX-74 (2015 Ag Spray Catalog and Parts Book Cover); DX-75 (2016 Ag Spray
Catalog and Parts Book Cover).] As a result, when viewed alone, the overall impression of
Schaben and Ag Spray-branded FIMCO sprayers and applicators is of green and yellow
colors, despite the use of black accents and yellow tanks.

26. Moreover, though FIMCO equipment typically has the words "Ag Spray" or "Schaben"
printed on it, and though this may work to distinguish the products somewhat, the Court finds
that the presence of these brand names is not so significant or distinctive so as to make the
products "dissimilar" for purposes of this factor. Rather, the similarities between the two

parties' products remain strong despite the use of the brand labels. *See Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 634 (6th Cir. 2002) ("Although the typeface and graphical design of the trademarks differ, these contrasts relate to the marks' "individual features" rather than the "overall impressions" that the marks convey. These differences, therefore, do not negate the high degree of similarity between the marks." (internal citations omitted)). Therefore, the similarity factor weighs strongly in favor of Deere.

### (4) Evidence of Actual Confusion

27. "Evidence of actual confusion is undoubtedly the best evidence of likelihood of confusion." *Daddy's*, 109 F.3d at 284 (quoting *Wynn Oil I*, 839 F.2d at 1188). That being said, "it does not follow that any type or quantum of such evidence is entitled to significant weight in the determination. Where the parties have been doing business in the same area for some time and where they have advertised extensively, isolated instances of actual confusion are not conclusive or entitled to great weight in the determination." *Homeowners*, 931 F.2d at 1110 (citations omitted). "Perhaps as important as the number of instances of confusion are the kinds of persons confused and degree of confusion. 'Short-lived confusion or confusion of individuals casually acquainted with a business is worthy of little weight,' while chronic mistakes and serious confusion of actual customers are worthy of greater weight." *Id.* (quoting *Safeway Stores, Inc. v. Safeway Disc. Drugs, Inc.*, 675 F.2d 1160, 1167 (11th Cir. 1982) (internal citation omitted)).

28. Vaughan testified that "[t]here was never any confusion . . . The farmer is probably the most educated buyer of any piece of equipment, whether it's a pickup truck or semi." [Tr. Vol. 3B at 61 (Vaughan Testimony).] Additionally FIMCO's witnesses Kessler, Schwarz, Yeazel, and Perkins all testified that, in their experience selling FIMCO-branded agricultural sprayers

or applicators, they have never encountered a situation where a prospective customer confused a FIMCO product as being manufactured or sold by Deere or who was confused about the manufacturer of a piece of green and yellow equipment. [Tr. Vol. 5A at 27, 38–39. (Kessler Testimony); Tr. Vol. 5A at 67 (Schwarz Testimony); Tr. Vol. 5A at 104, 107 (Yeazel Testimony); Tr. Vol. 5B at 15, 26 (Perkins Testimony).]

29. Two Deere witnesses, on the other hand, testified that they have experienced certain instances of alleged confusion.

30. The first was Brian Myers, a program manager in pricing and incentives for John Deere. [Tr. Vol. 1A at 28 (Myers Testimony).] Myers testified that, in April 2016, during a training exercise at a John Deere dealership, a new member of Myer's group by the name of Kirk Ogden asked Myers whether an Ag Spray-branded product was a John Deere product. [*Id.* at 68. (Myers Testimony).] Myers testified that Ogden had worked at Deere "for a couple years prior as a test engineer" and had a background in farming. [*Id.* at 68–69.] However, the Court does not find that this anecdote provides strong evidence of actual confusion. Generally, confusion on behalf of employees of the senior or junior users of the contested mark is not relevant to the actual confusion assessment. *See Progressive Distribution Servs., Inc. v. United Parcel Serv., Inc.*, 856 F.3d 416, 434 (6th Cir. 2017) ("Progressive only points to an incident of confusion involving a UPS employee, and not an actual or prospective customer of Progressive's services. This is significant because in a trademark infringement action, the focus rests upon the likelihood of a consumer being confused by the two marks and not an employee.")

31. The second witness was Greg Thompson, who has experience selling both Deere products and Schaben and Ag Spray-branded FIMCO products. [Tr. Vol. 2A at 67, 71–72 (Thompson

Testimony).] Thompson testified that some customers, when looking at both a Schaben and a Deere brochure for agricultural equipment, would ask whether both types of equipment were made by John Deere, despite the fact that the Schaben brochures had the word "Schaben" printed at the top. [*Id.* at 76.] Thompson recounted a specific instance in which a farmer who owned a John Deere tractor and who was in the market for a new trailed liquid nutrient applicator, when presented with both John Deere and Schaben brochures, asked whether both types of equipment were Deere-branded. [*Id.*]

32. Thompson also testified that a customer once asked him to tell him about a John Deere three-point sprayer that was displayed in the Heritage Tractor showroom, but which was in fact an Ag Spray three-point sprayer. [*Id.* at 77.] Thompson testified that "at least 40" other walk-in customers have also made similar comments to him during his time at Heritage Tractor and estimated that, of those, approximately 35 farmers who were "active" in farming made such comments. [*Id.* at 77–78.]

33. This anecdotal evidence regarding instances of confusion from Thompson provides some support for a finding of actual confusion. "It is significant that in [many of the] instances, the confused individuals were knowledgeable about [the agricultural industry] . . . but nonetheless were unclear about which [piece of equipment] was which." *Champions*, 78 F.3d at 1120. However, "[o]n the other hand, [such few] incidents is not a considerable quantum of evidence of actual confusion, and minimal or isolated instances of actual confusion are, obviously, less probative than a showing of substantial actual confusion." *Id.*

34. More probative of actual confusion, however, are the confusion surveys conducted by Poret, Deere's survey expert. Those surveys reflect that crop farmers who actually work with sprayers and applicators do experience confusion with regard to the source of FIMCO's

Schaben and Ag Spray products. The Schaben Confusion Survey yielded a net confusion rate of 22.0% who believed the pictured Schaben equipment was made by, approved by, or affiliated with Deere. [Tr. Vol. 2B at 20 (Poret Testimony); *see also* PD-4 at 4.]

35. The Ag Spray Confusion Survey yielded a net confusion rate of 39.0% who believed the Ag Spray equipment was made by, approved by, or affiliated with Deere. [Tr. Vol. 2B at 20 (Poret Testimony); *see also* PD-4 at 4.]

36. These rates are within the range that courts and commentators have found to support a finding of actual or likely confusion. *See* 6 McCarthy, *supra*, at § 32:187 ("[T]he key figure is 'net confusion'; the difference between the raw confusion percent and the control confusion percent."); 6 McCarthy, *supra*, at § 32:188 ("Generally, figures in the range of 25% to 50% have been viewed as solid support for a finding of a likelihood of confusion.") (collecting cases).

37. *See also First Nat. Bank in Sioux Falls v. First Nat. Bank S. Dakota*, 679 F.3d 763, 771 (8th Cir. 2012) ("FNB South Dakota's own expert found that the percentage of consumers likely to be confused was thirteen percent, and we have held that even eleven percent confusion is 'not an insignificant percentage.' As a result, the district court did not clearly err in finding that the survey evidence demonstrates a likelihood of confusion." (internal citations omitted); *Gateway, Inc. v. Companion Prod., Inc.*, 384 F.3d 503, 510 (8th Cir. 2004) ("[A]pproximately 39% of the people surveyed erroneously believed that Gateway manufactured or sponsored Cody Cow. This confusion rate substantially exceeds a rate we have previously found sufficient evidence of actual confusion."); *J & J Snack Foods Corp. v. McDonald's Corp.*, 932 F.2d 1460, 1463 (Fed. Cir. 1991) ("McDonald's presented consumer survey evidence in which 30% of the respondents stated that they thought a product marked

McPRETZEL originated with McDonald's."); *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 532 (S.D.N.Y. 2011), *aff'd*, 511 F. App'x 81 (2d Cir. 2013) ("The [net] confusion levels [of 27.8% and 22.5%] ascertained by the Mantis surveys have been accepted as indicative of likelihood of confusion."); *Warner Bros. Entm't v. Glob. Asylum, Inc.*, No. CV 12-9547 PSG CWX, 2012 WL 6951315, at *10 (C.D. Cal. Dec. 10, 2012), *aff'd sub nom. Warner Bros. Entm't v. Glob. Asylum, Inc.*, 544 F. App'x 683 (9th Cir. 2013), and *aff'd sub nom. Warner Bros. Entm't v. Glob. Asylum, Inc.*, 544 F. App'x 683 (9th Cir. 2013) ("Generally, confusion levels of 25 to 50 percent provide "solid support" for a finding of likelihood of confusion."); *Bell v. Starbucks U.S. Brands Corp.*, 389 F. Supp. 2d 766, 776 (S.D. Tex. 2005), *aff'd*, 205 F. App'x 289 (5th Cir. 2006) (Noting that "25% of consumers believed that 'Star Bock' beer was affiliated with Starbucks" and holding that percentage was sufficient "to show a significant level of actual confusion.").

38. On the contrary, courts have rejected survey evidence that falls substantially below that range. *See Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1149 (10th Cir. 2013) ("Net confusion rates of 6.5% and negative 0.5% do not create a genuine factual issue of likelihood of confusion."); *CareFirst of Maryland, Inc. v. First Care, P.C.*, 434 F.3d 263, 268 (4th Cir. 2006) ("[T]he survey only shows a confusion rate of 2 percent, hardly a sufficient showing of actual confusion."); *Diana Princess of Wales Mem'l Fund v. Franklin Mint Co.*, 216 F.3d 1082 (9th Cir. 1999), *as amended on denial of reh'g* (Feb. 24, 2000) ("Franklin's telephone survey evidence showed that only 6.9% of respondents thought money was being donated to the Fund. This percentage weighs against a finding of confusion.").

39. FIMCO challenges the methodology of Poret's confusion surveys in multiple ways. First, FIMCO questioned Poret on cross-examination about an error in one of the survey questions.

Specifically, a question in the Ag Spray Confusion survey mistakenly referred to the piece of Ag Spray equipment that was shown to respondents as a "sprayer" when, in fact, the piece of equipment shown was an applicator. [PX-694, p. 6, 8; Tr. Vol. 2B at 48–50, 55–56 (Poret Testimony).] FIMCO's counsel asked Poret whether any respondents pointed out this error in the answer box following the questions about this "sprayer." [Tr. Vol. 2B at 51 (Poret Testimony).] Poret could not recall during cross-examination, however, on redirect examination, Deere's counsel pointed Poret's attention to one response that stated "There are many sprayers made like this, but this is not a sprayer. It's post liquid fertilizer applicator that puts liquid fertilizer between rows." [*Id.* at 55–56 (quoting PX-695).] Overall, the Court does not find this error to substantially weaken the probative value of the Ag Spray Confusion survey. Even the respondent who identified the error in his or her response noted that, though the equipment was not a sprayer, "[t]here are many sprayers made like this." [*See* PX-695.] In other words, the essence of the survey was not compromised due to this small error. The equipment shown was still a piece of Ag Spray equipment, and a net of 39% of respondents believed the equipment was made by or affiliated with Deere. Though the *type* of Ag Spray equipment was stated incorrectly in the prompt, the outcome remained the same or substantially the same with regard to the resulting confusion.[13]

40. Second, FIMCO pointed out that Poret's surveys were "not limited to persons who would consider purchasing a piece of ag equipment" or who "were capable financially of such a purchase." [Tr. Vol. 2B at 51 (Poret Testimony).] It is true that surveys conducted in the

---

[13] FIMCO objected to the admissibility of PX-694 and PX-695 on grounds of hearsay, lack of foundation, and Rule 403. [DN 282 at 32.] The Court will overrule these objections. PX-694 contains screenshots of the surveys Poret conducted and PX-695 contain Poret's raw data files. Poret testified reliably as to these exhibits at trial, and, having designed the surveys, has personal knowledge of their contents. [*See* Tr. Vol. 2B at 36–37, 48–50, 55–56 (Poret Testimony).] Moreover, the Court already ruled, in an earlier opinion in this litigation, that, "since at least 1951 the cases are now unanimous that evidence of the state of mind of persons surveyed is not inadmissible as hearsay." *See* 6 McCarthy, *supra*, at § 32:168. [*See* DN 161.] Accordingly, the Court does not find these exhibits to be excludable on hearsay grounds.

trademark infringement context should attempt to "limit the respondent population to those persons likely to purchase defendant's products." *Leelanau Wine Cellars*, 502 F.3d at 518. However, leading commentators have recognized that "no survey can perfectly reproduce the actual purchasing decision in which the customer puts his or her money behind the decision." 6 McCarthy, *supra*, at § 32:163.

41. In this case, the evidence demonstrates that, due to the high cost and longevity of the agricultural equipment at issue, the frequency with which farmers purchase trailed agricultural equipment may vary greatly. [*See* Tr. Vol. 4A at 28 (Clay Roll Testimony) ("We have customers who will trade with us every year. We also have customers that maybe trade once every ten years and everywhere in between."); Tr. Vol. 5A at 40 (Kessler Testimony) (Explaining that the frequency with which a farmer shops for a sprayer or applicator "could be every year. It could be 20 years. It ranges."] As a result, obtaining a sample size of farmers currently in the market for a FIMCO-branded sprayer or applicator to survey would have been very difficult or nearly impossible.

42. Here, Poret surveyed individuals who stated that they were crop farmers who work with sprayers and applicators. [Tr. Vol. 2B at 10 (Poret Testimony).] Though surely not all of these individuals were potential purchasers of FIMCO trailed agricultural equipment, the fact that those individuals work and are therefore familiar with sprayers and applicators nonetheless makes their responses relevant in the Court's view. Therefore, although the universe of respondents surveyed may limit the probative value of the confusion surveys somewhat, the Court finds that they are still entitled to some weight in the actual confusion analysis. *See Leelanau Wine Cellars*, 502 F.3d at 518 ("Where a survey presented on the

issue of actual confusion reflects methodological errors, a court may choose to limit the importance it accords the study in its likelihood of confusion analysis.").

43. Moreover, the Sixth Circuit has specifically cautioned district courts to "bear[] in mind that it is not determinative of the matter that the . . . incidents of actual confusion did not relate to direct consumers of [the defendant's] services." *Champions*, 78 F.3d at 1120. Accordingly, while the group of respondents Poret surveyed may slightly limit the weight the Court must give to the confusion surveys, it does so only minimally.

44. Third, FIMCO adduced evidence at trial from Kessler, Schwarz, Yeazel, and Perkins that, in their experience, the decision-makers regarding the purchase of agricultural equipment are nearly always male. [*See, e.g.*, Tr. Vol. 5B at 20–21 (Perkins Testimony) (Explaining that the gender of the person who makes the purchasing decision for an agricultural sprayer is male "99.9 percent of the time.")] It appears FIMCO presented this testimony in an attempt to further limit the weight the Court should give to Poret's surveys, which did not narrow the survey respondents on the basis of gender. However, the Court does not believe that the failure to narrow respondents based on gender negatively affects the probative value of the Surveys in any significant way.

45. On the whole, the Court finds that the Schaben and Ag Spray confusion surveys provide at least some evidence of actual confusion, and therefore finds that this factor, too, weighs in Deere's favor.

### (5) Marketing Channels Used

46. This "factor requires a court to consider the similarities or differences between the predominant customers of the parties' respective goods or services." *Daddy's*, 109 F.3d at

285. Additionally, "a court must determine whether the marketing approaches employed by each party resemble each other." *Id.*

47. The parties market their products using similar approaches that target the same general types of customers: farmers and farming operations. [Tr. Vol. 1A at 47 (Myers Testimony); Tr. Vol. 5A at 37 (Kessler Testimony).]

48. Deere does not sell its products directly to end-users; rather, it sells its equipment only through authorized John Deere dealers which, in turn, sell to end-users. [Tr. Vol. 1B at 14 (Felter Testimony).] FIMCO does sell directly to end-users, [Tr. Vol. 5B at 52 (Wipson Testimony)], but it also sells to distributors, who sell to dealers, who then sell to end-users. [*See* Tr. Vol. 5A at 33 (Kessler Testimony).]

49. Deere dealers market Deere products at their dealerships using materials such as brochures, magazines, and catalogs; at trade shows; through direct mail; and through advertisements in newspapers, on television, and on the radio. [Tr. Vol. 1B at 9 (Felter Testimony).] Deere also markets its products on its website and on social media. [*Id.* at 11.] Additionally, Deere's public relations team orchestrates press releases to notify members of the agricultural industry and the public of new products and features of Deere equipment. [*Id.* at 11–12.] FIMCO markets its products at trade shows, through advertising in magazines and on the radio, through traveling salespeople, on its website, at its ten physical locations, and at dealerships that sell its products. [Tr. Vol. 5B at 52–53 (Wipson Testimony).] FIMCO also distributes catalogs, parts books, and product brochures. [*Id.* at 74–75.]

50. The parties also often sell products within a close proximity to one another or at the same dealership. For instance, Schwarz testified that there is a Deere dealer within fifteen miles of FIMCO's Columbus, Nebraska store. [Tr. Vol. 5A at 72 (Schwarz Testimony).] Similarly,

Yeazel testified that there is a Deere dealer about five miles away from Fertilizer Dealer Supply's Milton, Wisconsin location. [Tr. Vol. 5A at 93, 112 (Yeazel Testimony).] Perkins also testified that there is a Deere dealer located ten miles north of Perkins Sales' location in Bernie, Missouri and another Deere dealer located ten miles south of that location. [Tr. Vol. 5B at 21–22 (Perkins Testimony).] Additionally, the evidence at trial showed that twenty-four authorized Deere dealers also sell FIMCO equipment, further evidencing an overlap in Deere and FIMCO's marketing channels. [*See* Tr. Vol. 1B at 17–18 (Felter Testimony) (identifying dealerships); Tr. Vol. 5B at 113–16 (Wipson Testimony) (identifying dealerships).] *See Wynn Oil Co. v. Am. Way Serv. Corp.*, 943 F.2d 595, 602 (6th Cir. 1991) (*Wynn Oil II*) ("The district court found an obvious overlap in the marketing channels used because '[t]here are fifteen dealerships in Michigan where both Wynn and American Way are selling under the X-TEND mark.' . . . the district court's conclusion is based upon permissible, and even probable, inferences from the facts. The common marketing channel of auto dealerships adds to the likelihood of confusion.").

51. For these reasons, the Court finds that this factor also favors Deere.

### (6) Likely Degree of Purchaser Care

52. "Generally, in assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution. However, when a buyer has expertise or is otherwise more sophisticated with respect to the purchase of the services at issue, a higher standard is proper. Similarly, when services are expensive or unusual, the buyer can be expected to exercise greater care in her purchases. When services are sold to such buyers, other things being equal, there is less likelihood of confusion." *Homeowners*, 931 F.2d at 1111.

53. However, "[t]he effect of purchaser care, although relevant, will be less significant than, or largely dependent upon, the similarity of the marks at issue. If the District Court ultimately determines that the marks are not very similar, then even a high degree of purchaser care will decrease only slightly the already low likelihood of confusion. Similarly, if the District Court finds that the marks are quite similar, then purchaser care will decrease the likelihood of confusion only minimally because the care and skill which a purchaser will have used when deciding which [product] to buy will not have necessarily extended to his decision regarding which retailer to buy from. That is, confusingly similar marks may lead a purchaser who is extremely careful and knowledgeable about the instrument that he is buying to assume nonetheless that the seller is affiliated with or identical to the other party." *Daddy's*, 109 F.3d at 286.

54. The sixth factor presents a closer question. Several FIMCO witnesses testified at trial to the fact that prospective customers of FIMCO sprayers and applicators are well-researched, well-informed, and highly knowledgeable about the products they are considering buying. For example, Schwarz testified that farmers "do a great deal of homework in the purchasing process" and explained that a sprayer or applicator is "an important piece of equipment to their farm. It takes care of their crops through the whole year and protects they're livelihood, so they do a great amount of research on what they're going to buy before they buy it." [Tr. Vol. 5A at 62 (Schwarz Testimony).] Yeazel testified that, when customers come in to make a purchase, they have often already researched several other brands of equipment. [Tr. Vol. 5A at 102 (Yeazel Testimony).]

55. On the other hand, Schwarz, Yeazel, and Kessler each acknowledged that, at least to some extent, there is a range of knowledge among prospective customers. Additionally, Thompson

testified that, at Heritage Tractor, he encounters "guys that can afford anything and know very little about anything, and we've got guys that can just barely get something financed but know something about everything." [Tr. Vol. 2A at 70 (Thompson Testimony).]

56. Similarly, Felter testified that farmers in the U.S. "take[ ] a lot of care in analyzing and understanding price and features of" their agricultural equipment. [Tr. Vol. 1B at 49 (Felter Testimony).] However, he further testified that customer knowledge "varies widely." [*Id.* at 25–26.] Part of this variation in knowledge may be due to the fact that the frequency with which farmers purchase trailed sprayers or applicators varies widely from farmer to farmer. [*Id.*] For example, farmers who desire to keep their equipment under warranty or who have a very high usage rate of their equipment each year may purchase a new piece of equipment "perhaps every year or two." [*Id.* at 26–27.] Those farmers may be far more knowledgeable on the types and brands of equipment. On the other hand, farmers who "have low annual usage or want a familiar tool [may] keep that [same] machine for many, many years," [*id.*], which may cause them to be less aware of changing equipment and manufacturers. Kessler similarly testified that, with regard to purchase frequency, "[i]t could be every year. It could be 20 years. It ranges." [Tr. Vol. 5A at 40 (Kessler Testimony).]

57. The Sixth Circuit has noted that, where a district court finds that the marks at issue are highly similar, as the Court has here, a high degree of purchaser care is less likely to significantly decrease the risk of confusion. *Daddy's*, 109 F.3d at 286. *See also Induct-O-Matic Corp. v. Inductotherm Corp.*, 747 F.2d 358, 364–65 (6th Cir. 1984) (quoting *Wincharger Corp. v. Rinco, Inc.*, 297 F.2d 261, 264 (C.C.P.A. 1962) ("Being skilled in their own art does not necessarily preclude their mistaking one trademark for another when the marks are as similar as those here in issue, and cover merchandise in the same general field.)).

58. The Court finds that the testimony in this case supports a finding that many customers in the market for trailed agricultural implements exercise a high degree of care and sophistication. However, this is likely not the case across the board. And, due to the high similarity between the marks and the fact that both marks are used on the same or related types of agricultural equipment, confusion is still possible. On the whole, however, the Court concludes that this factor weighs in favor of FIMCO.

### (7) The Intent of Defendant in Selecting the Mark

59. "If a party chooses a mark with the intent of causing confusion, that fact alone may be sufficient to justify an inference of confusing similarity." *Homeowners*, 931 F.2d at 1111 (quoting *Wynn Oil I,* 839 F.2d at 1189). "Intent is relevant because purposeful copying indicates that the alleged infringer, who has at least as much knowledge as the trier of fact regarding the likelihood of confusion, believes that his copying may divert some business from the senior user." *Daddy's*, 109 F.3d at 286. However, "[d]irect evidence of intentional copying is not necessary to prove intent. Rather, the use of a contested mark with knowledge of the protected mark at issue can support a finding of intentional copying. Further, the extensive advertising and long-term use of a protected mark can create a presumption that the alleged infringer knew of the protected mark." *Id.* (internal citations omitted). "A finding that the infringement was not intentional, however, [has] no significance for the ultimate inquiry of likelihood of confusion." *Champions*, 78 F.3d at 1121.

60. This factor, too, presents a somewhat close question. On one hand, it appears clear that FIMCO commenced use of the green and yellow color scheme after it was aware of Deere's use of green and yellow on its agricultural equipment. As the Court discussed above, the earliest evidence of FIMCO's use of green and yellow (through JDD) on agricultural

sprayers or applicators comes from the four December 1957 photographs. Two of those photographs depict a Big Butch trailed three-barrel agricultural sprayer attached to a John Deere tractor. [DX-10, DN 244-6 at 16, 18; Tr. Vol. 3B at 152–53; 155 (Vaughan Testimony).] The other two photographs depict a Big Butch trailed single-barrel agricultural sprayer attached to a John Deere tractor. [DX-10, DN 244-6 at 20, DN 244-7 at 1; Tr. Vol. 3B at 154–55 (Vaughan Testimony).] These photos alone, suggest that FIMCO had "knowledge of the protected mark." *Daddy's*, 109 F.3d at 286.

61. On the other hand, "[h]owever, knowledge of a trademark, alone, will not support a finding of intent to confuse if other circumstances show that the defendant believed there was no infringement." *Progressive*, 856 F.3d at 436. Vaughan testified at trial that the reason FIMCO "chose or continued to use the colors green and yellow on its ag-related equipment such as trailed sprayers" was "[b]ecause that's what people were ordering." [Tr. Vol. 3B at 59 (Vaughan Testimony).] Vaughan testified that, when FIMCO began offering trailed liquid nutrient applicators in 2005 or 2006, the majority of them were green and yellow. [*Id.* at 60.] Vaughan testified that the decision to use green and yellow was not "to ride on John Deere's back and deceive the farmer." [*Id.*] Additionally, Vaughan testified that the first time he learned that Deere had registered trademarks for its green and yellow color scheme was when Deere served it with the papers instigating this litigation. [*Id.* at 62.]

62. Overall, the Court finds that there is insufficient evidence that FIMCO or JDD selected the green and yellow colors with the "intent of causing confusion," *Homeowners*, 931 F.2d at 1111, or that FIMCO or JDD had knowledge that Deere's green and yellow colors were a "protected mark." Accordingly, the Court does not find that substantial evidence exists from which to infer that FIMCO had the intent to cause confusion. Therefore, this factor is neutral.

**(8) Likelihood of Expansion of the Product Lines**

63. "[A] 'strong possibility' that either party will expand his business to compete with the other or be marketed to the same consumers will weigh in favor of finding that the present use is infringing." *Daddy's*, 109 F.3d at 287 (quoting *Homeowners,* 931 F.2d at 1112). "A finding that the parties will not expand their markets significantly, however, 'does not address' the ultimate issue of likelihood of confusion." *Id.* (citing *Champions*, 78 F.3d at 1122). "Thus, as with the seventh factor, an affirmative finding will provide a strong indication that the parties' simultaneous use of the marks is likely to lead to confusion, while a negative finding is *not* a strong indication to the contrary." *Id.* (citing *Champions,* 78 F.3d at 1122).

64. At trial, Wipson, FIMCO's President and Chief Operating Officer, testified that FIMCO currently has no plans to expand its product line of large agricultural equipment, and more specifically, no plans to expand into making or selling self-propelled agricultural sprayers or tractors. [Tr. Vol. 5B at 84–85 (Wipson Testimony).] Deere did not present any evidence with regard to its potential plans, or lack thereof, to expand its product lines.

65. However, in *Wynn II*, the Sixth Circuit affirmed the district court's finding that, when the two parties' products directly compete with each other, "the 'likelihood [of expansion of product lines] is already a reality.'" *Wynn Oil II*, 943 F.2d at 604. *See also Chrysler Corp. v. Newfield Publications, Inc.*, 880 F. Supp. 504, 511 (E.D. Mich. 1995) ("In this case, the 'possibility' is already a reality, because Plaintiffs have an established presence in the collectible card market, and the Court has found that [Defendant]'s product competes with collectible cards. Therefore, this factor must favor Plaintiffs.").

66. Because, as the Court concluded above, Deere and FIMCO already compete generally in the agricultural market for sprayers and applicators, and already compete directly in the market for trailed agricultural liquid nutrient applicators, this factor favors Deere.

### (9) Balance of Factors

67. "[I]n the course of applying the *Frisch* factors, '[t]he ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way.'" *Progressive*, 856 F.3d at 436 (quoting *Homeowners*, 931 F.2d at 1107).

68. Having considered and weighed each of the *Frisch's* factors, the Court concludes that Deere has carried its burden of proving, by a preponderance of the evidence, that FIMCO's use of green and yellow on trailed agricultural sprayers and liquid applicators is likely to cause confusion. It is true, as FIMCO has argued, that some factors weigh in its favor. Specifically, the high degree of purchaser care and the decrease in strength of Deere's use of green and yellow on trailed agricultural equipment due to multiple other companies' use of that color scheme throughout the years weigh in FIMCO's favor.

69. However, more factors weigh in favor of Deere. Specifically, the relatedness of the goods, the similarity of the marks, evidence of actual confusion, the marketing channels used, and the likelihood of expansion factors all weigh in favor of Deere. Accordingly, "[b]earing in mind that a successful Lanham Act plaintiff only must show a sufficient *potential* of confusion," the Court finds that Deere has made such a showing. *Daddy's*, 109 F.3d at 284. Indeed, the Sixth Circuit has affirmed findings of trademark infringement in cases in which the strength and consumer sophistication factors weigh in favor of the defendant. *See Stilson & Assocs., Inc. v. Stilson Consulting Grp., LLC*, 129 F. App'x 993, 997, 999 (6th Cir. 2005)

("The court acknowledged that some factors weighed in favor of Defendants-the degree of purchaser care and the decline in the strength of the Stilson & Associates name since 1995. But, according to the court, the relatedness of the services offered by Plaintiffs and Defendants, as well as the similarity of the marks, tipped the scale in Plaintiffs' favor . . . In sum, we find no clear error in the district court's underlying factual findings, and we agree that those findings support a conclusion that Defendants' use of the Stilson name created a likelihood of confusion.").

**B. False Designation of Origin in Violation of §1125(a) and Trademark Infringement in Violation of Kentucky Common Law.**

70. In addition to Deere's federal trademark infringement claim under § 1114, Deere brought claims for federal false designation of origin in violation of §1125(a) and trademark infringement in violation of Kentucky common law. Both of "these claims mirror the previously discussed federal claim of trademark infringement by also requiring proof of a likelihood of confusion." *Daddy's*, 109 F.3d at 288. *See also Wynn Oil II*, 943 F.2d at 604 ("[L]ikelihood of confusion is the essence of an unfair competition claim [in] that the same factors are considered under section 1125(a) as are considered under section 1114."); *Colston Inv. Co. v. Home Supply Co.*, 74 S.W.3d 759, 766 (Ky. Ct. App. 2001) (Identifying Kentucky's "test of infringement [a]s the *likelihood* of confusion.").

71. Because the Court has found, as a matter, of law, that there is a likelihood of confusion as a result of FIMCO's use of green and yellow on its trailed sprayers and applicators, this finding applies also to Deere's claims of false designation of origin and Kentucky trademark infringement. Accordingly, Deere also succeeds on these claims.

### C.  **Trademark Dilution**

72. Deere also claims that FIMCO's use of green and yellow colors on its trailed agricultural sprayers and liquid nutrient applicators dilutes Deere's famous trademark in green and yellow as it is used on John Deere agricultural tractors.

73. "Dilution law, unlike traditional trademark infringement law ... is not based on a likelihood of confusion standard, but only exists to protect the quasi-property rights a holder has in maintaining the integrity and distinctiveness of his mark." *Audi AG v. D'Amato*, 469 F.3d 534, 547 (6th Cir. 2006) (quoting *AutoZone*, 373 F.3d at 801; *Kellogg Co. v. Toucan Golf, Inc.,* 337 F.3d 616, 628 (6th Cir. 2003)). Accordingly, "the presence or absence of actual or likely confusion, of competition, or of actual economic injury" is irrelevant. § 1125(c)(1). Rather, the focus is on "whether a senior user's distinctive and famous mark is being diluted by another's use of a similar mark that weakens the strength or damages the reputation of the senior mark." *Maker's Mark*, 703 F. Supp. 2d at 697 (citing *Jet, Inc. v. Sewage Aeration Sys.*, 165 F.3d 419, 425 (6th Cir. 1999)).

74. Here, Deere alleges dilution by blurring, which is defined as "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark." § 1125(c)(2)(B).

75. In order to prevail on a claim of dilution by blurring, Deere, as the "senior user" of the mark, must demonstrate that its mark is 1) famous and 2) distinctive, that FIMCO's "junior mark" was 3) used in commerce, 4) such use began after the senior mark became famous, and 5) that use "is likely to cause dilution by blurring . . . of the famous mark." § 1125(c)(1).

**(1) Fame of Deere's Mark**

76. Deere asserts that its trademark in green and yellow on Deere tractors is "famous" within the meaning of the dilution statute. A "famous mark" is a mark "widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." § 1125(c)(2)(A).

77. In determining whether a mark is sufficiently "widely recognized" so as to become famous for dilution purposes, courts may consider, in addition to any other relevant factors, four factors specifically listed in the statute: 1) "[t]he duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties," 2) [t]he amount, volume, and geographic extent of sales of goods or services offered under the mark, 3) [t]he extent of actual recognition of the mark, and 4) "whether the mark was registered . . . on the principal register." § 1125(c)(2)(A)(i)–(iv).

78. Under the 2006 revision to federal trademark law, known as the Trademark Dilution Revision Act (TRDA), courts have found such marks famous as Audi, "America's Team" in reference to the Dallas Cowboys, Apple iPhone, Big Gulp, Blackberry, Burberry, Chanel, Citibank, Delta airlines, Nike's "Just Do It" slogan, Louis Vuitton, McDonald's, Miss USA beauty pageant, Motown music, Newport cigarettes, NYC Triathlon competition, Nike athletic shoes and clothing, Pepsi, Rolex, Rolls-Royce automobiles, Starbuck's coffee, "The House that Ruth Built" in reference to the New York Yankees, "The Other White Meat" slogan promoting pork, Viagra, Victoria's Secret, and Visa. 4 McCarthy, *supra*, § 24:107 (collecting cases).

79. In this case, Deere put on extensive evidence relating to if and when its trademark in green and yellow, as used John Deere agricultural tractors, became famous. Above, the Court made

findings of fact relating to Deere's advertising, sales and "actual recognition" of Deere's use of green and yellow by the public. Having considered all of this evidence together, the Court finds that Deere's mark was famous by approximately 1968, and certainly by the time Deere's mark was registered in 1988 and by time the Court finds that FIMCO began using green and yellow on trailed agricultural implements in commerce in 1998.

80. Though Deere urges the Court to find that its mark was famous earlier, by the mid-1950s, the Court does not find that sufficient evidence exists to find fame at that time. Though Deere spent significantly on advertising and publicity and made significant revenue in the 1950s and early 1960s, the majority of the evidence of public recognition of Deere's mark in that time period was still primarily in regional publications, trade publications, or publications that dealt specifically with farming. [*See, e.g.*, PX-641; PX-648; PX-660; PX-663; PX-664; PX-665; PX-667; PX-148.]

81. Between 1964 and 1968, however, Deere was featured by *Forbes*, *Fortune*, and *Businessweek*, all of which are national publications. [PX-670; PX-672; PX-673; PX-674.] Though the Court recognizes that articles in these national publications do not constitute direct evidence of "actual recognition," they do provide circumstantial evidence that Deere's use of green and yellow was "widely recognized by the general consuming public of the United States as a designation of source of" Deere's agricultural products. *See* 15 U.S.C § 1125(c)(2)(A).

82. In sum, the Court finds that Deere's mark was famous by about 1968, and, at the latest, by the time Deere registered its trademark in green and yellow on agricultural tractors in 1988.

## (2) Distinctiveness of Deere's Mark

83. "Only those marks that are 'distinctive' as a matter of law are accorded trademark protection." *Leelanau Wine Cellars*, 502 F.3d at 512 (citing *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.,* 280 F.3d 619, 635 (6th Cir. 2002)). There are two categories of distinctive trademarks: "(1) those that are inherently distinctive, and (2) those that have acquired distinctiveness through secondary meaning." *DeGidio v. W. Grp. Corp.*, 191 F. Supp. 2d 904, 910 (N.D. Ohio 2002), *aff'd*, 355 F.3d 506 (6th Cir. 2004).

84. The Supreme Court has held that, "with respect to at least one category of mark—colors— . . . no mark can ever be inherently distinctive." *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 211 (2000). Accordingly, for a trademark in color to be distinctive, it must become so by acquiring secondary meaning. "To demonstrate secondary meaning, the evidence must show that 'in the minds of the public, the primary significance of the trade dress is to identify the source of the product rather than the product itself.'" *Gen. Motors Corp.*, 468 F.3d at 418 (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 (1982)).

85. "Registration of a mark on the Principal Register of the USPTO creates a rebuttable presumption that a trademark is valid, that is, either inherently distinctive or descriptive with secondary meaning, and therefore, protectable under federal trademark law." *Leelanau Wine Cellars*, 502 F.3d at 513 (citing 15 U.S.C. § 1115(a)).

86. Moreover, once a registered trademark becomes incontestable pursuant to 15 U.S.C. § 1065, the registration for the mark is "conclusive evidence of the validity of the registered mark." 15 U.S.C. § 1115(b). A mark that has been registered for at least five years becomes incontestable provided that the owner of the mark files, within one year following a five-year period of use after the mark's registration, a "Section 15" affidavit averring that "those goods

or services stated in the registration on or in connection with which such mark has been in continuous use for such five consecutive years and is still in use in commerce," that there has been no adverse decision as to the owner's right to the marks, and that there are no such challenges pending either in the courts or in the PTO. § 1065(1)–(3).

87. Deere filed a Section 15 affidavit for its '103 and '576 Registrations in October 1996. [*See* PX-150; PX-151.] Accordingly, Deere's '103 Registration, which covers agricultural tractors "consist[ing] of a green vehicle body or frame with yellow wheels," [PX-1], is incontestable, and therefore presumptively valid.  In other words, it is presumptively "descriptive with secondary meaning," *Leelanau Wine Cellars*, 502 F.3d at 513, meaning it is distinctive. *DeGidio*, 191 F. Supp. 2d at 910.

88. FIMCO has not challenged the incontestability status of Deere's '103 Registration, nor has it attempted to argue that Deere's use of green and yellow on John Deere *tractors* lacks distinctiveness or strength. Indeed, multiple FIMCO witnesses at trial confirmed that Deere is the only company who makes a green and yellow agricultural tractor and that farmers who view a green and yellow agricultural tractor will think of Deere as the source. [*See, e.g.*, Tr. Vol. 5A at 51 (Kessler Testimony); Tr. Vol. 5B at 101–102 (Wipson Testimony).]

89. Accordingly, the Court concludes that Deere's trademark of green and yellow on agricultural tractors is a distinctive mark.

### (3) Whether FIMCO's Mark Was Used in Commerce and Whether That Use Began *After* Deere's Mark Became Famous

90. Next, the Court must determine when FIMCO first began using green and yellow on sprayers and applicators and whether, when that use began, Deere's mark was already famous. *See* § 1125(c)(1). As the Court held above, Deere's mark was famous by approximately 1968 or, at the latest, by 1988, when its mark was registered on the Principal Register.

91. Because the Court concluded above in its findings of fact that FIMCO did not present sufficient evidence that it made and sold green and yellow trailed agricultural equipment in commerce until 1998, the Court concludes that FIMCO began using the green and yellow color scheme on its green and yellow trailed equipment after Deere's mark became famous.

**(4) Whether FIMCO's Use of Green and Yellow on Sprayers and Applicators is Likely to Cause Dilution By Blurring of Deere's Mark**

92. The fourth and final element of trademark dilution that Deere must prove is that FIMCO's use of green and yellow on trailed agricultural sprayers and applicators is likely to cause dilution by blurring of Deere's famous mark, that is, of Deere's use of green and yellow on its agricultural tractors. *See* § 1125(c)(1).

93. "In determining whether a mark . . . is likely to cause dilution by blurring, the [C]ourt may consider all relevant factors, including the following [six]: "(i) The degree of similarity between the mark or trade name and the famous mark;" "(ii) The degree of inherent or acquired distinctiveness of the famous mark;" "(iii) The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark;" "(iv) The degree of recognition of the famous mark;" "(v) Whether the user of the mark or trade name intended to create an association with the famous mark;" and "(vi) Any actual association between the mark or trade name and the famous mark." § 1125(c)(2)(B)(i)–(vi).

### i. *Degree of Similarity Between Deere's Famous Mark and FIMCO's Use of Green and Yellow*

94. In its post-trial proposed findings, FIMCO argues that Deere has improperly focused its dilution claim on the fame of its trademark rights in green and yellow as used on Deere *tractors* as opposed to Deere trailed agricultural implements. [*See* DN 338 at 20–23.] Indeed, Poret's Fame Survey used a picture of a green and yellow tractor rather than a piece

of green and yellow trailed agricultural equipment. [PX-704; Tr. Vol. 2B at 33 (Poret Testimony).] However, as Deere has argued, the standard only requires that Deere's famous mark and FIMCO's use of the junior mark be "similar," not that they be used on identical goods. [*See* DN 337 at 61–62.] This is because "The purpose of anti-dilution laws is to provide a narrow remedy when the similarity between two marks is great enough that even a noncompeting, nonconfusing use is harmful to the senior user." *AutoZone*, 373 F.3d at 805–06 (quoting *Jet*, 165 F.3d at 425). In other words, it is possible for FIMCO's use of green and yellow on its products to dilute the strength of Deere's famous mark as used on a different product, agricultural tractors.

95. However, it is still the case "that a high degree of similarity, ranging from 'nearly identical' to 'very similar,' is required for a dilution claim to succeed." *Id.* at 806.[14] This requirement is clearly satisfied here. First, the parties have stipulated to the facts that the green and yellow colors that Deere uses on its agricultural tractors and the green and yellow colors FIMCO uses on its trailed agricultural equipment are "indistinguishable from each other to the naked eye" and "indistinguishable from each other when appearing on equipment in the field." [DN 164 at 1–2 (Stipulated Facts).] Second, the placement of the colors on the parties' respective goods is nearly identical. Deere tractors feature green bodies, green frames, yellow wheels,

---

[14] At least two circuit courts of appeal have held that the Trademark Dilution Revision Act of 2005 (TDRA) eliminated the old requirement that two marks be "nearly identical" or "substantially similar" in order for a dilution claim to be successful. *See Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 107–110 (2d Cir. 2009) ("The post-TDRA federal dilution statute . . . provides us with a compelling reason to discard the 'substantially similar' requirement for federal trademark dilution actions. The current federal statute defines dilution by blurring as an 'association arising from the similarity between a mark ... and a famous mark that impairs the distinctiveness of the famous mark,' and the statute lists six non-exhaustive factors for determining the existence of an actionable claim for blurring. 15 U.S.C. § 1125(c)(2)(B). Although 'similarity' is an integral element in the definition of 'blurring,' we find it significant that the federal dilution statute does not use the words 'very' or 'substantial' in connection with the similarity factor to be considered in examining a federal dilution claim.") *Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, 633 F.3d 1158, 1172–73 (9th Cir. 2011) (same). It appears the Sixth Circuit has not addressed the issue. However, because the Court finds that Deere and FIMCO's marks are "very similar" under even this high standard, this factor still weighs in favor of Deere.

and yellow accents. [*See, e.g.*, PX-257.] Similarly, FIMCO trailed agricultural equipment feature green frames, yellow wheels, and yellow tanks. [*See, e.g.*, PX-301; PX-331.] Third, photographs of FIMCO trailed agricultural equipment being pulled by John Deere tractors likewise show the high degree of similarity between the use of green and yellow on the two types of goods. [*See, e.g.*, DX-51.] Accordingly, this factor weighs in favor of a likelihood of dilution by blurring.

### ii. *Degree of Acquired Distinctiveness of Deere's Famous Mark*

96. As the Court mentioned above, Deere's famous trademark in green and yellow on its agricultural tractors is highly distinctive. A mark is highly distinctive "if the public readily accepts it as the hallmark of a particular source; it can become so because it is unique, because it has been the subject of wide and intensive advertisement, or because of a combination of both.'" *Maker's Mark*, 679 F.3d at 419 (quoting *Homeowners*, 931 F.2d at 1107). Green and yellow tractors meet each of these factors. First, they are unique in that no other company manufactures a green and yellow agricultural tractor. Second, Deere tractors have been advertised and marketed extensively for decades. As a result, green and yellow tractors are a clear "hallmark" of John Deere. [*See e.g.*, Tr. Vol. 5A at 43 (Kessler Testimony) (Agreeing that "any farmer . . . who sees a green and yellow tractor will think it's from Deere."); Tr. Vol. 5A at 81 (Schwarz Testimony) (Agreeing that "a farmer who sees green and yellow on a tractor is going to understand John Deere is the source, the maker of that tractor."); Tr. Vol. 5A at 121 (Yeazel Testimony) (Agreeing that he does not "know of any other company that makes green and yellow tractors except Deere."); Tr. Vol. 5B at 27 (Perkins Testimony) (Agreeing that "it's common knowledge that Deere makes green and

yellow tractors.").]. Accordingly, this factor also weighs in favor of a finding of likelihood of dilution by blurring.

### iii. Extent to Which Deere is Engaging in Substantially Exclusive Use of its Famous Mark

97. As the Court noted above, Deere is the only manufacturer of green and yellow tractors. Therefore, Deere is engaged in exclusive use of its famous mark. [Tr. Vol. 5A at 121 (Yeazel Testimony) (Agreeing that he does not "know of any other company that makes green and yellow tractors except Deere."); Tr. Vol. 5B at 101–102 (Wipson Testimony) (Agreeing that Deere is the only manufacturer of green and yellow tractors and that farmers who sees a green and yellow tractor "will immediately understand that it comes from Deere.").] Therefore, the third factor also weighs in favor of a likelihood of dilution by blurring.

### iv. Degree of Recognition of Deere's Famous Use of Green and Yellow on Tractors

98. Based on Poret's Fame Survey, the Court finds that there is a high degree of actual recognition of the source of green and yellow tractors as John Deere by the general consuming public. Specifically, the Fame Survey, in which respondents were shown an image of a green and yellow tractor, but with all brand names and symbols removed, resulted in a net of 74% of respondents who identified John Deere as the brand or maker of the green and yellow tractor. [Tr. Vol. 2A at 34 (Poret Testimony).]

99. FIMCO argues that Poret's Fame Survey used flawed methodology by attempting to measure the fame of green and yellow as used on a John Deere tractor as opposed to the fame of green and yellow as used on a John Deere sprayer or applicator. [*See* Tr. Vol. 2B at 40–45; DN 338 at 21–23.] Again, however, as the Court noted above, for dilution purposes, the junior user's mark need not be used on identical or competing *goods* as the senior user's mark. Rather, the

relevant question is instead whether the junior user's *mark* bears "a high degree of similarity, ranging from 'nearly identical' to 'very similar,'" to the senior user's mark. *AutoZone*, 373 F.3d at 806 (quoting *Jet*, 165 F.3d at 425). Because the Court concluded that FIMCO's mark and Deere's famous mark are very similar, the fact that Deere's mark is famous with regard to its tractors, while FIMCO uses its mark on sprayers and applicators, does not affect Deere's dilution claim.

### v. Whether FIMCO Intended to Create an Association with Deere's Famous Mark

100. The evidence in this case strongly supports a finding that FIMCO chose its green and yellow color scheme to associate with Deere's famous green and yellow tractors. Indeed, FIMCO put on four witnesses who all testified that farmers want their trailed agricultural implements to match their tractors and that, all other qualifications being equal, a farmer with a John Deere tractor would prefer to purchase a green and yellow trailed sprayer or applicator for that reason. [*See* Tr. Vol. 5A at 28–29, 48 (Kessler Testimony); Tr. Vol. 5A at 67–68 (Schwarz Testimony); Tr. Vol. 5A at 106 (Yeazel Testimony); Tr. Vol. 5B at 16–17 (Perkins Testimony).] Moreover, FIMCO trailed equipment is often depicted being pulled by John Deere tractors. [*See, e.g.*, DX-51 (1998 FIMCO Sprayer & Sprayer Parts Catalog); DX-60 (2006 Schaben Catalog); DX-28 (2009 Ag Spray Catalog).]

101. Though Vaughan also testified a few times that green and yellow are "the color[s] of agriculture", rather than John Deere, the Court does not find this testimony to be credible in light of FIMCO's repeated arguments throughout this litigation that farmers want to buy agricultural implements that match their Deere tractors and that dealers would be at a disadvantage if they were not allowed to sell green and yellow implements. Moreover, Vaughan himself referred to green and yellow as "the John Deere colors" at trial. [*See* Tr.

Vol. 6B at 60 (Vaughan Testimony) ("Majority of them [that we sold] were green and yellow, but we did sell some that were red, and I believe we made a few that were just black. I don't think the Case IH guy probably likes the John Deere colors sitting in his lot.").]

102. Overall, the Court finds that the evidence supports a finding that FIMCO intended to associate its products with John Deere tractors, and therefore that this factor favors a finding of likelihood of dilution.

### vi. Actual Association Between FIMCO's Use of Green and Yellow and Deere's Famous Use of Green and Yellow on Tractors

103. Poret's Dilution Surveys also tend to support a finding that there is "actual association" between FIMCO's use of green and yellow and Deere's famous use of green and yellow on its tractors. Specifically, when shown images of FIMCO equipment, several survey participants answered that Deere came to mind. The Schaben Dilution Survey resulted in a net of 38% of respondents who responded that Deere came to mind when viewing a piece of green and yellow Schaben trailed equipment, and the Ag Spray Dilution Survey resulted in a net of 43% of respondents who responded that Deere care to mind when viewing a piece of green and yellow Ag Spray trailed equipment. [*See* Tr. Vol. 2B at 29 (Poret Testimony).] Because there is evidence of actual mental association between FIMCO's use of green and yellow and John Deere, this factor also weighs in favor of a finding of likelihood of dilution.

### vii. Balance of Likelihood of Dilution Factors

104. Having considered each of the factors enumerated in § 1125(c)(2)(B), the Court finds that, because all six factors weigh in favor of a finding that FIMCO's use of green and yellow on trailed agricultural implements creates a likelihood of dilution of Deere's famous use of green and yellow on Deere tractors, this element is also satisfied.

105.	In sum, Deere has proven to the Court that its use of green and yellow on tractors is a famous and distinctive trademark, that FIMCO used a very similar mark in commerce after Deere's mark became famous, and that FIMCO's use of green and yellow is likely to cause dilution by blurring of Deere's famous mark. *See* § 1125(c)(1). Therefore, pursuant to §1125(c)(1), Deere is entitled to an injunction against FIMCO.

### D.  <u>Affirmative Defenses</u>

106.	FIMCO asserts two affirmative defenses in this case: acquiescence and estoppel. Specifically, FIMCO asserts that Deere must have been aware of its use of green and yellow long before 2011 and that Deere's delay in asserting its trademark rights constitutes acquiescence or estoppel, both of which FIMCO has the burden of proving. *Kellogg Co. v. Exxon Corp.*, 209 F.3d 562, 568–69 (6th Cir. 2000) (Explaining that the defendant, Exxon, had to prove its affirmative defense of acquiescence).

107.	Acquiescence, like laches, requires a "finding of conduct on the plaintiff's part that amounted to an assurance to the defendant, express or implied, that plaintiff would not assert his trademark rights against the defendant." *Id.* at 569 (quoting *Elvis Presley Enter., Inc., v. Elvisly Yours, Inc.*, 936 F.2d 889, 894 (6th Cir. 1991)). While "both laches and acquiescence require proof that the party seeking to enforce its trademark rights has unreasonably delayed pursuing litigation and, as a result, materially prejudiced the alleged infringer, acquiescence requires more." *Id.* Specifically, "acquiescence is intentional. Acquiescence requires 'a finding of conduct on the plaintiff's part that amounted to an assurance to the defendant, express or implied, that plaintiff would not assert his trademark rights against the defendant.'" *Elvis Presley Enterprises*, 936 F.2d at 894 (quoting *Sweetheart Plastics, Inc. v. Detroit Forming, Inc.,* 743 F.2d 1039, 1046 (4th Cir. 1984)).

108.    Similarly, estoppel "requires more than a showing of mere silence on the part of a plaintiff; defendant must show that it had been misled by plaintiff through actual misrepresentations, affirmative acts of misconduct, intentional misleading silence, or conduct amounting to virtual abandonment of the trademark." *Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 412–13 (6th Cir. 2002) (citing *SCI Systems, Inc. v. Solidstate Controls, Inc.* 748 F.Supp. 1257, 1261–62 (S.D. Ohio 1990)).

109.    The Court finds that FIMCO has not proven, by a preponderance of the evidence, that Deere engaged in conduct that amounted to the intentional, affirmative conduct or misrepresentations that are required to prove acquiescence and estoppel. FIMCO has argued that Deere products and FIMCO products were advertised at the same farm shows in close proximity to each other. However, as the Court found above in its findings of fact, the Court is not persuaded that Deere representatives who were actually chargeable with the enforcement of Deere's trademarks learned of FIMCO's use long before 2010 or 2011, as is required to charge Deere with knowledge. McCarthy, the leading commentator on trademarks and unfair competition, has stated that corporations are "not charged with notice [of use] if business dealings with defendant were conducted by lower echelon employees who had no duty to report instances of trademark infringement." 6 McCarthy, *supra*, at § 31:39 (citing *General Tire & Rubber Co. v. Greenwold*, 127 U.S.P.Q. 240 (S.D. Cal. 1960)). Moreover, "the knowledge of a plaintiff's sales representative will not be imputed to a corporate plaintiff where it was not the duty of the sales representative to investigate trademark infringement." *Id.* (citing *Official Airline Guides v. Churchfield Publications*, 756 F. Supp. 1393 (D. Or. 1990)). Rather, "to impute an agent's knowledge to a principal, it must be shown that the agent had duties with respect to trademark matters, although the agent need

not have acquired his knowledge in connection with those duties." *Id.* (citing *Dawn Donut Co. v. Hart's Food Stores*, Inc., 267 F.2d 358, 121 U.S.P.Q. 430 (2d Cir. 1959); *DC Comics, Inc. v. Powers*, 465 F. Supp. 843, 201 U.S.P.Q. 99 (S.D. N.Y. 1978)).

110.    Because, as the Court explained above, FIMCO has not proved Deere's knowledge of its use of green and yellow by virtue of farm shows, Deere dealers, or prior correspondence with JDD Lubricants, the Court finds that FIMCO has failed to prove the requisite conduct. Additionally, the evidence of FIMCO's expansion through the 1990s and 2000s further convinces the Court of the credibility of Deere's assertion that it did not learn of FIMCO's use of green and yellow until 2010 or 2011. Moreover, even if FIMCO *could* show knowledge, mere knowledge is not enough. Rather, FIMCO must show that Deere acted intentionally, through affirmative conduct or actual misrepresentations. FIMCO has shown no such actions. The evidence is to the contrary, in fact. Specifically, correspondence between Deere and JDD in 1943 and 1963 show that Deere did try to prevent JDD from indicating an affiliation with Deere, either through the use of the "JDD" initials or through the use of green and yellow on oil cans. Moreover, Deere's extensive enforcement efforts between 2000 and 2011 further convince the Court that, had Deere been aware of FIMCO's use of green and yellow, it likely would have initiated enforcement efforts sooner, as it did with nearly 39 other companies during that time period.

111.    In sum, FIMCO has not proved the required elements of its affirmative defenses of acquiescence and estoppel.

## VI.    REMEDY

112.    Needless to say, there was a considerable amount of live and designated deposition testimony and a significant number of exhibits presented by the parties and considered by the

Court in this case. The end result was this opinion of over 100 pages. Though there were some findings that did not garner much dispute, there were certainly many issues for which the parties offered conflicting evidence. Said another way, there were many issues where the trier of fact could go either way in this case. The attorneys for both sides were professional, well-prepared, and did an outstanding job. Ultimately, the outcome depended upon the weight of the evidence and which evidence the Court found to be more probative and persuasive. At the end of the day, the Court found that Deere carried the day.

113.    Having succeeded on its claims of federal and state trademark infringement, unfair competition and false designation of origin, and dilution, the Court will now address the appropriate remedy. In this case, Deere requests that the Court enter a permanent injunction prohibiting FIMCO and "its affiliates, officers, agents, servants, employees, attorneys, and all other persons in active concert or participation with" FIMCO from (1) "using the Deere Colors in connection with its sprayers and other wheeled agricultural equipment," (2) "using yellow tanks or wheels in connection with its green-bodied wheeled agricultural equipment," and (3) prohibiting "all manufacture, purchase, promotion, sale, and use of any products, packaging, advertising, labels, websites, or other sales or shipping material that infringe Deere's rights in the Deere Colors or the use of yellow tanks or wheels in connection with green-bodied wheeled agricultural equipment." [DN 1 at 9.]

114.    The Lanham Act gives courts the "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right" protected under the Act. 15 U.S.C. § 1116(a). "In the Sixth Circuit, '[i]njunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no

adequate remedy at law for the injury caused by a defendant's continuing infringement.'"
*Maker's Mark*, 703 F. Supp. 2d at 700 (quoting *Audi*, 469 F.3d at 550).

115.    "A plaintiff seeking a permanent injunction must demonstrate [(1)] that it has suffered irreparable injury, [(2)] there is no adequate remedy at law, [(3)] 'that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted,' and [(4)] that it is in the public's interest to issue the injunction." *Audi*, 469 F.3d at 550 (citing *eBay Inc., et al. v. MercExchange, LLC,* 547 U.S. 388 (2006)).

116.    First, "[g]enerally, irreparable injury, the first factor, is presumed from a showing of success on the merits of a trademark infringement claim." *Maker's Mark*, 703 F. Supp. at 700 (citing *DaimlerChrysler v. The Net Inc.,* 388 F.3d 201, 208 (6th Cir. 2004); *Circuit City Stores, Inc. v. CarMax, Inc.,* 165 F.3d 1047, 1056 (6th Cir. 1999)). Because the Court has found that Deere has succeeded on its claims, this factor is satisfied.

117.    Second, so long as FIMCO continues using the green and yellow color combination, "there [i]s potential for future harm, and therefore, there [i]s no adequate remedy at law." *Audi*, 469 F.3d at 550.

118.    Third, in considering the balance of hardships between the parties, FIMCO has argued that it would be disadvantaged if it were not able to sell green and yellow equipment because farmers prefer to match their implements to their tractors. [*See, e.g.*, Tr. Vol. 5A at 69 (Schwarz Testimony) (stating that he would be at a disadvantage "if [he] were not able to offer and green and yellow piece of trailed equipment and someone else was able to.").] As an initial matter, FIMCO's intent to create an association with John Deere green and yellow tractors due to farmers' "desire to match" is precisely one of the factors the Court finds weighs in favor of a finding of likelihood of dilution in this case. Moreover, however, it is no

longer the case that "many other manufacturers . . . continue to manufacture green and yellow pulled equipment." [*Id.* at 70.] Rather, the evidence in this case indicates that, though as many as forty other short-line manufacturers sold green and yellow equipment in the past, only three continue do so today, one of which being FIMCO. Accordingly, the Court does not find that any significant competitive disadvantage alleged by FIMCO is a sufficient hardship to weigh against issuing an injunction. Finally, Wipson, FIMCO's President and COO, testified that FIMCO's green and yellow equipment currently only makes up "about 4 percent of [FIMCO's] revenue." [Tr. Vol. 5B at 46 (Wipson Testimony).] This, too, weighs against a finding of significant hardship on behalf of FIMCO.

119.    On the other hand, Deere's hardships appear to be much greater. "Over many years, [Deere] has expended considerable amounts of money and effort building consumer association between the [green and yellow colors] and its [equipment]," while FIMCO has marketed its green and yellow equipment less extensively and for a shorter period of time. *See Maker's Mark*, 703 F. Supp. 2d at 700 ("When considering the third factor—the hardships of such a remedy—Maker's Mark's concerns seem to be much greater than Cuervo's. Over many years, Maker's Mark has expended considerable amounts of money and effort building consumer association between the red wax seal and its bourbon. Cuervo has put little effort into marketing Reserva and the red dripping wax seal on its bottle.").

120.    Fourth and finally, the Sixth Circuit has explained that "[i]t [i]s in the public's interest to issue the injunction in order to prevent consumers from being misled." *Audi*, 469 F.3d at 550.

121.    Overall, the Court finds that each of these factors support a finding that equity supports awarding injunctive relief.

122.    The Court's task, then, is to determine the appropriate scope of the injunction. District

courts have broad discretion in issuing injunctions, and "[t]he scope of injunctive relief is

reviewed for abuse of discretion." *Audi*, 469 F.3d at 550 (citing *Gibson Guitar Corp. v. Paul

Reed Smith Guitars, LP,* 423 F.3d 539, 546 (6th Cir. 2005)).

123.    The Court grants Deere's request for an injunction as follows:

> Defendant FIMCO, Inc. and its affiliates, officers, agents, servants, employees,
> attorneys, and all other persons in active concert or participation with FIMCO are
> hereby permanently enjoined from using a combination of green and yellow
> colors in the manufacture, sale, offering for sale, distribution, promotion,
> marketing, or advertising of FIMCO trailed and wheeled agricultural equipment at
> any locality within the United States. This injunction does not prohibit the above-
> described persons and entities from using solely the color green or solely the color
> yellow in connection with agricultural equipment, nor does it prohibit the use of
> green with another color or yellow with another color. However, it does prohibit
> the use of *any combination* of green and yellow together on a piece of equipment.

## VII.    CONCLUSION

Pursuant to the Findings of Fact and Conclusions of Law set out herein, the Court finds in

favor of Deere & Company on its claims of federal trademark infringement in violation of 15

U.S.C. § 1114, federal false designation of origin and unfair competition in violation of 15

U.S.C. § 1125(a), federal trademark dilution in violation of 15 U.S.C. § 1125(c), and common

law trademark infringement in violation of the laws of Kentucky. The Court also finds against

FIMCO on its affirmative defenses and its counterclaims seeking a declaration that its conduct is

non-infringing. Accordingly, the Court will issue the above-described permanent injunction

against FIMCO, Inc.

Pursuant to 15 U.S.C. § 1116(a), within sixty (60) days of the issuance of this

Memorandum Opinion, FIMCO is directed to file with the Court and serve on Deere a report, in

writing, detailing the manner and form in which FIMCO has and will comply with the

injunction. Deere shall, within fourteen (14) days of the issuance of this Memorandum Opinion, file any motion for costs and attorneys' fees.

The Court will enter an Order and Judgment consistent with the Findings of Fact and Conclusions of Law set out in this Memorandum Opinion.

Date:

cc:     Counsel