UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CASE NO. 5:15-CV-00105-TBR

DEERE & COMPANY,                                          PLAINTIFF/COUNTER-DEFENDANT

v.

FIMCO INC., d/b/a/ SCHABEN
INDUSTRIES,                                               DEFENDANT/COUNTER-CLAIMANT


**MEMORANDUM OPINION, ORDER, AND AMENDED INJUNCTION**

This matter is before the Court on various post-trial motions and briefs filed by both

parties. This litigation began when Plaintiff, Deere & Company ("Deere") brought suit against

Defendant FIMCO, Inc. ("FIMCO") alleging that FIMCO was acting in violation of federal

trademark and common law by producing and distributing trailed agricultural sprayers and

applicators bearing green and yellow colors that are indistinguishable from the green and yellow

colors Deere uses on its agricultural equipment.[1] Deere brought four claims against FIMCO,

including those for federal trademark infringement in violation of 15 U.S.C. § 1114, federal false

designation of origin and unfair competition in violation of 15 U.S.C. § 1125(a), federal

trademark dilution in violation of 15 U.S.C. § 1125(c), and common law trademark infringement

in violation of the laws of Kentucky. [DN 1 at 6–9 (Complaint).]

After a five-day bench trial, the Court issued Findings of Fact, Conclusions of Law, and a

Judgment. [DN 369.] Therein, the Court found for Deere on all of its claims and issued the

following permanent injunction against FIMCO:

> Defendant FIMCO, Inc. and its affiliates, officers, agents, servants, employees,
> attorneys, and all other persons in active concert or participation with FIMCO are

---

[1] The parties stipulated to the facts that the green and yellow paint colors used by Deere and FIMCO are
"indistinguishable from each other to the naked eye" and "indistinguishable from each other when appearing on
equipment in the field." [DN 164 at 1–2 (Stipulated Facts).]

hereby permanently enjoined from using a combination of green and yellow colors in the manufacture, sale, offering for sale, distribution, promotion, marketing, or advertising of FIMCO trailed and wheeled agricultural equipment at any locality within the United States. This injunction does not prohibit the above-described persons and entities from using solely the color green or solely the color yellow in connection with agricultural equipment, nor does it prohibit the use of green with another color or yellow with another color. However, it does prohibit the use of *any combination* of green and yellow together on a piece of equipment.

[*Id.* at 106.]

Now, the parties have raised several issues for the Court to address. First, FIMCO moved to have the Court's Findings of Fact, Conclusions of Law, and Judgment altered, amended, vacated, and supplemented and, alternatively, for a new trial. [DN 379.] Second, the parties each dispute how to interpret the injunction as it is currently worded. Third, both parties request that the Court modify the scope of injunction. Naturally, FIMCO moves to narrow the injunction and Deere moves to broaden it. The Court will address all of these issues below.

DISCUSSION

## A. Scope of the Injunction

### 1. Types of FIMCO Equipment Covered

The first dispute between the parties regarding the scope of the injunction concerns the types of FIMCO equipment to which the injunction applies. As it is currently worded, the injunction extends to "FIMCO trailed and wheeled agricultural equipment." [DN 369 at 106.] According to FIMCO, this wording means that the injunction extends only to "Ag equipment", which, according to its definition, includes only "[t]railed and wheeled agricultural equipment with *large yellow wheels*, such as sprayers, applicators, elliptical sprayers and Patriot pathfinder trailers." [DN 388 at 13.] This includes the following equipment:

 

 

[*Id.*] FIMCO's position is that the types of equipment depicted in the above four photos are the only types of equipment to which the injunction should extend. [*Id.*]

FIMCO goes on to argue that the injunction as currently worded could, but should not, be construed to apply to what it calls mere "large equipment," which includes "[t]railed and wheeled equipment with ***smaller white wheels*** and large tanks of more than 500 gallons," such as the equipment in the following photo:



[*Id.*] FIMCO further argues that the injunction does not and should not apply to "utility equipment," which includes "Commercial, Turf, Lawn & Garden equipment with ***smaller white wheels*** and a 500 gallon or smaller tank," as is displayed in the following picture:



[*Id.* at 14.] According to FIMCO, both large equipment and utility equipment have small white wheels, which indicates that they are "not designated for agricultural use." [*Id.* at 23.]

Next, FIMCO argues that the injunction does not and should not apply to "mounted equipment," which does not have wheels at all:



[*Id.* at 14–15.] And finally, FIMCO claims that the injunction does not and should not apply to its "lawn and garden equipment," which also does not have wheels, such as the following piece of equipment:



[*Id.* at 15.]

      FIMCO's argument that the injunction should only extend to "FIMCO's green framed and yellow wheeled agricultural sprayers and applicators," [DN 388 at 6], rests on two main points. First, FIMCO claims that the text of Deere's "three trademarks at issue expressly require bright green frames/bodies and bright yellow wheels." [*Id.* at 16.] Therefore, according to FIMCO, "it is axiomatic that products with frames/bodies of a color other than bright green and wheels of a color other than bright yellow cannot infringe." [*Id.*] Second, FIMCO argues that Deere's complaint and Deere's evidence at trial was limited solely to FIMCO's green and yellow "'trailed and wheeled' agricultural equipment," and therefore that the injunction cannot extend to any type of equipment that does not meet that description. [*Id.* at 19.]

      However, the Court has consistently rejected FIMCO's arguments that the only equipment or color arrangement that can infringe Deere's trademark rights are those that are *identical* to the equipment and marks over which Deere has trademark rights. As the Court explained in its Memorandum Opinion and Order denying FIMCO's motion for summary judgment, [DN 161], "[t]he appearance of the litigated marks side by side in the courtroom does not accurately portray market conditions." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 283 (6th Cir. 1997) (quoting *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1106 (6th Cir. 1991)).

Rather, courts must determine whether a given mark would confuse the public when viewed alone, in order to account for the possibility that *sufficiently similar marks* "may confuse consumers who do not have both marks before them but who may have a 'general, vague, or even hazy, impression or recollection' of the other party's mark."

*Id.* (quoting *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1188 (6th Cir. 1988)). Accordingly, "courts must view marks in their entirety and focus on their overall impressions, not individual features." *Id.* This approach is commonsense when considering the fact that "[o]wnership of a mark confers both the right to use a particular mark and the right to prevent others from using *the same or a confusingly similar mark*." *Homeowners Grp.*, 931 F.2d at 1106. Therefore, whether FIMCO's equipment is trailed or wheeled and whether it uses the exact same placement of green and yellow as is recited in Deere's trademarks is not the issue. Whether FIMCO's use of green and yellow is "confusingly similar," however, is the question for trademark infringement purposes.

And for trademark dilution purposes, the question is whether an "association aris[es] from the *similarity* between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark." 15 U.S.C § 1125(c)(2)(B) (emphasis added). In the dilution context, "[t]he purpose . . . is to provide a narrow remedy when the similarity between two marks is great enough that even a noncompeting, nonconfusing use is harmful to the senior user." *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 805–06 (6th Cir. 2004) (quoting *Jet, Inc. v. Sewage Aeration Sys.*, 165 F.3d 419, 425 (6th Cir. 1999)). In the Court's Findings of Fact and Conclusions of Law, the Court noted that the parties stipulated to the fact that the green and yellow colors FIMCO uses on its equipment are indistinguishable from the green and yellow colors Deere uses. [DN 369 at 70, 95.] Additionally, the Court found that "the placement of the green and yellow colors on the parties' respective agricultural equipment is also very similar. FIMCO's sprayers and applicators predominantly feature yellow tanks, yellow wheels, and green

frames. [*See, e.g.*, PX-301; PX-331.] Likewise, Deere's sprayers and applicators feature yellow tanks, yellow wheels, and green frames. [*See, e.g.*, PX-6; PX-7.]." [*Id.* at 70.] Finally, the Court noted that "photographs of FIMCO trailed agricultural equipment being pulled by John Deere tractors likewise show the high degree of similarity between the use of green and yellow on the two types of goods." [*Id.* at 96.] Therefore, while FIMCO is correct that district courts "should limit the scope of the injunction to the conduct 'which has been found to have been pursued or is related to the proven unlawful conduct,'" *Howe v. City of Akron*, 801 F.3d 718, 753 (6th Cir. 2015) (quoting *E.E.O.C. v. Wilson Metal Casket Co.*, 24 F.3d 836, 842 (6th Cir. 1994)), any confusingly similar use of green and yellow properly fits within the purview of an injunction in this case.

As Deere points out, courts issuing injunctions after finding trademark infringement and trademark dilution have not limited those injunctions only to the *exact* goods or services that were found to use the protected trademark in an infringing manner, as FIMCO seeks to do here. For instance, Deere cites to the Michigan district court's decision in *Audi AG v. D'Amato*, in which the infringing party used various Audi trademarks and logos on merchandise offered for sale on his website, *www.audisport.com*. *Audi AG v. D'Amato*, 381 F. Supp. 2d 644, 649, 660 (E.D. Mich. 2005), *aff'd*, 469 F.3d 534 (6th Cir. 2006). Though the defendant used Audi's logos on hats and shirts (as did Audi itself), the district court enjoined the defendant from any use of Audi's trademarks and logos on "*any service or product*," not just hats and shirts. *Id.* at 669 (emphasis added). In detail, after finding both trademark infringement and trademark dilution, the district court enjoined the defendant from "using any simulation, reproduction, counterfeit, copy or colorable imitation of the Audi Trademarks or trade dress in connection with the promotion, advertisement, display, sale, offering for sale, manufacture, production, circulation or

distribution *of any service or product*." *Id.* The Sixth Circuit affirmed the district court's decision and award of injunctive relief. *Audi AG v. D'Amato*, 469 F.3d 534, 550 (6th Cir. 2006).

More recently, in *Rolls-Royce Motor Cards Ltd. v. Davis*, the district court found that the defendant infringed on Roll's Royce's trademarks when he "record[ed] and s[old] music under the stage name 'Rolls Royce Rizzy,'" "advertise[d] his music under that name on his YouTube channel," sold "shirts that contain[ed] the words 'Team Rolls Royce' through his online store, http://rollsroycerizzy.spreadshirt.com," and "ma[de] use of the RR Badge." *Rolls-Royce Motor Cards Ltd. v. Davis*, No. 15-0417 (KM), 2016 WL 3913640, at *1 (D. N.J. Mar. 11, 2016). Though the defendant used Roll's Royce's trademarks in a different manner than Rolls Royce does, in connection with the distribution of Rolls Royce vehicles, the district court nonetheless permanently enjoined defendant from using those trademarks, 'or any other reproduction, copy, or colorable imitation of the ROLLS-ROYCE mark *in any manner in connection with the conduct of his business*, either alone or in conjunction with other words." *Id.* at *11.

Our sister district court in *Maker's Mark Distillery, Inc. v. Diageo North America, Inc.*, similarly enjoined the defendants from using Maker's Mark's red dripping wax seal not only on the exact Cuervo bottle that was found to be infringing, but in connection with *any* "Cuervo tequila products at any locality within the United States." *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 703 F. Supp. 2d 671, 702 (W.D. Ky. 2010), *aff'd*, 679 F.3d 410 (6th Cir. 2012).

Based on the above cases, the Court disagrees with FIMCO's argument that the injunction should extend "only [to] trailed and wheeled agricultural sprayers and applicators." [DN 394 at 10.] The Court is also skeptical of FIMCO's distinctions between what it now refers to as its "ag equipment," "large equipment," "utility equipment," "mounted equipment," and

"lawn and garden equipment," all marketed under FIMCO's Ag Spray brand. [*See* DN 388 at 13–15.] As Deere points out, FIMCO has never made these distinctions between the equipment in its Ag Spray division at any point in this litigation until now. Rather, at trial, Dave Wipson, FIMCO's President and COO, testified that FIMCO has "two divisions. We have what we consider our lawn and garden division, which goes under the FIMCO brand, and then we have our ag division, which currently goes under the Ag Spray brand." [DN 238 at 41 (Dave Wipson Trial Testimony).] Wipson further explained that the FIMCO lawn and garden equipment is generally "white with red and black accents," and primarily includes such equipment as fifteen to forty gallon sprayers and "a full line of attachments that would typically go behind a lawn and garden tractor or riding lawnmower or an ATV. So we offer carts that can be towed behind, aerators, spikers, things that you would use to take care of an acre-size lawn or so." [*Id.* at 41–42.]

With regard to FIMCO's Ag Spray division, Wipson explained that "Ag Spray" is "the brand that we use on the ag side of our business. And our primary colors that we use for ag sprayers is green and yellow." [*Id.* at 43.] Wipson testified at length that the Ag Spray division includes several different types of agricultural equipment:

> [W]e have our large ag implements, which is what we're talking about today, for the most part, which is our professional-grade sprayers and applicators. Those are generally 1,000 gallon to roughly 2,000 gallon types of equipment, very heavy-duty types of equipment designed to go in a field, row crop, towed behind a decent-sized tractor. We also offer smaller sprayers that are not as robust, don't have as much clearance, and those generally tend to be maybe 500 but for the most part 300 gallons on down. We also offer a fairly wide range of three-point hitch-mounted sprayers that go on the back of a tractor and have a boom that go with them. We have a fairly extensive line of UTV type or a utility type of vehicle that can either go in -- it's normally going to be mounted in the back on a skid and then also has a boom. We also offer a wide array of spot sprayers where it's just a tank and a gun and you're going along and doing fence row spraying, those kinds of things. And then we also have a complete line of fluid-handling equipment, which involves trailers and tanks. We make both storage tanks so that the trailer

can move a tank from place to place, but it's not designed to be moved when it's full of liquid, just more of a storage tank. And then we also offer nurse trailer -- a full line of nurse trailers, where those trailers are designed to actually move liquid into the field to fill up stationary types of tanks. And then we're also the largest parts supplier in the country for all the various major name brands of companies, such as Hypro, my former employer, as well. So that's also a big part of our business. And then we sell a lot of just plain storage tanks where we're not making metal to a frame or some way to move it, just the storage tanks themselves. We also sell a lot of those.

[*Id.* at 43–44.]

This testimony contradicts FIMCO's newly-claimed distinctions among its Ag Spray equipment. Wipson's testimony indicates that all of the equipment FIMCO seeks to distinguish between, including its green and yellow Ag Spray-branded "large equipment," "utility equipment," "mounted equipment," and "lawn and garden equipment," can all be used for agricultural activities. For example, Wipson explained that "three-point hitch-mounted sprayers [ ] go on the back of a tractor and have a boom that go with them." [*Id.* at 43.] This is exhibited in the following photo, which depicts an Ag Spray-branded mounted 3-point sprayer attached to a John Deere Tractor:



[PX-222 at 14.] Similarly, Ag Spray offers a "utility type of vehicle that [is] . . . normally going to be mounted in the back on a skid and then also has a boom." [*Id.*] Additionally, Ag Spray "spot sprayers" are used for "doing fence row spraying." [*Id.* at 44.] These are all agricultural

uses and activities. Wipson never testified at trial about tank size, wheel size, or wheel color in terms of whether a piece of Ag Spray equipment is "agricultural" or not.

In his Declaration filed along with FIMCO's brief in support of modifying the injunction, Wipson now states that

> FIMCO's use of small white wheels generally indicates that the equipment is nonagricultural. FIMCO generally uses large wheels of 46" to 54" when agricultural sprayers and applicators must stand tall enough to go over the top of row crops and must support a heavy tank. (The Pro 750 elliptical sprayer discussed in FIMCO's brief, which is in the nature of a "crossover" device, uses 38" wheels. Such 38 inch wheels are the smallest wheels offered by FIMCO on agricultural equipment.) FIMCO uses small wheels ranging from 8" to 15" on non-agricultural equipment (utility, turf and lawn and garden).

[DN 390 at 3 (Wipson Declaration).] However, the fact that Wipson never testified to these facts at trial, and the fact that he qualifies his statements in this Declaration with "generally" do not assuage the Court's skepticism. Additionally, FIMCO cites no evidence to support Wipson's post-trial statements that smaller wheels "generally" indicate that a piece of equipment is "nonagricultural." In sum, based on the above-cited cases extending injunctions to several aspects of an infringing defendant's business and Wipson's trial testimony about FIMCO's Ag Spray division, the Court does not find that limiting the injunction only to large agricultural sprayers and applicators, to the exclusion of other Ag Spray products, is proper.

However, the Court also finds that Deere's proposal to modify the injunction to extend it to "all goods and services of FIMCO" would be overly broad at this time. Deere argues that the injunction should extend this expansively, in part, because it prevailed on its dilution claim, which "protects famous marks from being watered down even by use on non-competing or unrelated goods, so the rights it protects are even broader than trademark infringement law." [DN 380 at 8.] According to Deere, "[b]ecause of dilution's broad sweep, courts routinely issue expansive injunctions in dilution cases that enjoin a losing defendant from using any similar

mark on *any* goods." [DN 380 at 9 (citing cases).] On the other hand, Deere acknowledges that the FIMCO-branded lawn and garden equipment, traditionally colored white, red, and black, "w[as] not directly in issue in the case . . . because FIMCO has used other colors on such equipment." [DN 393 at 12.][2] Because those types of equipment were not at issue in the case and because FIMCO-branded equipment (as opposed to Ag Spray-branded equipment) has a white, red, and black color scheme, the Court does not find that extending the injunction to all of FIMCO's goods and services to be appropriate at this time.

That being said, the Court does agree with Deere that, at the very least, based on the above-cited cases, "[b]oth dilution and trademark infringement law counsel enjoining FIMCO from using the Deere Colors on any agricultural equipment, not just wheeled or trailed equipment." [DN 380 at 10.] The question then becomes how to define "agricultural equipment," which the parties heartily debate here. For purposes of the "Amended Injunction," which will be fully detailed below, the term "agricultural equipment" will be deemed to refer to "all Ag Spray-branded equipment, and any and all other equipment, regardless of whether it is wheeled, trailed, mounted, or has a tank, and regardless of any wheel or tank size or color, that is capable of use in agricultural activities and that is commonly used for agricultural purposes." The Court will incorporate this language into the Amended Injunction below.

### 2. Color Arrangements Covered

Next, the parties dispute the color combinations and the color placements that the injunction prohibits FIMCO from using on its equipment. As it is currently worded, the injunction prohibits FIMCO "from using a combination of green and yellow colors in the manufacture, sale, offering for sale, distribution, promotion, marketing, or advertising of FIMCO

---

[2] However, as the Court explains below, if FIMCO were to transition into using green and yellow on its FIMCO-branded lawn and garden equipment in the future, this could present grounds for modifying the injunction pursuant to the Safe Distance Rule.

. . . equipment." [DN 369 at 106.] The Court explained that the "injunction does not prohibit . . . using solely the color green or solely the color yellow in connection with agricultural equipment, nor does it prohibit the use of green with another color or yellow with another color. However, it does prohibit the use of *any combination* of green and yellow together on a piece of equipment." [*Id.*]

FIMCO urges the Court to amend the injunction to narrow it only to equipment "with bright green frames/bodies and bright yellow wheels." [DN 394 at 12.] Under this definition, FIMCO contends that the following piece of "large equipment" would not be covered by the injunction by virtue of the fact that it has white, rather than yellow wheels:



[DN 388 at 13.] Again, FIMCO bases its argument on the grounds that the injunction cannot extend to any color arrangement other than what is explicitly mentioned in Deere's registered trademarks, or what was displayed at trial. This would create a largely ineffective injunction, however. Allowing FIMCO to continue to make and sell the above piece of equipment, with a bright green frame and a bright yellow tank, would surely not adequately protect Deere's rights against trademark infringement and trademark dilution.

Indeed, courts crafting injunctions regularly prohibit the use of not only the exact same mark as the plaintiff's, but also any confusingly similar marks. This goes back to the precept that a defendant's use of a mark need not be *identical* to the plaintiff's mark in order to be infringing.

Rather, "[o]wnership of a mark confers both the right to use a particular mark and the right to prevent others from using *the same or a confusingly similar mark*." *Homeowners Grp.*, 931 F.2d at 1106. Therefore, as the Court explained above,

> courts must determine whether a given mark would confuse the public when viewed alone, in order to account for the possibility that *sufficiently similar marks* "may confuse consumers who do not have both marks before them but who may have a 'general, vague, or even hazy, impression or recollection' of the other party's mark."

*Daddy's*, 109 F.3d at 283 (quoting *Wynn Oil*, 839 F.2d at 1188).

In *Wynn Oil v. American Way Service Corporation*, for example, the Sixth Circuit upheld the district court's determination that the defendant infringed on plaintiff's trademark, "X-TEND," and also upheld the district court's injunction prohibiting the defendant's use of "the word or term 'X-TEND' *or any other designation confusingly similar to 'X-TEND.'*" *Wynn Oil Co. v. Am. Way Serv. Corp.*, 943 F.2d 595, 598 (6th Cir. 1991). In doing so, the court explained that "an injunctive command that one cease using a word that is 'confusingly similar' to an existing trademark is common in trademark case injunctions" and that, in certain circumstances, "such a command is necessary to prevent the infringer from making an insignificant change in the mark to avoid the injunction and then using the altered mark in a confusingly similar manner." *Id.; see also Innovation Ventures, LLC v. N2G Distrib., Inc.*, No. 08-CV-10983, 2013 WL 2145677, at *1 (E.D. Mich. May 15, 2013), *aff'd*, 763 F.3d 524 (6th Cir. 2014) (Permanently enjoining the defendants from "(a) us[ing] the 5 HOUR ENERGY trademark, and/or (b) us[ing] marks that are confusingly similar to the 5 HOUR ENERGY trademark.").

FIMCO argues, however, that *Wynn Oil*, *Audi*, *Rolls Royce*, and other cases cited by Deere are all distinguishable because they dealt with trademarked words rather than colors. According to FIMCO, in those cases, "the courts did not expand the plaintiffs' trademarks. None of them prohibited any combination of the *letters* used in the plaintiff's trademark. Nor did any

14

of them prohibit any combination of two colors. The injunctions prohibited only the use of marks nearly identical to the plaintiffs' trademarks. Thus, the courts prohibited only what the trademarks in those cases protected." [DN 394 at 14–15 (emphasis added).] However, FIMCO is not entirely correct in its assertion. As the Court noted above, the *Wynn Oil* district court enjoined defendant's use of "the word or term 'X-TEND' *or any other designation confusingly similar to 'X-TEND.'" Wynn Oil*, 943 F.2d at 598. The Sixth Circuit upheld the injunction, explaining that "such a command is necessary to prevent the infringer from making an insignificant change in the mark to avoid the injunction and then using the altered mark in a confusingly similar manner." *Id.* at 609. That is precisely what FIMCO seeks to do here, where it contends that merely switching out yellow wheels for white wheels would prevent any infringement or dilution.

The Sixth Circuit used the same prohibition in *Elvis Presley Enterprises, Inc. v. Elvisly Yours, Inc.*, in which the injunction prohibited the defendant from "using the name, likeness and image of Elvis Presley or any trademarks of the plaintiff or any trademarks confusingly similar thereto, for the purposes of the sale, distribution, marketing, advertising and licensing of unauthorized goods or services in the United States." *Elvis Presley Enterprises, Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 897 (6th Cir. 1991); *see also Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 524 (10th Cir. 1987) (Upholding an injunction prohibiting the defendant from "producing and selling any spincast fishing reel in the present configuration of the Spinit SR–210 or any other spincast reel having an appearance confusingly similar to or identical to the Zebco Model 33 spincast fishing reel."); *Big Boy Restaurants v. Cadillac Coffee Co.*, 238 F. Supp. 2d 866, 873 (E.D. Mich. 2002) ("Thus, enjoining Defendant from using a mark confusingly similar to Big Boy's mark would best serve the public interest.").

In sum, the Court disagrees that an injunction prohibiting only "specific colors in specific places" is required in this case. [DN 388 at 16.] To the contrary, the injunction must protect against FIMCO's future "confusingly similar" use of green and yellow on agricultural equipment. Therefore, the Court will amend the language of the injunction slightly to prohibit the "use of *any confusingly similar combination* of green and yellow together on a piece of agricultural equipment."

### a) Yellow Levers and Knobs

FIMCO also raises additional issues with the Court's prohibition of the use of a combination of green and yellow. First, FIMCO asserts that "there are industry standard levers and knobs that are yellow used on such equipment." [DN 388 at 20.] Some examples of the small yellow parts to which FIMCO refers are shown below:

 

 

[*See* DN 390-3.] However, in his declaration, Wipson only states that FIMCO's "Green Steel products [ ] have certain yellow parts, ranging in size from only a few inches to perhaps less than two feet." [DN 390 at 1.] Though FIMCO states in its brief that such yellow parts are "industry

standard," Wipson never makes such a statement in his accompanying declaration. Wipson never states that the yellow parts on FIMCO's equipment are only available in yellow or even that they are the "industry standard" color for all such parts on agricultural equipment. [*See* DN 390.] In any event, however, as Deere points out, the small yellow parts would only become an issue if FIMCO chooses to use green frames or bodies for its equipment going forward. [DN 393 at 23.] Recently, after the filing of the parties briefing regarding the injunction, FIMCO has informed the Court that it is in the process of "launching an entirely new color scheme for its agricultur[al] equipment" that is entirely black and gray. [DN 396 at 4.] Therefore, even if the small yellow parts such as the ones shown above are, in fact, industry standard, it will not violate the injunction for FIMCO to continue using them. As the injunction indicates, only the *confusingly similar combination* of green and yellow is prohibited. Small yellow parts on a gray and black piece of equipment would not violate the injunction.

### b) Yellow Labels

Next, FIMCO contends that "the law requires the posting of certain yellow caution labels on equipment." [DN 388 at 12.] In Wipson's declaration, he states only that "FIMCO is required to post certain caution labels on its equipment, including the ag sprayers and applicators at issue here." [DN 390 at 1.] However, Wipson cites no evidence, statute, or regulation in support of this statement. Nonetheless, Deere states in its briefing that "to the extent FIMCO is, in fact, *legally required* to include yellow labels of a certain size on its equipment, Deere would concede that the combination of such labels with any green on the equipment should not be seen as running afoul of the Court's prohibition on any combination of green and yellow." [DN 393 at 23.] Moreover, as the Court explained above, because FIMCO has chosen a black and gray color scheme, the use of such yellow caution labels, if they truly are legally required, would not violate

the injunction. Accordingly, the issues of FIMCO's use of small yellow parts and yellow labels are moot, as they will not violate the Court's injunction when used with FIMCO's new black and gray color scheme.

### 3. Sell-Off Period

The next issue the parties request the Court to address is whether FIMCO should be allowed a period to sell off its infringing agricultural equipment and, if so, how long of a time period it should be allowed to do so.

> In balancing the equities of the case, the court may delay the implementation of an injunction so as to allow an infringer time to change to a different mark or time to sell off its available supply of articles already marked with an infringing trademark. Allowing such a sell-off of infringing goods avoids the wastefulness of extensive relabeling or trashing the existing stock of goods bearing an infringing mark.

5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 30:3 (5th ed.). FIMCO argues that "this Court should . . . allow FIMCO to advertise and sell-off its Affected Inventory of 90 agricultural sprayers and applicators for a period of 12 months from the date of this Amended Injunction." [DM 388 at 31.] In support of this argument, FIMCO cites to cases in which courts have allowed infringing parties various time periods to sell of their infringing inventory. *See, e.g.*, *Attrezzi, LLC v. Maytag Corp.*, 436 F.3d 32, 42 (1st Cir. 2006) (Affirming the district court's grant of a 12–month sell-off period); *Anhing Corp. v. Thuan Phong Co. Ltd.*, 2015 WL 4517846, at *26 (C.D. Cal. July 24, 2015) (Granting a six-month sell-off period); *Derek & Constance Lee Corp. v. Kim Seng Co.*, No. CV053635ABCMANX, 2010 WL 11508468, at *1 (C.D. Cal. Apr. 5, 2010), *aff'd*, 467 F. App'x 696 (9th Cir. 2012) (Recognizing the court's own prior grant of a six-month sell-off period).

FIMCO further identifies several factors that it believes weigh in favor of a 12-month sell off period for its infringing inventory. These include the facts that 1) Deere did not move for a

preliminary injunction, 2) Deere allegedly has no lost sales or monetary damages, 3) FIMCO's conduct was not willful or malicious, 4) Deere allowed other companies with which it entered into settlement agreements to sell of its existing green and yellow equipment, 5) FIMCO already bears the cost of stopping assembly of green and yellow equipment, deigning a new color scheme, and designing new marketing materials, 6) FIMCO could likely sell off its 90 units within twelve months, 7) it is not feasible for FIMCO to repaint its existing 90 pieces of equipment, 8) FIMCO has been and will continue to display signs at its stores stating that its existing green and yellow inventory is not associated with John Deere, 9) FIMCO plans to commence a new color scheme and marketing efforts by October 1, 2018, and 10) the agricultural economy is currently very poor and therefore FIMCO needs at least one year to substantially reduce its green and yellow equipment. [DN 388 at 27–31.]

Deere, on the other hand, contends that FIMCO is not entitled to any sell-off period at all, but at the very least, FIMCO should have only until January 13, 2018, three months from the Court's initial injunction entered October 13, 2017. [DN 380 at 20–21.] In response to the cases cited by FIMCO in which courts granted sell-off periods, Deere claims that those cases are distinguishable because, "in almost every one of those cases, the defendant had made a factual showing of the specific hardship from not being able to sell off—a showing FIMCO has not and cannot make here." [DN 393 at 24.] According to Deere, FIMCO cannot show such a hardship "given the relative ease and minimal expense with which it could repaint its existing units and quickly transition to a new color scheme for all its agricultural equipment." [*Id.*] Moreover, Deere alleges that, because the Court found trademark infringement *and* trademark dilution in this case, a sell-off period is not appropriate because any continued sales by FIMCO would continue to dilute the strength of Deere's trademarks. [*Id.* at 25.]

In response, FIMCO contends that it would, in fact, be highly infeasible for it to repaint its 90 finished green and yellow units. FIMCO states that, accompanying its brief, it

> has submitted testimony that the process would be much more involved and necessarily include a high cost. (Declaration of Wipson, pp. 3-4 & Ex. E; Declaration of Mike Norton, ¶¶ 1-9), This is because FIMCO does not wet-paint the Affected Equipment; it powder coats them which applies the color. To change the color of fully assembled Affected Equipment, such units would have to be shipped back to North Sioux City, completely disassembled, the powder coat burned off, the residue powder coat shot-blasted off, the equipment powder coated again with new colors, then the unit re-assembled and shipped back to company stores. (*Id.*). As a result, this is not a reasonable or financially viable option.

[DN 394 at 24–25.] Deere replies to this argument by citing the declaration of its "paint expert," who states that

> [r]epainting equipment frames "is relatively simple and can be done at a reasonably low cost in the field without significant sacrifices for quality," and without the need for long periods of time or highly skilled or trained labor. Dkt. 385 ¶¶ 5–12. As Mr. Krohn explained further, this is true even for powder-coated equipment, which could be disassembled, sanded, and repainted in about two hours by an average worker. Krohn Supp. Decl. ¶¶ 4–5.

[DN 393 at 28.] Despite the parties' conflicting arguments, the Court agrees that FIMCO has shown at least some hardship at the prospect of disassembling and repainting 90 pieces of equipment.

Deere further states that it "decided not to *seek* lost sales or monetary damages because it simply wanted FIMCO to stop using the Deere Colors," not because it has not suffered any lost sales or monetary damages. [*Id.* at 27.] According to Deere, "[s]uch reasonableness on Deere's part should not be used to justify allowing FIMCO to use the Deere Colors even longer." [*Id.*] With regard to FIMCO's argument about the costs associated with designing a new color scheme and marketing efforts and about the poor agricultural economy, Deere claims this is simply irrelevant. As to the allegedly poor state of the agricultural market, Deere argues that "FIMCO

cites no evidence for this and, in any event, there is no rule that FIMCO is entitled to extra sell-off time so it can dispose of its entire inventory of infringing and diluting equipment." [*Id.* at 28.]

Overall, there are arguments on both sides as to whether the Court should grant FIMCO a sell-off period and how long such a period should be. On one hand, Deere succeeded in proving that FIMCO's use of green and yellow both infringes and dilutes Deere's trademarks. On the other hand, the Court concluded in its Findings of Fact and Conclusions of Law that there was insufficient evidence to find that "that FIMCO . . . selected the green and yellow colors with the 'intent of causing confusion,' *Homeowners*, 931 F.2d at 1111, or that FIMCO . . . had knowledge that Deere's green and yellow colors were a 'protected mark.'" [DN 369 at 85.] Moreover, FIMCO has a significant number of finished infringing units, and not allowing FIMCO a reasonable amount of time to sell off those units would likely cause "wastefulness of extensive relabeling or trashing the existing stock of goods bearing [the] infringing mark." 5 McCarthy, *supra*, at § 30:3. Additionally, the Court does not find that allowing FIMCO a reasonable time period to sell off certain inventory is likely to cause significant additional harm to Deere's trademarks. *See Attrezzi*, 436 F.3d at 43 ("[T]here is no indication that the risk of harm to Attrezzi LLC's service mark is likely to increase appreciably because of the additional 12 months of Maytag's competing use; and we think that the district judge acted within his discretion."). Finally, even Deere acknowledges that "[u]ltimately, whether to grant a sell-off period is in the Court's discretion." [DN 393 at 26.]

Taking into consideration the fact that FIMCO has a significant number of finished units, the number of which will likely increase due to the Court's definition of "agricultural equipment" stated above and as used in the Amended Injunction below, the Court finds that a sell-off period of twelve months from the entry of the Court's Order and Judgment in the case is

reasonable. Therefore, FIMCO will have until October 13, 2018 to sell-off its existing infringing inventory as defined in the Amended Injunction below. According to Deere, however, "there is a vast difference between selling off existing infringing inventory to avoid waste and . . . the 'promotion, marketing, or advertising of FIMCO trailed and wheeled agricultural equipment,'" which Deere contends FIMCO should not be permitted to do. [DN 395 at 4.] Deere argues that, "[e]ven assuming a sell-off period, FIMCO should be advertising and promoting its *new* color scheme for *all* trailed agricultural equipment, and selling off existing stock along the way." [DN 397 at 2.]

In response, FIMCO argues that it "cannot sell off its existing inventory of green and yellow agricultural equipment without displaying it and offering it for sale." [DN 396 at 2.] Moreover, FIMCO states that it "has and will continue to display signs at its 10 company stores and at farm shows conspicuously stating that 'THIS EQUIPMENT IS NOT MANUFACTURED BY, OR ASSOCIATED OR AFFILIATED WITH JOHN DEERE.'" [*Id.*] However, Deere contends that "FIMCO is mistaken that its small disclaimer sign eliminates harm to Deere. In fact, disclaimers can worsen confusion--and actually *cause* dilution--by explicitly reminding consumers of Deere and its famous mark." [DN 395 at 4.] In support of this argument, Deere cites to a 1989 case out of the Eastern District of California and a 1997 case out of the Northern District of Iowa. [*Id.*] *See E. & J. Gallo Winery v. Gallo Cattle Co.*, No. CV-F-86-183 REC, 1989 WL 159628, at *19 (E.D. Cal. June 19, 1989), *aff'd*, 955 F.2d 1327 (9th Cir. 1992), *opinion amended and superseded*, 967 F.2d 1280 (9th Cir. 1992) ("The Field survey indicates that including a disclaimer on Defendants' label will not reduce the incidence of consumer confusion. Inclusion of a disclaimer on Defendants' label will *ipso facto* dilute the Gallo trademark . . . A disclaimer would be likely to contribute to source confusion. Labels for low-involvement

products like cheese, salami and wine often are not read with great care."); *Green Prod. Co. v. Indep. Corn By-Prod. Co.*, 992 F. Supp. 1070, 1076 (N.D. Iowa 1997) ("ICBP's argument is analogous to saying that ICBP has the right to hang a sign in front of its store that reads, 'Green Products.' When customers enter the store expecting to be able to see (and possibly, to buy) products made by Green Products, ICBP then announces, 'Actually, this store isn't owned by Green Products; it's owned by ICBP. We don't sell anything made by Green Products, but as long as you're here, we'll tell you how our products are better than Green Products.'").

The Court does not find either of these cases to be particularly persuasive. In *E & J. Gallo Winery*, the court found that a disclaimer would not be effective to reduce confusion because 1) a field survey entered into evidence in the case indicated that such a disclaimer would not reduce confusion and 2) because the labels on which the disclaimer would be placed, which would be on cheese, salami, and wine products, are not likely to be read with great care by customers. *E. & J. Gallo Winery*, 1989 WL 159628, at *19. Neither of these circumstances exists in this case.

In *Green Products*, the defendant argued that its use of the domain name "greenproducts.com," which was similar to plaintiff's mark, Green Products, Co., was non-infringing because "greenproducts.com" did not actually lead to a website that sold any Green Products goods. *Green Prod. Co.*, 992 F. Supp. at 1076. The court rejected this argument, reasoning that it was "analogous to saying that ICBP has the right to hang a sign in front of its store that reads, 'Green Products,'" when in fact it does not sell anything made by Green Products. *Id.* In that situation, the defendant would still be "capitalizing on the strong similarity between Green Products' trademark and ICBP's domain name to lure customers onto its web page." *Id.* This is quite distinguishable from FIMCO's practice in this case, which is to post a

sign clearly stating that its green and yellow equipment is in *no way* manufactured by, affiliated with, or associated with John Deere.

In sum, the Court concludes that from now until October 13, 2018, FIMCO shall be permitted to market, advertise, and display its infringing agricultural equipment in order to effectuate the sales thereof. However, FIMCO must continue to post conspicuous signs around all infringing agricultural equipment and in all advertisements therefor making clear that the agricultural equipment is not affiliated in any way with John Deere.

### 4. Amended Injunction

Consistent with the matters discussed above, the Court will issue the following Amended Injunction:

> Defendant FIMCO, Inc. and its affiliates, officers, agents, servants, employees, attorneys, and all other persons in active concert or participation with FIMCO are hereby permanently enjoined from using a combination of green and yellow colors that is confusingly similar to the color scheme over which Deere has protected trademark rights in the manufacture, sale, offering for sale, distribution, promotion, marketing, or advertising of any FIMCO agricultural equipment at any locality within the United States. As used herein, the term "confusingly similar" is meant to prohibit FIMCO from making minor or insignificant changes to a piece of agricultural equipment with a green and yellow color scheme, such as adding white wheels, in an effort to avoid violating this injunction. As used herein, the term "agricultural equipment" will be deemed to refer to "all Ag Spray-branded equipment, and any and all other FIMCO equipment, regardless of whether it is wheeled, trailed, mounted, or has a tank, and regardless of any wheel or tank size or color, that is capable of use in agricultural activities and that is commonly used for agricultural purposes."

> This injunction does not prohibit the above described persons and entities from using solely the color green or solely the color yellow in connection with agricultural equipment, nor does it prohibit the use of green with another color or yellow with another color. However, it does prohibit the use of *any confusingly similar combination* of green and yellow together on a piece of agricultural equipment.

> Though FIMCO is prohibited from manufacturing any new infringing agricultural equipment as defined in this injunction, FIMCO shall have until October 13, 2018 to sell off any existing, completed infringing inventory. FIMCO is permitted to

market, advertise, and display such infringing agricultural equipment only to the extent necessary to bring about the sale thereof. In marketing and advertising such agricultural equipment, FIMCO shall post, along with every advertisement or display, a conspicuous disclaimer explaining that such agricultural equipment is not affiliated with John Deere & Company.

## 5. Future Modifications or Contempt Proceedings

The Court cautions that, while the Amended Injunction extends only to "agricultural equipment" as defined above, rather than "all goods and services of FIMCO," and extends only to "*any confusingly similar combination* of green and yellow," the Court retains the power to modify the injunction going forward to prevent further infringing conduct. *See LFP IP, LLC v. Hustler Cincinnati, Inc.*, 810 F.3d 424, 426 (6th Cir. 2016) ("Courts have long held the power to modify injunctions, whether to narrow or broaden them. Injunctions frequently demand 'continuing supervision by the issuing court and always a continuing willingness to apply its powers and processes on behalf of the party who obtained that equitable relief.'") (quoting *Sys. Fed'n No. 91, Ry. Employes' Dep't v. Wright*, 364 U.S. 642, 647 (1961)).

For example, the Safe Distance Rule, recognized in the Sixth Circuit, "prevent[s] known infringers from using trademarks whose use by non-infringers would not necessarily be actionable." *Innovation Ventures, LLC v. N2G Distrib., Inc.*, 763 F.3d 524, 544 (6th Cir. 2014) (quoting *Taubman Co. v. Webfeats,* 319 F.3d 770, 778–79 (6th Cir. 2003)). In detail,

> The Safe Distance Rule gives courts a particularly useful tool in crafting and enforcing permanent injunctions. Once a party infringes on another's trademark or trade dress, the confusion sowed "is not magically remedied" by *de minimis* fixes. "Instead, the confusion lingers, creating the need for the infringer not only to secure a new non-infringing name (or other infringing characteristic) for his product, but one so far removed from any characteristic of the plaintiff so as to put the public on notice that the two are not related." In contempt proceedings, the Safe Distance Rule "reliev[es] the reviewing court of the need to retry the entire range of issues that may be relevant in an infringement action for each small variation the defendant makes to the enjoined mark." *PRL USA Holdings, Inc. v. U.S. Polo Ass'n, Inc.,* 520 F.3d 109, 118 (2d Cir. 2008). If the law were otherwise, an enjoined party "could simply make a tiny change and start a new trademark

> contest all over again in the context of the contempt hearing as to use of the 'new' format." 5 McCarthy on Trademarks and Unfair Competition § 30:21 (4th ed.2013).

*Id.* (internal citations omitted). Importantly, "[t]he Safe Distance Rule . . . is particularly apt . . . where a serial infringer has tinkered with products to skirt a permanent injunction for commercial gain. *Id.* at 545; *see also id.* at 546 ("Applying the Safe Distance Rule, the district court found that the modified products were confusingly similar to FHE's protected mark. This was not an abuse of discretion. The district court found that 'Defendants' new labels on their Nitro2Go Pure Energy product ha[d] a red-yellow-black color scheme that closely mimics Plaintiff's label: a black bottom with a yellow sunrise fading to red.'") The Court emphasizes that any such attempts by FIMCO to skirt the Amended Injunction issued herein will not be looked upon favorably in any future contempt proceedings between the parties.

## B.  Motion for New Trial

Before the parties submitted briefing on their requests for the Court to modify the injunction, FIMCO moved "to have the Findings and Conclusions (Dkt. No. 369) and Judgment (Dkt. No. 370) altered, amended, vacated and supplemented pursuant to Fed.R.Civ.P. 52 and [ ] for a new nonjury trial pursuant to Fed.R.Civ.P. 59." [DN 379.] Therein, FIMCO requested that the Court vacate, alter, or amend 1) its previous denial of FIMCO's motion for partial summary judgment and 2) its grant of summary judgment to Deere on FIMCO's affirmative defenses of laches and aesthetic functionality. [*Id.* at 1–2.] FIMCO further requested that the Court vacate, alter, or amend its Findings of Fact, Conclusions of Law and Judgment 3) on the grounds that it erroneously admitted and refused to admit certain evidence at trial, 4) insofar as the Court gave weight to the expert report of Hal Poret, 5) as to when the Deere colors became famous, 6) "to the extent the Court rejected the eye witness accounts as to FIMCO's use of the colors yellow and green after FIMCO acquired JDD," 7) because there was insufficient evidence of actual

confusion, 8) because there was insufficient evidence of dilution, 9) to find that yellow tanks are not part of Deere's trademarks or the Court's injunction, 10) to find that Deere failed to present sufficient evidence of confusion or dilution, and 11) to the extent they found against FIMCO on its affirmative defenses and counterclaims. [*Id.* at 2–5.] FIMCO additionally requested that the Court "reconsider the scope and timing of its [i]njunction." [DN 379 at 5.]

FIMCO stated that the extensive relief it very briefly requested in its motion "will be fully described in the upcoming brief and supported by any affidavits submitted at the time to be set by the Court." [*Id.* at 1.] However, the only additionally briefing, affidavits, and declarations submitted by the parties had to do solely with the interpretation, timing, scope, and modification of the permanent injunction. [*See* DN 378 (Order instructing the parties to submit briefs addressing the scope of the injunction); DN 380 (Deere's brief re: modification of injunction); DN 388 (FIMCO's brief re: scope and timing of the injunction); DN 392 (Deere's response re: modification of injunction); DN 392 (FIMCO's reply brief re: scope and timing of the injunction).] The Court has addressed those arguments herein.

As to FIMCO's remaining arguments under Rule 52 and Rule 59, however, FIMCO never briefed those issues. Federal Rule of Civil Procedure 52(b), under which FIMCO moves here, provides that, "[o]n a party's motion filed no later than 28 days after the entry of judgment, the court may amend its findings--or make additional findings--and may amend the judgment accordingly. The motion may accompany a motion for a new trial under Rule 59." Fed. R. Civ. P. 52(b). Indeed, FIMCO also moves for a new nonjury trial under Rule 59. Under that rule, the Court may grant a motion for a new trial "after a nonjury trial, for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court." Fed. R. Civ. P. 59(a)(1)(B). Additionally, "[a]fter a nonjury trial, the court may, on motion for a new trial, open

the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new ones, and direct the entry of a new judgment." Fed. R. Civ. P. 59(a)(2). Finally, under Rule 59(e), a party may move for the Court to "alter or amend a judgment." Fed. R. Civ. P. 59(e). However, FIMCO submitted no supplemental briefing or case law regarding any of the many additional issues it mentioned in its motion to alter, amend, or vacate, or alternatively for a new trial. FIMCO also never requested an extension of time to brief those issues, nor will the Court, at this late date, entertain such a motion. The Court spent considerable time preparing its original Findings of Fact and Conclusions of Law in this matter, and the Court has tediously addressed the current post-trial motions and responses filed by the parties. There comes a time when the trial court must present a final decision. That time is now.

CONCLUSION

For the reasons discussed in detail above, **IT IS HEREBY ORDERED** as follows:

(1) FIMCO's motion to have the Court's Findings of Fact, Conclusions of Law, and Judgment altered, amended, vacated, and supplemented or, alternatively, for a new trial, [DN 379], is **DENIED**.

(2) The Court issues the following **AMENDED INJUNCTION** which supersedes the Court's prior October 13, 2017 injunction:

Defendant FIMCO, Inc. and its affiliates, officers, agents, servants, employees, attorneys, and all other persons in active concert or participation with FIMCO are hereby permanently enjoined from using a combination of green and yellow colors that is confusingly similar to the green and yellow color scheme over which Deere has protected trademark rights in the manufacture, sale, offering for sale, distribution, promotion, marketing, or advertising of any FIMCO agricultural equipment at any locality within the United States. As used herein, the term "confusingly similar" is meant to prevent FIMCO from making minor or insignificant changes, such as adding white wheels or black accents, to a piece of agricultural equipment with a green and yellow color scheme in an effort to avoid violating this injunction. As used herein, the term "agricultural equipment" will be deemed to refer to "all Ag Spray-branded equipment, and any and all other

FIMCO equipment, regardless of whether it is wheeled, trailed, mounted, or has a tank, and regardless of any wheel or tank size or color, that is capable of use in agricultural activities and that is commonly used for agricultural purposes."

This injunction does not prohibit the above described persons and entities from using solely the color green or solely the color yellow in connection with agricultural equipment, nor does it prohibit the use of green with another color or yellow with another color. However, it does prohibit the use of *any confusingly similar combination* of green and yellow together on a piece of agricultural equipment.

Though FIMCO is prohibited from manufacturing any new infringing agricultural equipment as defined in this injunction, FIMCO shall have until October 13, 2018 to sell off any existing, completed infringing inventory. FIMCO is permitted to market, advertise, and display such infringing agricultural equipment only to the extent necessary to bring about the sale thereof. In marketing and advertising such agricultural equipment, FIMCO shall post, along with every advertisement or display, a conspicuous disclaimer explaining that such agricultural equipment is not affiliated with John Deere & Company.

(3) Deere **SHALL**, within **fourteen (14) days** of the issuance of this Memorandum Opinion and Order, file its motion for costs and attorneys' fees. FIMCO shall respond to that motion within **fourteen (14) days**. No replies will be permitted.

There being no just cause for delay, this is a final and appealable order.

**IT IS SO ORDERED**.

Date:

cc:     counsel